No. 15-6002

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

PATRICIA FOLEY-HINNEN
*Petitioner*,

v.

GOVERNMENT ACCOUNTABILITY OFFICE,
*Respondent*.

Appeal from the Government Accountability Office,
Personnel Appeals Board No. 11-03

# Petitioner's Opening Brief

Williams & Rhodes, LLP
Marisa L. Williams
Attorneys at Law
7887 E. Belleview Ave., Suite 1100
Englewood, CO 80111
(303) 220-0303
(303) 840-7370 (fax)
Attorney for Petitioner
Patricia Foley-Hinnen

October 5, 2015

Oral Argument Not Requested

Form 9

**FORM 9. Certificate of Interest**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

PATRICIA FOLEY-HINNEN v. GAO

No. 2015-6002

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party) Petitioner, Patricia Foley-Hinnen certifies the following (use "None" if applicable; use extra sheets if necessary):

1. The full name of every party or amicus represented by me is:

PATRICIA FOLEY-HINNEN

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

4. ☑ The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

The Personnel Appeals Board Office of General Counsel, Senior Trial Attorney Frank Mack, represented Petitioner below.

5/28/15
Date

[signature]
Signature of counsel

Marisa L. Williams
Printed name of counsel

Please Note: All questions must be answered

cc: Domenique Kirchner

**Certificate of Service**

I hereby certify under penalty of perjury that on this 28th day of May, 2015, I filed and served a copy of the foregoing Certificate of Interest electronically on all parties by operation of the Court's electronic filing service.

s/*Marisa Williams*

TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

STATEMENT OF RELATED CASES ........ 1

STATEMENT OF JURISDICTION ........ 1

STATEMENT OF ISSUES ........ 1

STATEMENT OF THE CASE AND RELATED FACTS ........ 2

SUMMARY OF ARGUMENT ........ 9

ARGUMENT ........ 9

I. Ms. Foley-Hinnen's Claim for Retaliatory Reassignment Must be Remanded for Hearing Because the PAB Weighed the Evidence, Failed to Accept Her Evidence as True and Failed to Afford Her All Reasonable Inferences to Which She was Entitled ........ 9

II. Ms. Foley-Hinnen's Claim for Retaliatory Denial of her Detail to State Must be Remanded for Hearing Because the PAB Weighed the Evidence, Failed to Accept Her Evidence as True and Failed to Afford Her All Reasonable Inferences to Which She was Entitled ........ 22

III. Ms. Foley-Hinnen's Retaliation Claims Must be Remanded for Hearing Because the PAB Denied her Due Process of Law ........ 35

CONCLUSION AND RELIEF REQUESTED ........ 36

CERTIFICATES OF SERVICE AND COMPLIANCE ........ 38

ATTACHMENT: PAB FINAL DECISION

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........ 11

*Brady v. Office of Sergeant at Arms*,
520 F. 3d 490 (D.C. Cir. 2008) ........ 30

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........ 18

*Clark County School Dist. v. Breeden*,
532 U.S. 268 (2001) ........ 15

*Crawford v. Metro. Gov't*,
555 U.S. 271 (2009) ........ 15

*First National Bank v. Cities Service Co.*,
391 U.S. 253 (1968) ........ 22

*Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ........ 22

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792 (1973) ........ 11

*Reeves v. Sanderson Plumbing Products, Inc.*,
530 U.S. 133 (2000) ........ 10

*St. Mary's Honor Ctr. v. Hicks*,
509 U.S. 502 (1993) ........ 10

*Solomon v. Vilsack*,
763 F.3d 1 (D.C. Cir. 2014) ........ 18

STATUTES, REGULATIONS, RULES

31 U.S.C. § 751 .......... 35

31 U.S.C. § 753(a)(2), (7) .......... 1

31 U.S.C. § 755(a) .......... 1

42 U.S.C. § 2000e-16(a) .......... 11

4 C.F.R. § 27.1 .......... 35

4 C.F.R. § 28.21(c)(3) .......... 10

Fed. R. Civ. P. 56 .......... 10

Fed. R. App. P. 32 (a)(7) .......... 38

## STATEMENT OF RELATED CASES

Petitioner is not aware of any related cases.

## STATEMENT OF JURISDICTION

Patricia Foley-Hinnen petitions this Court for review of a final agency decision. On April 1, 2015, the U.S. Government Accountability Office (the "GAO" or "Agency") Personnel Appeals Board (the "PAB") issued the "Decision on Petitioner's Appeal from the Initial Decision of the Administrative Judge" (the "Final Agency Decision" or "FAD") in *Foley-Hinnen v. GAO*, PAB Docket No. 11-03. [App. 1-112]. Ms. Foley-Hinnen timely filed her Notice of Petition for Review with this Court on April 30, 2015.

This Court has jurisdiction over the petition pursuant to 31 U.S.C. § 755(a) because the Final Agency Decision disposed of the Title VII retaliation claims Ms. Foley-Hinnen filed against her employer, GAO, under 31 U.S.C. § 753(a)(2) and (7).

## STATEMENT OF THE ISSUES

**I. Ms. Foley-Hinnen's Claim for Retaliatory Reassignment Must be Remanded for Hearing Because the PAB Weighed the Evidence, Failed to Accept Her Evidence as True and Failed to Afford Her All Reasonable Inferences to Which She was Entitled.**

**II. Ms. Foley-Hinnen's Claim for Retaliatory Denial of her Detail to State Must be Remanded for Hearing Because the PAB Weighed the Evidence, Failed to Accept Her Evidence as True and Failed to Afford Her All Reasonable Inferences to Which She was Entitled.**

**III. Ms. Foley-Hinnen's Retaliation Claims Must be Remanded for Hearing Because the PAB and the GAO Denied her Due Process of Law.**

## STATEMENT OF THE CASE AND RELEVANT FACTS

Case History.

This case involves illegal retaliation by GAO's highest level managers against a GAO employee of more than twenty years, Patricia Foley-Hinnen, who served as a witness in her co-workers' EEO cases and who subsequently pursued her own discrimination claims against GAO. Shortly after she engaged in these protected activities, management involuntarily reassigned her to the only work group for which she had previously indicated she could not work. Then, when Ms. Foley-Hinnen secured a fully-paid detail which would have allowed her to work elsewhere for the year she had to wait before she could transfer to a different work group, GAO denied her request for the paid detail. While GAO ultimately allowed Ms. Foley-Hinnen to go on the detail, it only permitted her to do so in leave without pay status. As a result, GAO deprived Ms. Foley-Hinnen not only of her regular pay, but also

attendant benefits including paid health insurance, retirement and leave accrual.

Ms. Foley-Hinnen filed her first formal EEO complaint against GAO alleging sex and age discrimination in 2002. [App. 901] GAO did not timely process her complaint, and it did not issue her Notice of Right to Petition the Board until March 2011. [App. 114]. She timely filed her petition on April 27, 2011. *Id.* The parties subsequently engaged in discovery, and GAO filed a motion for summary judgment on July 16, 2012. [App. 115] Almost one year later, on July 8, 2013, PAB Administrative Judge Braxton issued an Initial Decision ("ID") granting GAO summary judgment as to all claims. [App. 400, 450] Ms. Foley-Hinnen appealed a portion of the ID to the Board on July 23, 2013. [App. 116]

Administrative Judge Braxton did not participate in the appeal. [App. 55] The remaining four member of the Board split 2-2, with none of them adopting Judge Braxton's factual and legal conclusions in their entirety. *Id.* Ms. Foley-Hinnen then filed this Petition for Review.

<u>Relevant Historical Facts</u>.

Ms. Foley-Hinnen worked for GAO as a Band II Analyst. [App. 300] In 1991, she transferred from GAO's Europe Office to the Denver Field Office,

where she was assigned to work in the National Security and International Affairs Division ("NSIAD"). *Id.* From 1993 to approximately 2000, Ms. Foley-Hinnen performed defense environmental work for NSIAD's Defense Management and NASA group ("DMN") and the "Defense Acquisition" ("DA") group. *Id.* She also continued to work on the International Relations and Trade ("IRT") team within NSIAD. *Id.*

During Ms. Foley-Hinnen's tenure in Denver, Thomas Brew served (among other titles) as the Regional Manager in Denver and as Associate Director in the DA group. [App. 602 (Brew Depo. 7:17-8:12)] In 1997, Mr. Brew left the Denver office to serve as the Assistant Comptroller General for Policy and eventually became the Agency's Managing Director for Field Offices. *Id.*

James Solomon testified that he served as Acting Manager of the Denver office beginning in 1997 until 2000, when he became an Assistant Director for Acquisition and Sourcing Management ("ASM"). [App. 615-16 (Solomon Depo. 11:11-14; 14:5-12)]. While he served in ASM, Mr. Solomon's supervisor was Mr. Brew, who had moved to Washington, D.C. *Id.* During the years Ms. Foley-Hinnen worked with the DA group in Denver, one of her coworkers was Ted Baird. [ App. 125, ¶ 9]

Starting in 2000, GAO began a structural reorganization from five "Divisions" encompassing approximately 35 issue areas into 13 teams. [App. 301, ¶ 4] On June 21, 2000, the Agency announced that DMN environmental work was to be moved to the Natural Resources and Energy ("NRE") team, leaving DMN only responsible for weapons/military work. [App. 670] Ms. Foley-Hinnen testified that "prior to the major segment of the reorganization" in 2000, she was assigned out of NSIAD to NRE and continued to do defense environmental work in NRE. [App. 733 (Foley-Hinnen Depo., 307:15-308:2)] Ms. Foley-Hinnen explained that "they transferred everybody who worked on defense environmental issues under NSIAD over to ... natural resources and energy [NRE]." *Id.*, *see also* [App. 780].

On October 6, 2000, the Comptroller General issued a memorandum to all employees announcing an Employee Preference Survey [App. 785] that provides:

> By now you should have been informed of your ***initial*** team or work group assignment. The Employee Preference Survey gives you an opportunity to indicate if you are interested in changing that assignment ... [t]he effective date of any reassignment will be decided on a case-by-case basis, depending on the needs of the agency, and the employee's circumstances.

Emphasis added. GAO had previously informed the employees that "[t]he Employee Preference Survey is voluntary. If you are satisfied with your assigned team, office or group and are not interested in changing assignments at this time, there is no need for you to complete the survey." (Emphasis added). [App. 786]

Gene Dodaro, the then-Chief Operating Officer of the Agency testified that the Preference Survey was indeed voluntary, and that it "started early after the reorganization to allow people to express their preferences for moving ... to other teams." [App. 802-803 (Dodaro Depo. 9:13-10:18)] He also testified that employees "basically continued to work on the same engagements that they worked on at that time. Then they were given the opportunity through [the] employee preference survey to move to other teams." *Id*.

At the time of the Preference Survey, management planned for four teams to have a presence in the Denver Field Office: Acquisition and Sourcing Management ("ASM"), Financial Management and Assurance ("FMA"), Information Technology ("IT"), and Natural Resources and Energy ("NRE"). [App. 301-20] According to Mr. Brew, the ASM team required experience with the military and with contracting, while the FMA and IT teams were to

be comprised of accountants and computer specialist staff. [App. 834] He did not describe the experience necessary to be assigned to NRE. *Id.*

Ms. Foley-Hinnen responded to the Preference Survey by selecting, as her first choice, the International Affairs and Trade (IAT) team. However, she had also indicated that she wanted to remain in the Denver office, and the IAT team was not going to be located in Denver. [App. 301, ¶ 9] She indicated her second choice was the NRE team where she was currently working. *Id.* Mr. Brew led the analysis of the employee preference survey as it related to field office employees. [App. 301, ¶ 7]

Ms. Foley-Hinnen discussed her responses on the Preference Survey with Mr. Brew's assistant, Jackie McDaniel, who was working with him on the reorganization.[1] Ms. Foley-Hinnen testified that she told Ms. McDaniel, among other things:

> [D]o not place me until you have had a conversation with me . . . absolutely do not put me in the weapons group [of ASM]. That is the only place I cannot work based on hostile work environment and based on I'm an ex-Peace Corps volunteer and I will not work on weapons, and I've told GAO that for 20 years. I will not work on weapons systems.

[1] Mr. Brew admitted Ms. McDaniel was among the staff making calls to employees regarding their Preference Survey responses, but said he did not recall Petitioner asking for environmental work in the survey. [App. 829]

[App. 736 (319:6-14)] Further, Ms. Foley-Hinnen had been telling Mr. Solomon and others since approximately 1993 that she was opposed to working in weapons systems, based on religious and moral grounds. *Id.* (at 615:12-616:4). Petitioner testified that she told Ms. McDaniel to make sure the Agency discussed other options with her, as provided in GAO procedures, if her preferences could not be honored. [App. 736 (318:2-19:5)]

On April 10, 2001, the Agency informed Ms. Foley-Hinnen of Mr. Brew's initial decision to reassign her to ASM. [App. 624] As described above, even Mr. Brew considered the reassignments preliminary in nature. ("Therefore, she was *preliminarily* assigned to the ASM team." Emphasis added.) And further evidence that the initial assignments were preliminary appears in an Agency created document, dated August 16, 2002, in which GAO admits that Ms. Foley-Hinnen went "from NRE" and "joined" ASM in "October/November 2001." [App. 840, 847]

Further corroborating Ms. Foley-Hinnen's testimony, this exhibit lists the employees (including Mr. Baird), who elected to join ASM as soon as it was formed in 2000. In addition, the document reveals that every other DA employee, including herself, either transferred to NRE, retired, or otherwise left the Agency. Messrs. Holguin and Padilla went from DA to NRE in

October/November 2001); Mr. Kigerl went from DA to NRE in Jan. 2001; and Mr. Laetz went from DA to NRE in Feb. 2002. *See id.*

Ultimately, "[o]f the 18 staff members who were placed in NRE and ASM, no one but [herself] was placed in a group [she] did not request or approve as part of the employee preference survey." [App. 132-33; Appl 638-39]. After reviewing the employee preference survey forms that the Agency produced in discovery, Ms. Foley-Hinnen described that Mr. Holguin's first choice was to move from ASM to NRE and his second choice was to remain in ASM; Mr. Padilla listed no preference, but was moved from ASM to NRE, and Messrs. Kigerl's and Laetz's choices were to move from ASM to NRE. [App. 638-39] GAO has not challenged Petitioner's summary of her coworkers' preference forms.

## SUMMARY OF THE ARGUMENT

In granting summary judgment to the GAO, the PAB failed to comply with applicable legal standards when it weighed the evidence, failed to accept Ms. Foley-Hinnen's evidence as true, and failed to afford her all reasonable inferences.

## ARGUMENT

### I. Ms. Foley-Hinnen's Claim for Retaliatory Reassignment Must be

**Remanded for Hearing Because the PAB Weighed the Evidence, Failed to Accept Her Evidence as True and Failed to Afford Her All Reasonable Inferences to Which She was Entitled.**

**A. Standard of Review**

31 U.S.C. § 755(a) provides that this Court shall set aside a final PAB decision when it is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not consistent with law; (2) not made consistent with required procedures; or (3) unsupported by substantial evidence.

Petitioner submits that the PAB's Decision is not consistent with the law because the Board failed to apply applicable legal standards when it granted GAO summary judgment. Specifically, when considering a motion for summary judgment, the reviewing court must consider all of the evidence in the record without making credibility determinations or weighing the evidence.[2] *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). Instead, the evidence of the non-moving party must be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v.*

[2]Petitioner recognizes that Board regulations, not the Federal Rules of Civil Procedure, govern summary judgment proceedings before the PAB. However, as the Board noted in the Decision, 4 C.F.R. § 28.21(c)(3) essentially tracks Fed. R. Civ. P. 56. [App. 18, n. 12]

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). As the Supreme Court explained, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

**B. Discussion**

Title VII makes it unlawful for a federal employer to retaliate against an employee for opposing a discriminatory practice or participating in a charge of discrimination. 42 U.S.C. § 2000e-16(a). An employee may establish a claim of retaliation either through direct or circumstantial evidence, using the same burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). The PAB properly recognized that, because GAO offered legitimate non-discriminatory reasons for the decisions at issue when it sought summary judgment, a detailed *McDonnell Douglas* analysis was not necessary. [App. 20-21]. Thus, the Board proceeded directly to the ultimate issue in the case, whether a reasonable fact finder could find the Agency retaliated against Ms. Foley-Hinnen. *Id.*

While Petitioner does not dispute the propriety of dispensing with the an initial *prima facie* analysis in this case, in doing so the PAB seems to have

also disregarded its obligations to avoid weighing the evidence, to construe the evidence in Petitioner's favor as the non-moving party, and to afford her the reasonable inferences that arose from the evidence.

As described *supra*, Ms. Foley-Hinnen was the only employee who was involuntarily reassigned, and GAO assigned her to the one work group she clearly indicated she could not abide, ASM. In the months following the April 2001 initial decision, Ms. Foley-Hinnen repeatedly expressed her unwillingness to work on the military side of ASM. For example, on April 19, 2001, she spoke with Mr. Brew to appeal his decision, stating: "I told him that I believed his putting me in the same hostile environment he had pulled me out of felt like reprisal for engaging in protected activity, and that this assignment would be intolerable for me." [App. 634] Thereafter, she wrote a memorandum addressed to Mr. Brew and others dated August 10, 2001, stating:

> I would like you to reconsider my pending transfer from the NRE Team to the ASM Team, in light of my significant expertise with defense environmental issues. I have given this a lot of thought since our last meeting. As I indicated then, I believe I fell through the cracks when our work was transferred from the Defense Management group to NRE during the reorganization.

[App. 850]

Throughout this entire period, Ms. Foley Hinnen continued to perform environmental work in NRE until September 2001, when she took leave without pay for several weeks to avoid doing weapons work while she continued appealing the reassignment. [App. 736] Importantly, GAO's Office of General Counsel interviewed Ms. Foley-Hinnen on or about October 26, 2001 concerning an EEO case filed against Messrs. Brew and Solomon by one of her female coworkers. [App. 133, ¶ 29] The Agency did not deny this allegation. [App. 155, ¶ 29].

On November 2, 2001, Ms. Foley-Hinnen obeyed an Agency order to travel to Washington D.C. to testify on behalf of another female coworker against Mr. Solomon. [App. 635] That same day she made her first contact with the Agency's EEO Office ("O&I") where she expressed her fear of retaliation because of her role as a witness in the EEO cases. *Id. See also* [App. 730-731 (281:3-283:6)] She also met with Mr. Jesse Hoskins, GAO's Chief Human Capital Officer, and made him aware of her protected activity. *Id.*

Ms. Foley-Hinnen told Mr. Hoskins that she was in town to testify as a witness in the *Davis* case filed against Brew and Solomon; that she had also been a witness in the *Vargas* case, and that she had visited O&I that same day.

*Id.* The day after Ms. Foley-Hinnen returned from this trip, on Monday, November 5, 2001, Mr. Solomon referred to the EEO case. He told her that he was aware she did not end up testifying at the hearing and then he questioned her about what else she had been doing Washington. [App. 751 (507)].

The very next day, on November 6, 2001, Ms. Foley-Hinnen described "Solomon told me that he would be reassigning me from the Natural Resources and Environment ("NRE") group to [ ] Acquisitions and Sourcing Management ("ASM")." [App. 629] More specifically, Mr. Solomon said "you're going to be working for me and Ted Baird." [App. 752-53 (513:5-514:6)] Ms. Foley-Hinnen testified that she then asked Mr. Solomon, that if she had to work in ASM, would he at least assign her to work on the civilian side instead of the weapon side. She suggested that she could be a “referencer,” or work in any discrete short term job in any other assignment. Mr. Solomon refused because, he claimed, there was no other place to put her. [App. 728 (239-240)]

Notably, GAO has never offered any evidence that ASM did not have civilian work available, nor did it proffer evidence that would controvert Ms. Foley-Hinnen’s deposition testimony. Accordingly, Petitioner submits the Agency admitted this material fact. And even if the Agency’s failure does not

equate with an admission, at the summary judgment stage, Ms. Foley-Hinnen's evidence must be accepted as true.

Only three days, including a weekend, elapsed between Ms. Foley-Hinnen's most recent protected activities and GAO's final pronouncement that she would indeed have to begin working in ASM. When an employee's protected activities are followed closely by an employer's adverse actions, the combination creates an inference of retaliation. *See Crawford v. Metro. Gov't*, 555 U.S. 271, 283 (2009) (concurring); *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001). Ms. Foley-Hinnen was entitled to this inference because the three days between her protected activity and the Agency's adverse action constitutes very close proximity in time.

The PAB did not afford Ms. Foley-Hinnen any inference of retaliation despite this proximity in time. Instead, the Board rejected Ms. Foley-Hinnen's evidence establishing her reassignment to ASM was not final until November 6, 2001, choosing instead to credit the Agency's argument that the reassignment had actually occurred in April 2001, when Mr. Brew first announced the initial or "preliminary" reassignments. As described above, however, even Mr. Brew described the April decision as preliminary in nature. The Board overstepped by weighing the evidence at the summary judgment

stage.

### C. GAO's Proffered Legitimate Business Reasons Were Pretext

With respect to the Agency's proffered reasons for its actions, GAO articulated several allegedly non-retaliatory reasons for Petitioner's ASM placement: 1. "NRE's Managing Director, Mr. Robinson, opposed her placement in NRE due to performance concerns;" 2. "NRE [was full and] did not require additional resources;" and 3. "ASM was the only other team in Denver for which Petitioner was qualified to work." [App. 237]

#### 1. GAO's Claim that Mr. Robinson made the decision not to assign Petitioner to NRE was false.

Robert Robinson was the Managing Director of NRE. GAO asserted that "[d]uring the preference survey placement process, Mr. Robinson opposed [her] permanent assignment to NRE's Denver office due to her recent performance on an NRE assignment." [App. 204] GAO then argued that because Mr. Robinson was not aware of Ms. Foley-Hinnen's protected activity, he could not have been motivated by retaliation. *Id.*

Initially, the Administrative Judge erred in accepting these factual allegations as true, despite Ms. Foley-Hinnen's objections citing evidence in the record. While the Board ultimately agreed with Ms. Foley-Hinnen that Mr.

Robinson was not involved in Mr. Brew's preliminary reassignment decision [App. 29-30], the PAB nevertheless insisted that "undisputed facts and uncontroverted evidence" proved Mr. Brew knew Mr. Robinson did not support Ms. Foley-Hinnen continuing to work in NRE by August, 2001. [App. 30]

The evidence the Board insists supports this conclusion, however, does not establish that Mr. Robinson *ever* told Mr. Brew his opinion about Ms. Foley-Hinnen. For example, Mr. Robinson testified in his deposition that he did not recall ever discussing his opinion about Ms. Foley-Hinnen with Mr. Brew. [App. 1005 (26:1-14)] At most, he admitted the *possibility* that he spoke with Mr. Brew about Ms. Foley-Hinnen. *Id*. Further, the PAB's citation to Mr. Robinson's statement to the EEO Investigator [App. 30, n. 24, *citing* App. 1010-17] does not describe any communication from Mr. Robinson to Mr. Brew regarding his opinion about Ms. Foley-Hinnen.

Likewise, although the PAB concluded that Ms. Foley-Hinnen admitted Mr. Robinson's opinion of her was the reason Mr. Brew did not allow her to remain in NRE, she actually disputed that factual allegation. [App. 302, ¶13]. And while Ms. Foley-Hinnen eventually assumed that Mr. Robinson must have shared his opinion of her work with Mr. Brew, she did not say, as the PAB

implies, that Mr. Brew cited Robinson's opinion of her work as a reason to reassign her. [App. 31][3] In any event, Petitioner's speculation does not constitute evidence that Mr. Robinson ever shared his opinion with Mr. Brew, or that he did so before Mr. Brew made his final decision on the reassignment.

In short, the PAB's conclusion that Mr. Brew relied upon Mr. Robinson's opinion of Ms. Foley-Hinnen's work when he issued his final decision reassigning her to ASM is a construct the Board created, nothing more. The Agency was not entitled to this construction at the summary judgment stage. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 328 (1986) (the party seeking summary judgment must support the motion with evidence, conclusory assertions do not suffice). Further, as the non-moving party, Ms. Foley-Hinnen was entitled to all reasonable inferences arising from her evidence. Yet the PAB failed to afford her the inference to which she was entitled on this issue: that GAO's proffer of a false reason for Mr. Brew's decision was a pretext for discrimination. Based on this combination of factors, summary judgment was inappropriate. *Solomon v. Vilsack*, 763 F.3d 1,

---

[3]Petitioner does not dispute that *Mr. Brew told her* in August 2001 that he had spoken to Mr. Robinson and Mr. Robinson said NRE was full. But again, that does not prove that Mr. Brew actually spoke with Mr. Robinson, nor does it prove NRE was in fact full.

14 (D.C. Cir. 2014).

**2. GAO did not prove that NRE was full.**

The PAB cited to Ms. Foley-Hinnen's Amended Petition as evidence supporting GAO's contention that NRE was full when she requested to remain in that group. [App. 39, *citing* App. 132, ¶ 27]. As described above, however, Ms. Foley-Hinnen only said that Mr. Brew *told* her Mr. Robinson made such a statement. She did not claim she had witnessed their communication. Further, GAO *denied* this factual allegation. [App. 154, ¶ 27 ("Deny third sentence and aver that Brew had a board with field office staffing levels, which indicated that NRE was full and that he shared this information with Petitioner.")]

Aside from the Amended Petition, Ms. Foley-Hinnen introduced evidence directly refuting Mr. Brew's claim that NRE was full. First, Mr. Robinson (who managed NRE) did not testify that NRE was full. On the contrary, he stated:

> My recollection was that we had a kind of soft cap. ... The reason I say a soft cap is that let's say there was a person that was found - and, again, this is all hypothetical - was found to have all expertise in one particular area and was not capable of working in another area. They may assign an additional person. If there was some overriding reason why that cap

> would be exceeded, then that would be possible in
> this particular case.

[App. 1006 (Depo. P. 31)] Likewise, Ms. Foley-Hinnen introduced evidence from GAO itself that controverting Mr. Brew's excuse that she could not work in NRE because it was full. Specifically, the Agency produced a document in 2002 that admits Ms. Foley-Hinnen went "from NRE" and "joined" ASM in "October/November 2001." [App. 840, 847] On its face, this document demonstrates that Petitioner was originally assigned to NRE, but GAO transferred her to ASM in October/November 2001. Obviously, if Ms. Foley-Hinnen already encumbered one of the slots in NRE, allowing her to remain in NRE would not have increased the number of NRE employees.

Further, the Agency's document reflects that at the very same time GAO reassigned Ms. Foley-Hinnen into ASM, the Agency moved two of her coworkers from DA into NRE. *Id.* Thereafter, GAO moved a third DA employee to NRE in January 2001, followed by yet another employee in February 2001. *Id.* The clear import of this evidence is that NRE was not full, as Mr. Brew claimed, during the reassignment process.

In sum, Ms. Foley-Hinnen introduced evidence discrediting Mr. Brew's articulated legitimate business reason for reassigning her from NRE to ASM.

The PAB was obliged, at the summary judgment stage, to accept this evidence as true. Not only did the PAB fail to fulfill this obligation, but it compounded the error by trying to explain away the evidence. GAO was not entitled to such assistance from the Board in making its case for summary judgment.

**3. GAO never explained why it could not reassign Ms. Foley-Hinnen to the civilian side of ASM.**

GAO has never disputed that Ms. Foley-Hinnen unequivocally expressed that she would not work for the weapons group in ASM. Mr. Brew admitted he knew she did not want to do military work. [App. 607 (46-47)] Further, the Agency has not disputed her contention that she asked Mr. Solomon to at least put her on the side of ASM that did not do weapons work. Yet neither Mr. Brew nor anyone else at GAO offered any evidence to support Mr. Solomon's assertion that Ms. Foley-Hinnen had to work in weapons because there was no civilian work available in ASM.

Likewise, although Mr. Brew did not dispute any of Ms. Foley-Hinnen's multiple communications reminding him that he had previously agreed to take her out of the group in which Mr. Solomon and Mr. Baird worked, a group she described as creating a hostile work environment [App. ], GAO did not explain why this was ultimately the only group to which it could assign her.

In sum, the Agency did not adduce any evidence to show a legitimate reason for reassigning Ms. Foley-Hinnen to the only team she told GAO was completely unacceptable to her. Based on these facts, the Agency failed to rebut Ms. Foley-Hinnen's *prima facie* case of retaliatory reassignment to the weapons division.

Ultimately, the PAB failed to draw all justifiable inferences in favor of Ms. Foley-Hinnen and it compounded this failure by either disregarding her evidence or choosing to credit GAO's evidence (and some merely conclusory allegations) to the contrary. PAB's grant of summary judgment on this claim was error. *Liberty Lobby, supra; Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *First National Bank v. Cities Service Co.*, 391 U.S. 253 (1968).

## II. Ms. Foley-Hinnen's Claim for Retaliatory Denial of her Detail to State Must be Remanded for Hearing Because the PAB Weighed the Evidence, Failed to Accept Her Evidence as True and Failed to Afford Her All Reasonable Inferences to Which She was Entitled.

### A. Standard of Review

The same standard of review applies as articulated in Argument I.

### B. Discussion of Retaliation

The same statement regarding retaliation law applies as articulated in

Argument I.

On August 10, 2001, while she continued her environmental work in NRE, Ms. Foley-Hinnen anticipated that she might soon be involuntarily reassigned to ASM. She therefore sent a Memorandum to Mr. Brew (copying Elliott Smith, Rudy Payan, and Jack Brock), stating that she would like to explore the possibility of a temporary detail outside of GAO in order to avoid working for the weapons side of ASM. [App. 850]

Ms. Foley-Hinnen testified that in response to her email, Mr. Brew referred her to Gloria Jarmon who, as Director of the Office of External Liaison, was responsible for arranging details to NATO and other international organizations. [App. 639] In this regard, Ms. Foley-Hinnen said she "tried to follow the NATO model" in seeking her detail to State, "so there would not be a problem with precedence" while she waited the year GAO would require before she could transfer out of ASM. [App. 780-81; 1020-24] According to Petitioner, Ms. Jarmon told her GAO's policy was "to loan people to groups that we support." [App. 639-40] Ms. Jarmon also told Ms. Foley-Hinnen that "it may make sense to send you to State even if we haven't done one to State before, if it's aligned with our goals[] and it sounds to me like it is." *Id.*

Ms. Foley-Hinnen described that Ms. Jarmon briefed the Executive Committee on her detail request and the Committee responded positively, raising no issues or concerns. [App. 640] Further, neither Ms. Jarmon nor anyone else suggested the Agency had a practice or policy precluding details to an Executive Branch Agency. [App. 639-40; 1020-24] GAO did not rebut Ms. Foley-Hinnen's evidence on this issue.

In order to have her detail request approved, Ms. Foley-Hinnen was instructed to obtain a formal request from the Department of State and to submit that request to Comptroller General David Walker. [App. 303] Ms. Foley-Hinnen obtained that letter (dated September 19, 2001) from the State Department. The letter requested that PFH be allowed to participate in a "non-reimbursable detail," where GAO would pay Petitioner's salary and the State Department would pay official travel expenses. [App. 303]

According to PFH, she delivered her detail request to Mr. Walker's subordinate, Sallyanne Harper, the Chief Administrative Officer and her subordinate, Jessie Hoskins, the Chief Human Capital Officer. Mr. Hoskins later informed Ms. Foley-Hinnen, on or about October 11, 2001, that GAO would not authorize her detail to the State Department unless it was fully reimbursed. [App. 640] Ms. Foley-Hinnen recalled that she then reduced her

schedule to working part time so she could dedicate herself to securing funding from the State Department and to "avoid starting an assignment with ASM." [App. 640]

During the three months that her detail request was pending approval, neither Ms. Harper, who was a member of the Executive Committee, nor Mr. Hoskins told Ms. Foley-Hinnen that GAO had a practice or policy that precluded GAO employees from accepting details to Executive Branch agencies. *Id*. On December 11, 2001, at a ceremony where Petitioner received a community service award from the Comptroller General, she used the opportunity to raise the issue of her pending detail request. [App. 304] Mr. Walker indicated that he was not familiar with her request or the State Department's letter inviting her to accept a detail. At his request, she left Mr. Walker a copy of the letter from State before she left Washington D.C. [App. 643]

Importantly, during their discussion on December 11, 2011, Mr. Walker did not tell Petitioner that there was a policy or practice in place precluding details to the Executive Branch. *Id.* GAO did not controvert this evidence.

Mr. Dodaro was also at the December 11 ceremony, and Ms. Foley-Hinnen raised the detail issue with him as well. Mr. Dodaro told her GAO

would not pay her salary for a detail to the State Department or any Executive Branch agency. [App. 304] Notably, the Agency did challenge part of this proffer, claiming Mr. Dodaro said GAO was limiting details “even to Congress and would not approve a detail to an Executive Branch agency." [App. 156] However, GAO did not challenge Ms. Foley-Hinnen’s assertion that like Mr. Walker, Mr. Dodaro did not mention any policy or practice that would preclude details to the Executive Branch.

On December 21, 2001, Ms. Foley-Hinnen informed Mr. Hoskins that the State Department had agreed to fully fund the detail. Mr. Hoskins then instructed Ms. Foley-Hinnen that she needed approval from her Managing Director, Jack Brock (of ASM) and an official document from the State Department stating its agreement to pay for the detail. [App. 643-44] Ms. Foley proceeded to secure Mr. Brock’s approval and the necessary letter from State. [App. 644]

The next day, December 22, 2001, Ms. Foley-Hinnen was packing her office to move to Washington to begin her detail. Mr. Solomon asked what she was doing, and she explained her pending move and the detail. Mr. Solomon left her office, returning about an hour later, and declared that he had conferred with Mr. Hoskins, and Mr. Hoskins allegedly said "the detail is not a

done deal." [App. 644] Mr. Hoskins, however, did not inform Ms. Foley-Hinnen of the same. To the contrary, on January 2, 2002, he sent her an email stating that he had not yet received the official letter from the State Department agreeing to fully reimburse the detail. Mr. Hoskins did not mention that the detail was not a "done deal," nor did he say anything that indicated the Executive Committee was trying to make a policy decision about details in general. [App. 646]

Ultimately, GAO denied Ms. Foley-Hinnen's request for a fully reimbursed detail to the State Department. One of the allegedly legitimate business reasons GAO claimed warranted the Executive Committee's adverse decision was "because it determined that Executive Branch details could undermine GAO's independence and because Congress had provided GAO with appropriated funds to support Congress, not the Executive Branch." However, that was *not* the reason GAO originally gave for denying Ms. Foley-Hinnen's detail. When Mr. Walker first tried to justify the decision to Petitioner on January 7, 2002, he said "we have had *a standing policy position for some time* that we do not do details to the Executive Branch for a variety of reasons." [App. 1026] Mr. Walker repeated that explanation in an email he sent her the next day. [App. 1027]

In the course of discovery, however, Ms. Foley-Hinnen learned that this explanation was not true. Mr. Walker admitted that the Agency "did not have a policy for details to the Executive Branch" prior to considering her particular request. [App. 1205 ("I do not recall having any discussion about it until the policy issue was brought up to the Executive Committee *as a result of Ms. Hinnen's request."*) (Emphasis added)] He also said there was not "an expressed [sic] written policy that dealt directly with details to executive branch agencies. So there was nothing that said that you could or you couldn't do it." *Id.*

Mr. Walker further testified that after discussing Ms. Foley-Hinnen's detail request with those at the meeting, it was the unanimous view of the Executive Committee that details *should not be* allowed to the Executive Branch. [App. 1207] And while this belated pronouncement would seem to be a pretty clear decision precluding such details, Mr. Walker added that the intent of the policy was *not* to eliminate the possibility of details to Executive Branch agencies [App. 1208, 26-27], and that such a detail "could be a rare exception under unusual circumstances." [App. 1208, 32]

Clearly, Mr. Walker's explanation of this allegedly long-standing policy proved the policy was not, in fact long-standing. Rather, GAO developed the

policy in response to PFH's request. Further, and also contrary to Mr. Walker's initial explanation to Ms. Foley-Hinnen, the policy Mr. Walker described as the Executive Committee's final pronouncement was not an absolute bar to such details. The Committee anticipated it could make exceptions to the policy.

Mr. Walker testified, "[W]hat resulted from the executive committee decision, more importantly, was a written policy that addressed the issue for any and all individuals." [App. 1206-07] Mr. Walker explained that this written policy "ma[de] it clear that the executive committee must approve detailed GAO employees to other agencies, which would include executive branch agencies, if there were any such requests." *Id.* Obviously, this result could only apply to future requests for details, but it serves to emphasize the absence of a clear policy or practice before Ms. Foley-Hinnen's request.

Like Mr. Walker, Mr. Dodaro admitted that the Executive Committed developed the policy together *in discussions about Ms. Foley-Hinnen's request*. Emphasis added. [App. 809] But he could not otherwise recall when that policy or practice began. *Id.* Mr. Dodaro also described the Agency's initial "policy" or practice in less than absolute terms:

> The policy was to consider each situation on a

> case-by-case basis because there were a wide variety of detail possibilities including the Congressional detail, international organizations, executive branch agencies, et cetera. The policy was that it was not, we believed, to be a good idea-to detail people to the executive branch agencies because of independence concerns and because we were being given our appropriation to provide support to the Congress and carry out our mission. So for those reasons we decided that details to the executive branch were not appropriate.

Id. at 35-36 (Emphasis added).

Thus, PFH adduced evidence that the Agency's explanation for denying her detail changed over time. Ms. Foley-Hinnen was therefore entitled to an inference of retaliation. When an employer gives one reason at the time he makes a decision, but gives a different reason at the time of trial, a jury can reasonably conclude the employer's proffer was a pre-textual, after-the-fact justification. *See, e.g.*, *Brady v. Office of Sergeant at Arms*, 520 F. 3d 490, 495, n. 3 (D.C. Cir. 2008) (employees may cast doubt on the employer's proffered reason by, among other things, pointing to changes and inconsistencies in the stated reasons for the adverse actions).

The PAB did not afford Ms. Foley-Hinnen this inference. Instead, the Board chose to interpret the evidence in the light most favorable to GAO, concluding management's articulation of the policy could be explained by

benign confusion about who could make the decision on detail requests. At the summary judgment stage, however, the Board should not have been construing the evidence in a manner that would favor the moving party.

Mr. Hoskins testified in his deposition about the Agency's history of approving details prior to Petitioner's request:

> Q. Had you dealt with any other types of details, say internal details, while you were at GAO and prior to Ms. Hinnen' s request?
>
> A. I don't remember, but I know there was some [sic] details made overse[a]s and with, I believe, the Department of Defense."

[App. 1052] Notably, the Department of Defense is an Executive Branch agency. But the PAB refused to credit Mr. Hoskins' professed historical knowledge about that GAO permitted such details in the past. In doing so, the Board once again exceeded the proper scope of review by weighing the evidence.

The PAB attempts to bolster its interpretation of the evidence by opining that the conflict of interest policy the Agency ultimately developed seems reasonable and that agencies are entitled to develop their own policies. [App. 40] Ms. Foley-Hinnen does not disagree, in principle, with these concepts. But that was not the issue before the Board. Regardless of how

reasonable the policy may be, GAO cannot escape the fact that it did not truthfully describe its reason for denying her request in the first instance. The evidence demonstrates GAO did not develop the policy until after it claimed to have relied upon it to deny her request, and even then, the newly developed policy does not bar all details to the Executive Branch.

The Board also ignored the fact that - contrary to the conflict of interest defense - the Executive Committee ultimately allowed Ms. Foley-Hinnen to work for the State Department if she agreed to use Leave Without Pay ("LWOP"). When questioned why the Agency found no conflict of interest in allowing Petitioner to take LWOP for a year while working for an Executive Branch agency, but found that such a conflict existed if she took a fully reimbursed detail to the Executive Branch, Mr. Dodaro responded: "I believe we arrived on [sic] the decision of a leave-without-pay situation because there was miscommunication about the nature of the detail. So we thought in this particular case we would make an exception because of the situation specifically resolving [sic] Ms. Hinnen." [App. 810-811] Ms. Foley-Hinnen was entitled to an inference of retaliation based on the evidence she presented showing pretext.

Ms. Foley-Hinnen also provided evidence demonstrating a close

proximity in time between her protected activities and the Executive Committee's decision to deny her detail request. Specifically, when she visited with Mr. Hoskins on November 2, 2001, she explained to him that she was in Washington to testify in an EEO case and that she was afraid the Agency was going to retaliate against her by denying the detail.

Mr. Hoskins was subsequently asked to brief the Executive Committee on Ms. Foley-Hinnen's request, and GAO issued its decision deny the paid detail on January 4, 2001. [App. ]. The two month period between the protected activity and the adverse decision evidences sufficient proximity in time to infer retaliation.

Mr. Hoskins admitted that he most likely told the Executive Committee, including Messrs. Walker and Dodaro, about Ms. Foley-Hinnen' s reasons for wanting the detail: because she did not want to work on the weapons systems team of ASM and because she had experienced a hostile work environment with that same group of coworkers. Mr. Dodaro corroborated Mr. Hoskins' recall, saying Mr. Hoskins provided not only the factual background for the detail request, but he also "was there to provide his perspectives on this issue." [App. 808 (32)] Mr. Dodaro described: "I believe, as I recall, Ms. Hinnen had some conversations with Mr. Hoskins about this matter" and

explained: "we wanted to make sure we understood what had transpired up to the point for us making the decision." [App. 808 (31)]

Logically, if Mr. Hoskins described for the Executive Committee what had transpired up to that point, then he must have told them about Ms. Foley-Hinnen’s recent protected activities, her concern they might retaliate against her by denying the detail, and the reasons she felt she could not work for ASM. And there is no evidence to suggest Mr. Hoskins was less than completely forthcoming when he spoke to the Committee. Inexplicably though, the PAB concluded Mr. Hoskins only shared some of his information: “[a] reasonable fact finder at best could logically deduce from this statement that Mr. Hoskins informed the Committee the Petitioner wanted the detail because she was dissatisfied with her ASM assignment.” [App. 44] The Board did not explain it’s apparent conclusion that Mr. Hoskins was less than completely candid with the Committee, but regardless of its reasoning, the result demonstrates that PAB construed the evidence in the manner that most favored GAO. Once again, the Board overstepped.

Ms. Foley-Hinnen adduced sufficient evidence for a fact-finder to believe that retaliation was more likely than not the reason GAO denied her request for a paid detail to the Department of State.

## III. Ms. Foley-Hinnen's Retaliation Claims Must be Remanded for Hearing Because the PAB and the GAO Denied her Due Process of Law.

### A. Standard of Review

31 U.S.C. § 755(a) provides that this Court shall set aside a final PAB decision when it is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not consistent with law; (2) not made consistent with required procedures; or (3) unsupported by substantial evidence.

### B. Discussion.

Ms. Foley-Hinnen contends that the PAB denied her due process when it issued a decision affirming Administrative Judge Braxton's Initial Decision because the appellate panel split 2-2. Pursuant to 4 C.F.R. §27.1, GAO's Personnel Appeals Board is composed of five members appointed by the Comptroller General, in accordance with the provisions of 31 U.S.C. § 751. The regulation provides that a simple majority of the Board shall constitute a quorum and a majority of a quorum may act for the Board. The regulation further provides that the Board may designate a panel of its members or an individual member to take any action within the scope of the Board's authority, subject to later review by the Board.

In this case the PAB properly designated one of the members to conduct

the proceedings. However, after he issued the Initial Decision, that Administrative Judge did not participate with the rest of the Board in reviewing the arguments on appeal. [App. 55] And while the four remaining members clearly constitute a quorum, the split decision reflects a majority did not vote to affirm.

The Board asserts that 4 C.F.R. § 27.1 permits the PAB to count the member who wrote the summary judgment decision as the third member necessary to comprise the majority for affirmance. [App. 24, n. 18] However, Petitioner respectfully submits the rule does not appear to address the situation as the Board describes. Further, given that all four of the remaining members disagreed with some portion of the legal and factual analysis contained in the Initial Decision, it seems possible the member who did not participate in the appellate review may have changed his mind after further consideration.

Petitioner's counsel has not been able to find any case law discussing this issue. Nevertheless, she respectfully submits that the GAO PAB denied Patricia Foley-Hinnen due process when it issued summary judgment below.

## CONCLUSION

For the reasons described above, Ms. Foley-Hinnen respectfully

requests that this Court remand her case to the PAB with instruction that she be afforded a hearing on her retaliation claims.

Respectfully submitted this 5th day of October, 2015.

_*s/Marisa Williams*____________
Counsel for Petitioner Foley-Hinnen
Williams & Rhodes LLP
7887 E. Belleview Ave. #1100
Englewood, CO 80111
303-220-0303 (phone)
303-840-7370 (fax)
mlw@williamsandrhodes.com

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 5th day of October, 2015, I filed and served a copy of the foregoing Opening Brief electronically on all parties by operation of the Court's electronic filing service.

s/*Marisa Williams*

## CERTIFICATE OF COMPLIANCE

As Fed. R. App. P. 32 (a)(7)(C) requires, I certify that this brief is spaced proportionally and contains seven thousand six hundred and thirty (7630) words. I relied upon a word processor to obtain the count, specifically WordPerfect X6 software.

I certify that the information on this form is true and correct tot he best of my knowledge and belief, formed after a reasonable inquiry.

s/*Marisa Williams*

**PERSONNEL APPEALS BOARD**
**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**
**WASHINGTON, D.C.**

| | | |
|---|---|---|
| **PATRICIA FOLEY-HINNEN,**<br>**Petitioner/Appellant** | ) | |
| **v.** | ) | **Docket No. 11-03** |
| **U.S. GOVERNMENT ACCOUNTABILITY OFFICE,**<br>**Respondent/Appellee** | ) | April 1, 2015 |

**DECISION ON PETITIONER'S APPEAL**
**FROM THE INITIAL DECISION OF THE ADMINISTRATIVE JUDGE**

## I. INTRODUCTION

This matter is before the Personnel Appeals Board (PAB or Board) on appeal by Patricia Foley-Hinnen (Petitioner) from a Decision issued on July 8, 2013 by an Administrative Judge (AJ) granting summary judgment in favor of the Government Accountability Office (GAO, Respondent or the Agency) on Petitioner's Amended Petition (Am. Pet.).

On January 27, 2014, Petitioner filed Appellant's Corrected Opening Brief (App. Brief) with a 67-page appendix, including documents not in the Summary Judgment Motion record. The Agency filed GAO's Response to Petitioner's Appeal to the Full Board (Response Brief), with two appended exhibits, on February 21, 2014. Petitioner then filed Appellant's Reply in Support of Opening Brief (Reply Brief) on March 14, 2014. In the interim, on March 6, 2014, the Personnel Appeals Board Office of General Counsel (PAB/OGC) filed a Motion to Intervene in order to file an Amicus Brief. GAO filed an Opposition to the Motion to Intervene on

March 7, 2014, but asked, if the Motion was granted, that it be permitted to file an Opposition to the Amicus Brief. The PAB/OGC filed a Response to GAO's Opposition to Personnel Appeals Board Office of General Counsel Motion to Intervene on March 11, 2014. By Order dated March 18, 2014, the PAB granted the Motion to Intervene and permitted the Agency to file GAO's Response to Amicus Brief, which was filed on March 28, 2014.

Upon review of the submissions of the parties and the entire record herein, the Board affirms the grant of summary judgment, while not adopting certain holdings of the AJ, for the reasons stated herein.

## II. SUMMARY JUDGMENT PROCEDURAL HISTORY

Petitioner filed her Petition in this case on April 27, 2011 and an Amended Petition on May 12, 2011. The Amended Petition includes the following claims:

- Petitioner's supervisors retaliated against her based on protected activities when, during an Agency reorganization, they reassigned her to the weapons side of the Acquisition and Sourcing Management (ASM) team to work in the same hostile work environment from which she had previously been removed after she complained of a hostile work environment;

- Her supervisors retaliated against her because of her participation in protected activities by denying her request for a one-year detail to the Department of State, thereby forcing her to accept GAO's offer of Leave Without Pay (LWOP) for one year to work for the Department of State;

- Supervisors retaliated against her because of her protected activities by:
  - denying her request for additional LWOP to continue working at the Department of State beyond one year;
  - denying her request for an extension of the retirement date she requested under a voluntary time-limited early retirement option; and
  - constructively discharging her from her employment;

- Her supervisors subjected her to a hostile work environment, including each of the actions cited above;

- GAO committed prohibited personnel practices in violation of 5 U.S.C. §§2302(b)(9)(A), (B) and 2302(b)(12), as applied to GAO through 31 U.S.C. §732(b)(2), by taking the above-cited retaliatory actions and by establishing a hostile work environment.[1]

On July 16, 2012, after an extended discovery period, GAO filed a Motion for Summary Judgment (MSJ), accompanied by Respondent's Statement of Undisputed Material Facts (Resp. Statement) and Respondent's Memorandum of Law in Support of Motion for Summary Judgment (Resp. Memo) (including Exhibits A through JJ). On August 15, 2012, Petitioner filed Petitioner's Memorandum of Law in Opposition to Respondent's Motion for Summary Judgment (Opposition) (including Exhibits 1 through 13), along with Petitioner's Response to Respondent's Statement of Undisputed Material Facts (Pet. Fact Response), and Petitioner's Statement of Material Facts as to which there is a Genuine Issue (Pet. Fact Statement). GAO thereafter filed Respondent's Reply Memorandum of Law in Support of Motion for Summary Judgment (Reply) on September 7, 2012 (with Exhibits 1 through 3), to which Petitioner responded by filing Petitioner's Response to GAO's Reply Memorandum of Law in Support of Motion for Summary Judgment (Sur-reply) on September 27, 2012. The Decision granting summary judgment in favor of GAO on all claims issued on July 8, 2013 (SJ Dec.).[2]

---

[1] Petitioner did not address the remaining merit system claims (she withdrew those based on 5 U.S.C. §2302(b)(9) in her Sur-reply to MSJ at 1) or the hostile work environment claims in her appeal. We therefore deem the claims abandoned. *See Davis v. GAO,* PAB Docket Nos. 00-05 and 00-08 at n.1 (7/11/03).

[2] Because the Board is not accepting new evidence submitted on appeal (*see* n.20 *infra*), all exhibits cited herein are to exhibits submitted as part of the MSJ proceedings.

Case: 15-6002 Document: 10 Page: 67 Filed: 06/17/2015

III. AJ FINDINGS OF UNDISPUTED FACT

Neither Petitioner nor GAO has noted any exceptions to the AJ's findings of undisputed fact.[3] We therefore incorporate the undisputed material facts set forth in the AJ's July 8, 2013 Decision and set forth the following summary for purposes of this Decision. *See* SJ Dec. at 5-20, ¶¶1-55. Where noted, we also cite additional facts established in the record that are relevant and material to our disposition of this appeal.

Petitioner began employment with GAO in November 1982. SJ Dec. at 5 ¶1; Am. Pet. at 2. She started working in the Denver Field Office in 1993, assigned to environmental cleanup issues in the National Security and International Affairs Division (NSIAD). *Id.* ¶¶1-2. The environmental work in NSIAD comprised two issue areas collectively called the Defense Core Group, consisting of the Defense Management and NASA (DMN) group and the Defense Acquisitions (DA) group. *Id.* ¶1. In addition to her environmental work for the Defense Core Group, Petitioner did international work for NSIAD's International Relations and Trade (IRT) group. SJ Dec. at 5-6 ¶2.

In April 1994, Petitioner applied—but was not selected—for a promotion to a Band III position, despite being ranked among the "Best Qualified" candidates. Petitioner claims that her name was removed from the Best Qualified list by Regional Manager Thomas Brew and that her application was "lost" until Mr. Brew told her that she would be interviewed for the position shortly before the interview was to begin. SJ Dec. at 6-7 ¶5. Petitioner nevertheless acknowledges she was in fact interviewed for the position, but was not selected. *Id.* At the time,

[3] Petitioner's Appellate Brief recites a summary statement of facts primarily referencing the Summary Judgment Decision but also including several additional alleged facts that we do not find significant to the disposition of this appeal. *See, e.g.*, App. Brief ¶¶7, 8, 11, 15, 16, 17, 18, & 22. This summary statement does not note exceptions to any of the AJ's findings of undisputed fact.

Petitioner did not challenge the nonselection. Petitioner's Exhibit 1 to MSJ (Pet. Ex.) at 542 (Petitioner's Deposition) (Pet. Depo.).

From 1996 to 2001, Petitioner repeatedly complained to her supervisors, Mr. Brew and James Solomon,[4] about the office assignment policy in the Denver Field Office. SJ Dec. at 7 ¶7. She claimed that by assigning office space based on seniority and Band[5] level, GAO in effect was discriminating against women and minorities in favor of white men. *Id.* In 1997, Petitioner asserts that she told Mr. Brew that male members of the DA team in NSIAD, to which she was then assigned as a co-core group leader, were subjecting her to a hostile work environment because she was female and because she complained about gender discrimination in pay and office space assignments. SJ Dec. at 7 ¶8; Pet. Ex. 1 at 57-58 (Pet. Depo.). Petitioner acknowledges that she filed no formal complaint at the time, but she asserts that she asked Mr. Brew to transfer her out of the DA unit, and that he granted her request. Am. Pet. ¶11; Pet. Ex. 1 at 57-58, 542. She began work with the International Relations and Trade group in Denver in 1997. Am. Pet. ¶11. Mr. Brew moved to Washington, D.C. in September 1997 and became Assistant Comptroller General for Policy; by 2000, he became the Managing Director for Field Offices. Respondent's Exhibit G to MSJ (Resp. Ex.) at 000212, 000215 (Brew Response to EEO Investigator) (Brew Investig. Resp.); Resp. Ex. F at 6 (Brew Depo.).

In the Fall of 1997, Petitioner again applied for a Band III promotion for which Messrs. Solomon and Brew were on the selection panel, but she was not determined to be among the "Best Qualified" candidates for the position. SJ Dec. at 7-8 ¶9. Petitioner did not challenge her

---

[4] At the time, Mr. Solomon was Assistant Regional Manager for Planning and Reporting in Denver. Resp. Ex. FF at 15-16 (Solomon Depo.).

[5] In 1989, GAO converted from the traditional GS pay system for federal employees to a pay-banding system for the analyst workforce. *37 Named Petitioners v. GAO*, PAB Docket No. 09-01 at 4 (3/31/10).

failure to make the Best Qualified list for the promotion she sought in the Fall of 1997. Pet. Ex. 1 at 542.

In May 2001, Petitioner was interviewed by an EEO investigator in connection with a discrimination and reprisal complaint filed by a co-worker, Maria Vargas. Ms. Vargas's complaint named Messrs. Brew and Solomon as responsible management officials. SJ Dec. at 10 ¶19. Petitioner was listed as a possible rebuttal witness for the Agency in Ms. Vargas's case at a July 18, 2001 PAB hearing, but she never was called to testify. *Id.* ¶20.

Petitioner also was interviewed several times in 2000 and again in late October 2001 as a potential witness in a discrimination/retaliation complaint filed by another co-worker, Sandra Davis. *Id.* ¶21. According to Petitioner, Ms. Davis had "several discrimination and reprisal complaints pending in which she named [Messrs.] Brew and Solomon as responsible officials."[6] Am. Pet. ¶16. Petitioner alleges that when she was interviewed in October 2001 by an attorney from the GAO General Counsel's Office, she told the attorney that both Messrs. Brew and Solomon had retaliated against her and that she feared further retaliation because of her protected activities. Am. Pet. ¶29.

In November 2001, Petitioner traveled to Washington, D.C. to testify in Ms. Davis's administrative hearing; however, she was not called as a witness. SJ Dec. at 10 ¶21; Am. Pet. ¶31. In her deposition, Petitioner testified Mr. Solomon was aware she was a potential witness in the *Davis* case, but she also testified that she never told Mr. Solomon or Mr. Brew what she said to those who interviewed her in either the *Davis* or the *Vargas* case. Pet. Ex. 1 at 507-08; Resp. Ex. A at 222-24 (Pet. Depo.). Mr. Brew testified at his deposition—and there is no evidence to the contrary in the record—that at the time he had no knowledge Petitioner had any involvement

[6] The Board takes judicial notice that the three petitions (which were consolidated) filed by Ms. Davis in Dockets 00-05 and 00-08 named Mr. Solomon but not Mr. Brew as a responsible management official. *Davis v. GAO*, PAB Docket Nos. 00-05, 00-08.

with either case. Resp. Ex. F at 90-91. By then he was stationed at Headquarters in Washington, D.C. Resp. Ex. G at 000215 (Brew Investig. Resp.).

Petitioner asserts that sometime in early 2000, she was moved from the International group back to DMN where she continued doing environmental work. Am. Pet. ¶21. During 2000, GAO began an Agency-wide structural reorganization that encompassed taking five divisions, containing thirty-five issue areas, and creating thirteen teams. SJ Dec. at 8 ¶11. According to Petitioner, prior to the reorganization, "the DMN environmental work was transferred to another division, along with the field staff, and renamed the Natural Resources and Energy ("NRE") group." Am. Pet. ¶21. In addition, during the reorganization Petitioner alleges that the DA group was renamed the Acquisition and Sourcing Management (ASM) team, but retained its issue areas. Am. Pet. ¶22. In October and November 2000, in conjunction with the reorganization, GAO conducted an Agency-wide employee preference survey in an effort to obtain feedback from employees about their assignment preferences; employees were told that their individual preferences would "be taken into account after we consider organizational needs, staff skills and knowledge." Resp. Ex. D (10/06/00 Memo from CG to All Employees re Employee Preference Survey). Petitioner's Amended Petition states that the survey solicited employees' input "on which teams they wished to be permanently placed upon completion of their-then current assignments." Am. Pet. ¶23. After placement decisions were made, managing directors who were losing or gaining team members could appeal placement decisions. Resp. Ex. G at 000220. By this time, Mr. Brew had been promoted to Managing Director of Field Offices, while Mr. Solomon had become the Acting Regional Manager of the Denver Office. SJ Dec. at 6, 8 ¶¶4, 12. Mr. Brew's responsibilities as Managing Director of Field Offices included overseeing the employee survey process and making the preliminary assignments to teams for

Case: 15-6002 Document: 10 Page: 71 Filed: 08/17/2015

field staff. Resp. Ex. G at 000220.

In response to the employee preference survey, Petitioner requested that she be allowed to continue doing international work in IRT. SJ Dec. at 8 ¶14. Her second choice was the Natural Resources and Energy team. *Id.;* Pet. Fact Response ¶9. Despite her request, however, Petitioner was notified on April 10, 2001 that she was being placed in ASM, most likely in the weapons section, upon finishing the NRE assignment she was then in the process of completing. SJ Dec. at 9 ¶18; Am. Pet. ¶¶24, 27.

On April 19, 2001, Petitioner protested the ASM assignment to Mr. Brew and asked to remain in NRE. Resp. Ex. N at 5 (Petitioner's First Supplemental Responses to Respondent's First Set of Interrogatories) (Pet. Sup. Interrog. Resp.). Mr. Brew told Petitioner the decision to place her in ASM was firm and based on her previous experience in Defense Acquisitions. Am. Pet. ¶24; Resp. Ex. G at 000220 (Brew Investig. Resp.). He also said that NRE had no vacancies at the time, while ASM was in need of additional staffing. Resp. Ex. G at 000220. When Petitioner reminded Mr. Brew that he granted her request to be transferred from a forerunner to ASM some four years before, he indicated he had forgotten about that, but that Petitioner could try to get back to NRE during the open season the following year; meanwhile he would support her if she requested leave for a detail or to pursue a Ph.D. in the interim. Resp. Ex. Q at 1 (Pet. 1/07/02 email to Walker).

In August 2001, Petitioner's assignment to NRE ended. SJ Dec. at 10 ¶22. She asked that Mr. Brew and Mr. Solomon reconsider the decision to assign her to ASM, and renewed her request that she be extended in the NRE group. *Id.* In her August 10, 2001 memorandum addressed to Mr. Brew, Petitioner said she believed she "fell through the cracks" when the defense environmental issues group was transferred from the DM group to NRE during the

reorganization. Resp. Ex. J. Mr. Brew advised her he had spoken with NRE Managing Director Robert Robinson and that Mr. Robinson told him that NRE was "fully staffed and had no room for her." Am. Pet. ¶27; Resp. Ex. S at 000017 (Pet. EEO Complaint); *see also* Resp. Ex. H at 30 (Robinson Depo.).

The Amended Petition alleges that Mr. Robinson did not want Petitioner in NRE because Edward Zadjura, her supervisor while working in NRE during the reorganization, had given Mr. Robinson negative and false information about her performance. Am. Pet. ¶27. Petitioner's discovery responses state that she was not permanently assigned to NRE because the acknowledged difficulties she had working under Mr. Zadjura had been reported to Mr. Robinson. Resp. Ex. N at 9, 11-12 (Pet. Sup. Interrog. Resp.); Pet. Ex. 1 at 616-17 (Pet. Depo.). Petitioner states that Mr. Zadjura told Mr. Robinson her work was "not very good" and that "she was not particularly easy to work with" and that Mr. Robinson, without affording her any rebuttal opportunity, relied on these representations in not supporting her permanent assignment to NRE. Pet. Fact Statement ¶25.

In August 2001, Petitioner began to pursue a detail to do international work for the Department of State (State).[7] SJ Dec. at 11 ¶23. During the Fall of 2001, she took six weeks of leave and leave without pay (LWOP) in order to explore her detail options. *Id.* ¶22. While she was in Washington on November 2, 2001 as a non-called witness in the *Davis* case, Petitioner spoke with Jesse Hoskins, Chief Human Capital Officer (CHCO) at GAO, about her quest for a detail to State. SJ Dec. at 10 ¶21; Am. Pet. ¶31.

In December 2001, Petitioner received a Community Service Award in Washington from

---

[7] "A detail is the temporary assignment of an employee to a different position or set of duties for a specified period of time. There is no formal position change; officially, the employee continues to hold the position from which detailed and keeps the same status and pay." GAO Order 2300.1 Sup., Employment (General), Ch. 4 ¶4-1 (Oct. 8, 1993).

David Walker, then Comptroller General of the United States (CG). SJ Dec. at 12 ¶28. Petitioner spoke with Mr. Walker and Gene Dodaro, then Chief Operating Officer (COO), about the proposed detail; she asked Mr. Dodaro whether GAO would pay for her detail to State. SJ Dec. at 12 ¶¶28, 29. Mr. Dodaro told her that GAO would not pay her salary while on a detail to the Department of State. *Id.* ¶29. Later in December 2001, State offered to fully fund Petitioner's detail. Am. Pet. ¶37. Mr. Hoskins told Petitioner that she needed final approval for the detail from Jack Brock, Managing Director of ASM. SJ Dec. at 12-13 ¶30. Mr. Brock gave his approval and Petitioner so notified Mr. Hoskins. *Id.;* Am. Pet. ¶38. When Petitioner notified Mr. Solomon of her plans to commence the detail, Mr. Solomon informed her that Mr. Brock's approval of the detail was not sufficient. Instead, she would have to get the approval of the Agency's Executive Committee.[8] Am. Pet. ¶39. The Executive Committee met and decided to deny Petitioner's request for the detail on the basis that there was a policy against details to Executive Branch agencies. SJ Dec. at 13 ¶¶31, 32; Pet. Fact Response ¶¶27, 28.

On January 4, 2002, Petitioner contacted GAO's Office of Opportunity and Inclusiveness (O&I), claiming that the denial of her detail to State was retaliatory. SJ Dec. at 15 ¶35. After O&I gave Petitioner notice of her right to file a formal complaint of discrimination, she filed a complaint (dated April 30, 2002 and filed on May 2, 2002) which included allegations of retaliation in connection with her assignment to ASM and the denial of the detail. SJ Dec. at 16 ¶40; Am. Pet. ¶46; Resp. Ex. S (Pet. EEO Complaint).

Petitioner appealed the decision of the Executive Committee denying her detail request to Comptroller General Walker. SJ Dec. at 15 ¶36. Mr. Walker sustained the Executive Committee's decision, claiming that "we have never done a detail to an Executive Branch

[8] At the time, the Executive Committee consisted of Comptroller General David Walker, Chief Operating Officer Gene Dodaro, Chief Administrative Officer Sallyanne Harper, and General Counsel Tony Gamboa. Resp. Ex. C at 19 (Dodaro Depo.).

agency and...said no to a number of requests." SJ Dec. at 15-16 ¶¶36-38. As an alternative, he initially suggested that Petitioner resign with reinstatement rights, which would include priority consideration for a position for which she was qualified. This had been done in somewhat similar situations where employees were placed in "U.S./Saudi Arabian joint economic commission assignments." Pet. Ex. 10 (Walker 1/08/02 email to Pet.). Mr. Walker explained that such an approach "avoids having a GAO employee involved in Executive Branch or management policy making activities in connection with matters that we may be asked to do work on at some time in the future." *Id.* Petitioner found this suggestion unsatisfactory and, ultimately, Mr. Walker authorized Petitioner to use LWOP[9] for the year of her employment at State. Resp. Ex. S at 000031-32 (EEO Complaint); SJ Dec. at 15 ¶37. She accepted the offer and began a one-year appointment at State in February 2002. SJ Dec. at 16 ¶39. During Petitioner's voluntary year-long LWOP, GAO did not make contributions to her retirement account and she was required to reimburse the Agency for health insurance premiums to maintain her employee health insurance coverage. *Id.*; Am. Pet. ¶45.

In December 2002, as her temporary appointment at State was coming to an end, Petitioner submitted an application for voluntary early retirement pursuant to the Agency's Voluntary Early Retirement Authority (VERA) being implemented through a GAO Notice.[10] SJ Dec. at 17 ¶41. She averred that her reason for retiring was that an extension of her temporary

[9] The governing GAO Order defined Leave Without Pay (LWOP) as "a temporary nonpay status and absence from duty, granted upon an employee's request. LWOP is an authorized absence. . . ." Order 2630.1, Leave Policies & Procedures (1/27/82) Chg. 5, Ch. 12 ¶1a (May 18, 1987) (Resp. Ex. W). It further stated: "Normally, authorization of LWOP is a matter of administrative discretion." *Id.* ¶2.

[10] The Notice was issued pursuant to the Voluntary Early Retirement Authority provided by a 2000 amendment to the GAO Personnel Act, Pub. L. No. 106-303 (codified at 31 U.S.C. §§731 *et seq.*), which authorized the Comptroller General to allow for voluntary early retirement of employees during a period deemed necessary for realigning GAO's workforce with budget constraints and mission needs; correcting skill imbalances; or reducing high-grade, managerial, or supervisory positions. Pub. L. No. 106-303 §1(a); GAO Order 2831.1 ¶3 (Apr. 27, 2001).

appointment at State and her LWOP might result in loss of her health insurance. Am. Pet. ¶47. GAO approved her application for early retirement and scheduled it for March 14, 2003. *Id.* According to the GAO Notice, applications for voluntary early retirement were to be submitted by December 20, 2002 and the retirements were to take effect between February 1 and March 14, 2003. *Id.*; SJ Dec. at 17 ¶41; Resp. Ex. T (VERA Notice).

In January 2003, State agreed to extend Petitioner's temporary appointment and contribute to her health insurance. Am. Pet. ¶48. Petitioner thereafter informed appropriate GAO officials (CHCO Hoskins and Chief Administrative Officer (CAO) Sallyanne Harper) that she no longer wanted to retire. *Id.*; SJ Dec. at 17 ¶43; *see* Resp. Ex. U (Pet. 1/28/03 Letter to Hoskins & Harper). Instead, she asked to withdraw her VERA application and sought to extend her LWOP status for at least one additional year, or until her O&I complaint was resolved. Am. Pet. ¶48; SJ Dec. at 17 ¶43. Petitioner addressed a letter to Mr. Hoskins, Ms. Harper, Mr. Brock and Mr. Howard (ASM Human Capital Manager), dated January 30, 2003, requesting another year of LWOP because her other options were not "ideal"; she also offered to give up her position in Denver if necessary. SJ Dec. at 18 ¶47; Resp. Ex. X at 1-2 (Pet. 1/30/03 Letter to Hoskins, Harper, Brock & Howard). Petitioner's request to extend her LWOP for an additional year was referred to Jack Brock, as ASM Managing Director. SJ Dec. at 18 ¶44.

By letter dated January 30, 2003, Petitioner's request for an additional year of LWOP was denied by Mr. Brock. SJ Dec. at 18-19 ¶¶47, 48; Resp. Ex. Z (Brock Letter). Mr. Brock stated that he did not believe Petitioner met the criteria for such an extension—*i.e.*, that under the Order governing Leave Policies and Procedures (Order 2630.1 (Jan. 27, 1982)), GAO must benefit from the extended absence. Resp. Ex. Z; *see* Resp. Ex. W (Order 2630.1). Mr. Brock did, however, offer a shorter LWOP period to accommodate Petitioner's asserted medical needs.

Resp. Ex. Z.

Upon learning of Mr. Brock's denial of the requested LWOP extension, Petitioner asked Mr. Hoskins to reinstate her request for early retirement. Resp. Ex. BB at 1-2 (Pet. 2/05/03 email to Hoskins). Mr. Hoskins informed Petitioner that he had not notified Human Capital Office (HCO) staff to cancel her retirement application because he had not been sure that her prior communication constituted a request to withdraw the application, rather than a statement that she herself intended to contact HCO staff to do so. *Id.*

In the meantime, Petitioner appealed the denial of her requested LWOP extension to Mr. Walker, asking his assistance because "all of the people involved in approving" the extension were also involved in her pending discrimination complaint. SJ Dec. at 19 ¶50; Resp. Ex. AA (Pet. 1/30/03 Letter to Walker). Mr. Walker referred the matter back to Mr. Hoskins on the ground that there was no right to appeal the denial of a LWOP request. Am. Pet. ¶52. On February 5, 2003, Mr. Hoskins emailed Petitioner, informing her that there was no appeal process for a LWOP denial, and that "Mr. Brock's decision on this matter stands." Resp. Ex. BB at 1. Petitioner thereafter emailed Mr. Hoskins asking if she could delay her early retirement for 8-11 months. SJ Dec. at 20 ¶52. Mr. Hoskins told Petitioner that he could not authorize such a delay of her retirement, because the VERA announcement required that employees retire by March 14, 2003. *Id.*. ¶53; Resp. Ex. BB at 1 (Hoskins 2/05/03 email to Pet.). On February 10, 2003, Petitioner retired from GAO. SJ Dec. at 20 ¶55; Resp. Ex. CC (Notification of Personnel Action).

On February 6, 2003, Petitioner amended her O&I complaint, alleging that "GAO's action in denying her requests for an LWOP extension and delay in retirement date were retaliation for engaging in protected activity, part of a retaliatory hostile environment, and

resulted in her constructive discharge." Am. Pet. ¶54.

O&I completed its investigation of Petitioner's complaints, and issued a Report of Investigation (ROI), portions of which have been introduced into the Motion record by the parties.

## IV. PARTIES' ARGUMENTS ON APPEAL

PETITIONER

Petitioner asserts on appeal that: (1) she was denied due process during the course of the investigation of her original complaint; (2) the initial complaint was improperly "fragmented;" (3) the AJ erred in finding Petitioner's claims were untimely; (4) the AJ erroneously concluded there were no genuine, material facts in dispute; (5) the AJ erred in concluding Petitioner did not adequately respond to legitimate nonretaliatory reasons offered by GAO for several challenged employment actions; and (6) the AJ erroneously concluded that GAO was entitled to judgment as a matter of law on all of the claims.

PAB/OGC

The PAB/OGC argues that the AJ erred: (1) in concluding, *sua sponte*, that one of the claims was untimely; (2) in applying the wrong standard to decide the constructive discharge claim; (3) in not drawing all reasonable inferences in Petitioner's favor; and (4) in failing to acknowledge that there were material facts in dispute concerning some of Petitioner's claims, as well as GAO's proffered reasons for its actions.

GAO

GAO contends that Petitioner's due process and "fragmentation" claims should not be considered because they were first raised on appeal. The Agency also argues that Petitioner's

Case: 15-6002 Document: 10 Page: 78 Filed: 06/17/2015

claim challenging the manner in which the investigation and processing of her claims was handled is not a cognizable claim and lacks merit.

GAO further maintains that the AJ correctly decided the Motion for Summary Judgment based on undisputed material facts establishing that it was entitled to judgment as a matter of law. The Agency argues that Petitioner did not establish a *prima facie* case of retaliation because she did not establish a nexus between its actions and her protected activities. GAO also contends that summary judgment was appropriate because Petitioner did not sufficiently rebut the Agency's articulated, legitimate, nonretaliatory reasons for each of its actions. Finally, GAO maintains that Petitioner failed to show that the AJ misapplied Federal Circuit or Board case law concerning her constructive discharge claim.

## V. DISCUSSION

STANDARD OF REVIEW

Board regulations provide that on appeal from an initial decision, the Board:

> may substitute its own findings of fact and conclusions of law, but the Board generally will defer to demeanor-based credibility determinations made in the initial decision. In determining whether some action other than affirmance of the initial decision is required, the Board will also consider whether:
>
> (1) New and material evidence is available that, despite due diligence, was not available when the record was closed;
> (2) The initial decision is based on an erroneous interpretation of statute or regulation;
> (3) The initial decision is arbitrary, capricious or an abuse of discretion, or otherwise not consistent with law; [or]
> (4) The initial decision is not made consistent with required procedures and results in harmful error.

4 C.F. R. §28.87(g).[11]

---

[11] *See also*, 4 C.F.R. §28.87(f): "Upon appeal or following its review, *sua sponte*, the Board may affirm, reverse, modify or vacate the initial decision in whole or in part. . . ."

Pursuant to these regulations and instructional case law, the Board may review *de novo* a decision on a motion for summary judgment, but ordinarily will not reverse that decision unless it is inconsistent with law or is otherwise based on an erroneous interpretation of statute or regulation. *Yant v. United States,* 588 F.3d 1369, 1372 (Fed. Cir. 2009); *Taydus v. GAO,* PAB Docket No. 07-03 at 5 (5/04/10) *(en banc); see Turner v. GAO,* PAB Docket No. 08-01 at 5-6 (9/18/09) *(en banc)*; *Gatlin-Brown v. GAO,* PAB Docket No. 00-02 at 4 (11/09/01) *(en banc)*; *Madson v. GAO,* PAB Docket No. 96-07 at 2 (12/02/97) *(en banc).*

NEW ISSUES ON APPEAL

Petitioner argues for the first time on appeal that she was denied due process when O&I allegedly failed to complete its investigation in a timely manner, or provide her with a complete and final copy of the Report of Investigation; and that the Agency did not timely issue the Final Agency Decision (FAD). She claims that her original complaint was "fragmented" when the O&I report ignored her age and sex discrimination claims and some of her retaliation claims on grounds that they were time-barred. Petitioner further argues that the PAB/OGC failed to timely investigate her claims after she filed her charges with that Office. App. Brief at 10-13, 15.

GAO responds that these claims were not raised either in the Amended Petition or in Petitioner's Opposition to the Motion for Summary Judgment and, therefore, they must be deemed waived. Response Brief at 4-5. GAO also asserts that the Board is not authorized to remedy Petitioner's due process violation claims because the prior investigations were conducted by O&I and the PAB/OGC, and Board precedent forecloses claims challenging the manner in which either entity processes and investigates a claim. *Id.* at 5. GAO also asserts that if Petitioner was concerned about the O&I delay in completing the investigation, she had the right to "opt out" and proceed with her charge with the PAB/OGC anytime after 120 days had elapsed

from the date her complaint was filed with O&I (GAO Order 2713.2, Discrimination Complaint Process, Ch. 6 ¶4.a(2) (Dec. 2, 1997)) or to file a Petition with the PAB after 180 days had elapsed from the date of her charge filing with the PAB/OGC (4 C.F.R. §28.18(a)(2)). *See* Response Brief at 13 n.5.

We conclude that there is no reason to address these issues on appeal because they were not first presented to the AJ. Although we have the authority to review such issues, we decline to do so because Petitioner has not offered any good cause explanation for her failure to present the issues to the AJ in the first instance. *Smithkline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006); *Gant v. United States*, 417 F.3d 1328, 1332 (Fed. Cir. 2005); *Bosley v. MSPB,* 162 F.3d 665, 668 (Fed. Cir. 1998). Moreover, even if the Board were to exercise its discretion and review the new claims alleging delayed investigation of Petitioner's complaints, the claims are not timely. Petitioner had no obligation to wait for a completed investigation by O&I, a Final Agency Decision, or a completed PAB/OGC investigation before filing her Petition before this Board. *See* GAO Order 2713.2, Ch. 6 ¶4.a(2) (Dec. 2, 1997); 4 C.F.R. §28.18(a)(2). Further, a petitioner is "not bound by the conclusions reached by [O&I or the PAB/OGC] and may proceed to present her best case before the Personnel Appeals Board [that will] take a fresh look at her allegations." *Gaston v. GAO*, PAB Docket No. 99-02 at 4 (Order of 7/11/00); *see Chennareddy v. Dodaro,* 698 F.Supp. 2d 1, 11 & n.20 (D.D.C. 2009).

## LEGAL STANDARDS

### A. SUMMARY JUDGMENT ANALYSIS

Section 28.21(c)(3) of the Board's regulations provides that upon the filing of a motion for summary judgment:

> Summary judgment will be granted if the pleadings, depositions, answers to interrogatories, admissions, affidavits, if any, and other documents show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[12]

4 C.F.R. §28.21(c)(3). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Ethicon Endo-Surgery v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998); *Bryant v. GAO*, PAB No. Docket No. 10-03 at 13-14 (7/11/11); *37 Named Petitioners v. GAO*, PAB Docket No. 09-01 at 9 (3/31/10). As stated in *Taydus v. GAO*, PAB Docket No. 07-03 at 3 (1/13/09), the PAB has recognized that:

> [a]lthough the moving party bears the burden of demonstrating the absence of genuine issues of material fact, it can discharge this burden by showing *an absence of evidence to support the nonmoving party's case. Conroy v. Reebok Int'l*, 14 F.3d 1570, 1575 (Fed. Cir. 1994). *See also, Madson v. GAO*, PAB Docket No. 96-07 (Apr. 23, 1997), *aff'd en banc*, Dec. 2, 1997. Thus, *a party opposing summary judgment must do more than show "some metaphysical doubt" as to the material facts to create a triable issue. United States v. Newport News Shipbuilding & Dry Dock Co.*, 933 F.2d 996, 1000 (Fed. Cir. 1991) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) ("the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial'")); *Gatlin-Brown v. GAO*, PAB Docket No. 00-02 (Mar. 23, 2001), *aff'd en banc*, Nov. 9, 2001.

*Taydus v. GAO* at 4, *aff'd en banc* (5/04/10) (quoting *Tekeley v. GAO*, PAB Docket No. 06-16 at 22 (8/09/07)) (emphasis in original).

Once the moving party proffers undisputed facts to establish entitlement to judgment as a matter of law, the party opposing the motion for summary judgment must establish that there are

---

[12] This rule essentially tracks Fed. R. Civ. P. 56.

genuine material facts in dispute and/or that the movant is not entitled to judgment on the undisputed facts. "Material facts are those facts which might affect the outcome of the litigation. Factual disputes which are irrelevant or unnecessary will not be considered." *Madson v. GAO*, PAB Docket No. 96-07 at 7 (4/23/97), *aff'd en banc* (12/2/97). The party opposing a motion for summary judgment must present sufficient evidence to establish that a reasonable factfinder could return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).[13]

A motion for summary judgment must be decided by accepting the nonmovant's evidence as true and by drawing reasonable inferences and resolving factual ambiguities in favor of the nonmovant. *Reeves v. Sanderson Plumbing Prod.*, 530 U.S. 133, 150-51 (2000); *Matsushita Elec. Indus. v. Zenith Radio Corp*, 475 U.S. 574, 587-88 (1986); *U.S. v. Diebold*, 369 U.S. 654, 655 (1962). Nonetheless, inferences that are supported by only speculation or conjecture are not sufficient to defeat a summary judgment motion. *Hnin* v. *TOA*, 751 F.3d 499, 509 (7th Cir. 2014).

A motion for summary judgment should not be decided based on credibility determinations or factual findings. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).

---

[13] We believe our dissenting colleagues' conclusion that Petitioner's ASM assignment and State Department detail claims should survive summary judgment because there are triable issues of fact going to these claims overlooks important parts of the *Liberty Lobby* summary judgment analysis. *Liberty Lobby* and its progeny establish that the summary judgment analysis involves more than simply determining if there is conflicting evidence regarding material facts. Disputes over facts which are not material to the outcome of the case should not even enter into the equation. The decision to grant or deny summary judgment must be made on the motion record taken as a whole after giving credence to both Petitioner's evidence as well as GAO's uncontradicted evidence. In this process, Petitioner is not entitled to favorable inferences predicated on argument, speculation or conjecture. Rather, the nonmovant must offer "concrete evidence from which a reasonable [factfinder] could return a verdict in his favor." *Liberty Lobby*, 477 U.S. at 256. Ultimately, the summary judgment determination comes down to whether, on the motion record taken as a whole, the Petitioner has presented sufficient probative evidence to establish that a reasonable factfinder could return a verdict in her favor. Dubious claims should be dismissed at the summary judgment stage. *See University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. __, 133 S.Ct. 2517, 2532 (2013).

Rather, the decision should rest on whether there are material facts in genuine dispute—that is, facts in dispute that would affect the outcome of the litigation. *See Liberty Lobby,* 477 U.S. at 248-50. The court must review the record "taken as a whole," giving credence to the evidence favoring the nonmoving party as well as uncontradicted evidence supporting the moving party. *Reeves,* 530 U.S. at 150-51.

In evaluating whether the nonmoving party has produced sufficient evidence for a reasonable factfinder to conclude that the moving party's stated reasons are pretextual, the judge may consider among the total circumstances of the case the underlying strengths and weaknesses of the nonmoving party's *prima facie* case. *Evans v. Sebelius*, 716 F.3d 617, 620 (D.C. Cir. 2013). Finally, "[e]valuating whether evidence offered at summary judgment is sufficient to send a case to [trial] is as much art as science." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011). In such a case, the court must carefully assess whether the evidence is "merely colorable" or whether there is "sufficient evidence favoring the nonmoving party for a [factfinder] to return a verdict for that party." *Liberty Lobby*, 477 U.S. at 248-49. These principles will be applied in reviewing the AJ's Decision on Summary Judgment herein.

As the Supreme Court held in *Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715 (1983), in a case such as the present one, where the employer has defended against a retaliation claim by arguing that it had legitimate, nondiscriminatory reasons (LNDRs) for taking an adverse employment action, the question of whether the plaintiff has established a *prima facie* case of retaliation under the *McDonnell Douglas* factors becomes irrelevant.[14] Rather, the issue

---

[14] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Although *Aikens* dealt with a claim of discrimination based on race, as opposed to retaliation as here involved, it is clear to us that *Aikens* applies equally to retaliation claims. *See, e.g., Solomon* v. *Vilsack*, 763 F.3d 1, 14 (D.C. Cir 2014). We also note that there is a split among the Circuits as to whether *Aikens* applies at the summary judgment stage. In this regard, the D.C. Circuit, along with the Eleventh Circuit, has held that *Aikens* does apply at the summary judgment stage. *Brady v. Ofc. of Sgt. at Arms*, 520 F.3d 490, 493-94 (D.C. Cir. 2008);

Case: 15-6002 Document: 10 Page: 84 Filed: 06/17/2015

to be decided by the finder of fact is whether the record in the case establishes that the defendant intentionally discriminated against the plaintiff. *Aikens*, 460 U.S. at 715-16. The Court in *Aikens* went on to hold that the plaintiff retains the overall burden of persuasion. *Id.* at 716.

B. RETALIATION

To establish a claim of retaliation, Petitioner must show that she engaged in a statutorily protected activity, that the Agency took an adverse employment action, and that a causal connection exists between the protected activity and the adverse employment action. SJ Dec. at 24-25. The AJ determined, and we concur, that Petitioner was involved in protected activity under Title VII. Petitioner repeatedly complained to her supervisors about what she saw as the discriminatory effect of pay banding on pay for women, and she was also interviewed and prepared to testify for two cases brought before the Board by employees of the Denver Field Office. The AJ determined that such participation in the GAO administrative process also constituted protected activity. SJ Dec. at 25.

In 2013, the Supreme Court of the United States issued a decision establishing that the "but-for" standard of causation applies to Title VII retaliation claims under 42 U.S.C. §2000e-3. In *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. __, 133 S.Ct. 2517 (2013), the Court rejected as legally incorrect the less demanding "motivating factor" standard of causation previously applied in both private and federal sector retaliation claims and held that the proper standard is "but-for" causation, under which a party alleging retaliation must prove that

---

*Morrison v. City of Bainbridge*, 432 Fed. Appx. 877, 881 n.2 (11th Cir. 2011) (unpublished). Three other Circuits (the 4th, 5th, and 10th) have held that it does not. *See, e.g., Pepper v. Precision Valve Corp.*, 526 Fed. Appx. 335, 336 n.* (4th Cir. 2013) (unpublished); *Stallworth v. Singing River Health Sys.*, 469 Fed. Appx. 369, 372 (5th Cir. 2012) (unpublished); *Hinds v. Sprint/United Mgmt.*, 523 F.3d 1187, 1202 n.12 (10th Cir. 2008). We will follow the holdings of the courts that apply *Aikens* at the summary judgment stage, as we believe this approach to be more in line with the effective and efficient handling of discrimination and retaliation claims.

but for retaliation the complained of adverse action would not have been taken. 133 S.Ct. at 2528. *Nassar* arose, however, in a private sector context, and the Supreme Court's holding does not specifically address federal sector Title VII retaliation claims, which arise under the language of 42 U.S.C. §2000e-16(a) rather than 42 U.S.C. §2000e-3. *See* SJ Dec. at 3 (retaliation proscription implicit in federal sector provision prohibiting discrimination). Since *Nassar*, federal circuit[15] and district[16] courts have consistently applied the "but-for" standard to federal

---

[15] *See, e.g., Chiang v. Donahoe*, 579 Fed. Appx. 39, 42 (2nd Cir. 2014) (unpublished) (to survive summary judgment on retaliation claim, Postal employee must prove "protected activity was a but-for cause of the alleged adverse action"); *Staley v. Gruenberg*, 575 Fed. Appx. 153, 156 (4th Cir. 2014) (unpublished) (temporal proximity alone insufficient to prove that FDIC employment action would not have been taken "but for" protected activity); *Bell v. Shinseki*, 584 Fed. Appx. 42, 43 (4th Cir. 2014) (unpublished) (throughout summary judgment process VA employee bore ultimate burden to establish that "'protected activity was a but-for cause of the alleged adverse action'"); *Philbrick v. Holder*, 583 Fed. Appx. 478, 489 (6th Cir. 2014) (unpublished) (Marshals Service employee must establish that "but-for" protected activity adverse action would not have occurred); *Campbell v. Hagel*, 536 Fed. Appx. 733, 734 (9th Cir. 2013) (unpublished) (plaintiff required to show protected activity was a "but for" cause of adverse employment action; no showing of adverse employment action made).

[16] *See, e.g., Brooks v. Kerry*, 37 F.Supp. 3d 187, 207-08 (D.D.C. 2014) (State Department employee must, consistent with *Nassar*, provide "'proof that the desire to retaliate was the but-for cause of the challenged employment action'"); *Xia v. Jewell*, 2014 WL 1350142, *4 (D. Utah 2014) (unpublished) (Interior employee provided evidence of pretext from which reasonable jury could conclude that retaliation for protected activity was "but-for" reason for adverse action); *Brooks v. Blank*, ___ F.Supp. 3d ___, 2014 WL 1495774, *13 (S.D.N.Y. 2014) (Commerce employee must establish that "protected activity was a 'but-for' cause of the alleged adverse action"); *Morales v. Gotbaum*, 42 F.Supp. 3d 175, 188 (D.D.C. 2014) (PBGC employee "must establish that retaliation was the 'but-for cause' of the adverse action" to survive summary judgment); *Young v. McHugh*, 24 F.Supp. 3d 658, 668 (E.D. Mich. 2014) (Army employee alleging retaliation must establish protected activity was "but-for" cause of alleged adverse action); *Burks v. Salazar*, ___ F.Supp. 3d ___, 2014 WL 2575740, *18-19 (E.D. Cal. 2014) (Interior employee failed to establish protected activity was "but-for" cause where undisputed facts showed dissatisfaction with employee's work performance); *Watt v. Mabus*, ___ F.Supp. 3d ___, 2014 WL 2533399, *4-5 (E.D. Va. 2014) (*Nassar* standard forces Navy employee to show that alleged adverse action would not have occurred absent retaliation for protected activity; reason cannot be pretext unless shown to be false); *Crockett v. Mabus*, ___ F.Supp. 3d ___, 2014 WL 3109786, *5 (M.D. Ga. 2014) (summary judgment appropriate where Navy employee "failed to produce evidence from which a reasonable jury could find that [protected] EEO activity was the 'but-for' cause" of alleged retaliation); *Jones v. McHugh*, 2014 WL 3107996, *4 (D. Kan. 2014) (unpublished) (Army employee must establish that protected activity was 'but-for' cause of alleged adverse action); *Arroyo v. Comm'r of Soc. Sec.*, 2014 WL 2615750, *4 (D.P.R. 2014) (unpublished) (retaliation plaintiff must establish that protected activity was but-for cause of alleged adverse action); *Day-Lewis v. EEOC*, 2014 WL 4632221, *8 (E.D. Pa. 2014) (unpublished) (plaintiff must establish that protected activity was a "but for" cause of adverse employment action).

sector retaliations claims. In contrast to this developing line of federal circuit and district court caselaw, the United States Equal Employment Opportunity Commission (EEOC) recently declined to apply *Nassar* to federal sector retaliation cases in *Petitioner v. Sally Jewell, Secretary, Dept. of Interior*, EEOC Doc. No. 0320110050, 2014 WL 3788011, at *10 n.6 (EEOC 7/16/14). In this case, the EEOC expressed its view that "the 'but for' standard ... does not apply to retaliation claims by federal sector . . . employees under Title VII or the ADEA because the relevant federal sector statutory language does not employ the 'because of language on which the Supreme Court based its holdings in [*Nassar*] and *Gross v. FBL Fin. Servs.*, 557 U.S. 167 (2009) (requiring 'but-for' causation for ADEA claims brought under 29 U.S.C. §623)'."

While the Board is certainly obliged to consider Executive agency decisions for guidance, it is not bound to accept such decisions as controlling. *GAO v. GAO/PAB*, 698 F.2d 516, 535 (D.C. Cir. 1983); *see Taylor-Carter v. GAO*, PAB Docket No. 96-03 at 5 (12/18/96) (Board looks at MSPB decisions for guidance); *Shaller v. GAO*, PAB Docket No. 02-102-04-87 at 2 (12/01/81). Moreover, we see no reason to specifically address *Nassar*'s application to federal sector retaliation claims in order to resolve the issues now before us.

The AJ held that Petitioner's claims did not survive summary judgment under the "motivating factor" standard of causation. In so concluding, the AJ noted that, "[t]he *Nassar* decision does not change the outcome of this case." SJ Dec. at 25 n.9. On appeal, neither party has raised an issue regarding this determination.[17]

Because we ultimately affirm the AJ's grant of summary judgment to GAO on Petitioner's retaliation claims under the "motivating factor" standard, albeit on somewhat

[17] Petitioner's appeal concurred with the AJ's conclusion that *Nassar* did not affect the outcome of the case on summary judgment. App. Brief at 30. Neither the PAB/OGC's Amicus submission nor GAO's Response to Petitioner's Appeal address the applicability of *Nassar*.

different grounds and with a partial dissent by two Board members,[18] there is no need to decide the applicability of the "but-for" causation standard. Since Petitioner's claims do not survive summary judgment under the motivating factor standard of causation, they— *ipso facto*—would not survive summary judgment under the "but-for" standard of causation. We therefore decline in this case to decide the applicability of the *Nassar* "but-for" standard of causation to retaliation claims arising at GAO.[19]

PETITIONER'S CLAIMS

A. THE ASM ASSIGNMENT

For the reasons set out below, we affirm the AJ's grant of summary judgment to GAO on the claim that Petitioner's 2001 assignment to ASM was in retaliation for her protected activity.[20]

---

[18] As the Board is composed of five members, one of whom wrote the underlying Summary Judgment Decision, the affirmance of that Decision by two additional members constitutes a majority for purposes of this appeal. *See* 4 C.F.R. §27.1.

[19] The dissent's assertion that this Board's decision argues in favor of applying the "but for" causation standard (dissenting opinion, at 3) is incorrect. The Board has simply found it unnecessary to resolve the issue in the circumstances presented in this case.

[20] We note that the AJ *sua sponte* raised the issue as to whether the ASM assignment claim was timely submitted to the Agency. Despite the fact that GAO did not raise a timeliness defense, it appears the AJ concluded that the filing time limit was jurisdictional and that Petitioner's ASM assignment claim was not timely filed. However, the AJ nevertheless proceeded to address the ASM assignment claim on the merits. We believe the filing time limit is not jurisdictional. *See, e.g., Zipes v. TWA*, 455 U.S. 385, 398 (1982). Rather, it constitutes an affirmative defense that GAO could waive and that was subject to estoppel and equitable tolling arguments. *Hammond v. Chao,* 383 F.Supp. 2d 47, 55 (D.D.C. 2005). We also note that in Petitioner's appeal papers to the full Board, she raises factual issues concerning whether the claim was filed with GAO within the 45-day filing period and seeks to supplement the record with documents not submitted below. Evidence not submitted in connection with the AJ's decision is not generally allowed. *Brenneman v. OPM,* 439 F.3d 1325, 1328 (Fed. Cir. 2006); *Gatlin-Brown v. GAO,* PAB Docket No. 00-02 at 4 (11/09/01) *(en banc)* (citing 4 C.F.R. §28.87(g)(1)). Moreover, Petitioner has not argued that these documents constitute new and material evidence that was previously unavailable. We therefore decline to permit supplementation of the record. However, we conclude based on the existing record that GAO waived any right that it had to assert that Petitioner's ASM assignment claim was untimely. Accordingly, for purposes of this appeal, we accept Petitioner's ASM assignment claim as timely filed and proceed to address the claim on its merits.

In reaching this conclusion, we have examined the evidentiary record to determine whether, accepting Petitioner's evidence as true and by drawing reasonable inferences and resolving factual ambiguities in her favor, a reasonable factfinder could conclude based on a preponderance of the evidence that GAO's proffered legitimate nondiscriminatory reasons for its actions are untrue and that more likely than not Petitioner's assignment to the ASM team was actually motivated by retaliation for her protected activities.

The starting point for analysis of the ASM assignment claim is the pertinent material facts that are not in dispute: Over the years from 1993 to 2000, Petitioner was assigned to NSIAD's Denver component doing defense environmental work for both its Defense Management and NASA and Defense Acquisition groups and international work for its International Relations and Trade group. Pet. Fact Response ¶¶2, 3. In 2000, GAO began a structural reorganization in which it went from five divisions covering 35 issue areas to 13 teams. As the reorganization progressed, employees were given initial assignments to teams, and then GAO initiated a voluntary preference survey to allow employees to express assignment preferences. Pet. Fact Response ¶¶4, 6. Petitioner completed the survey, indicating that she wished to remain in Denver and listing the International Affairs and Trade (IAT) team as her first choice, the NRE team as her second choice, and no third choice. Pet. Fact Response ¶9.

At the time Petitioner completed the survey, she was working on an assignment for the NRE team under the supervision of Edward Zadjura. That assignment ran from November 2000 to August 2001. Pet. Fact Statement ¶25. Petitioner had work-related difficulties with Mr. Zadjura, who reported his concerns about the quality of Petitioner's work performance to the Director of NRE, Robert Robinson. Pet. Fact Response ¶¶11, 12; Pet. Fact Statement ¶25.

Case: 15-6002 Document: 16 Page: 89 Filed: 06/17/2015

GAO's Managing Director of Field Operations, Thomas Brew, led the analysis of employee preference surveys and had responsibility for making team assignments for field staff. Pet. Fact Response ¶7. On April 10, 2001, Petitioner was informed that she was being assigned to the Denver ASM team. Am. Pet. ¶24. On April 19, 2001, Petitioner protested the assignment to Mr. Brew, who told her the decision was firm and was based on her previous experience in Defense Acquisitions, a predecessor group to ASM. *Id.*; Resp. Ex. G at 000220 (Brew Investig. Resp.); Resp. Ex. N at 5 (Pet. Sup. Interrog. Resp.). Mr. Brew also stated that NRE had no vacancies at the time, and that ASM was in need of additional staffing. Resp. Ex. G at 000220.

Petitioner thereafter continued to protest the assignment to ASM and asked to be permitted to remain in NRE upon completion of her NRE project, which was about to end. On August 10, 2001, she sent a memorandum to Mr. Brew again seeking reconsideration of her assignment to allow her to continue working in NRE. Resp. Ex. J; *see* Resp. Ex. S at 000022-24 (Pet. EEO Complaint). Petitioner met with Mr. Brew on August 16, 2001, when he told her that he had spoken with NRE Director Robinson, who said that NRE was fully staffed and had no room for her. Am. Pet. ¶27; Resp. Ex. S at 000017, 000024.

In reviewing the AJ's Decision, it is clear that his analysis and conclusions on the ASM assignment claim focus exclusively on Mr. Robinson as the operative decisionmaker. SJ Dec. at 28. In our view, however, the record evidence establishes that Mr. Brew was the Agency official who interacted with Petitioner and was the face of GAO management with respect to the ASM assignment.

GAO asserted before the AJ two LNDRs for assigning Petitioner to ASM rather than NRE—first, that Mr. Robinson had concerns based on his discussions with Mr. Zadjura about the quality of Petitioner's job performance during her work assignment in NRE while the GAO

reorganization was pending; and second, that NRE was at full complement at the time and therefore there was no open position in NRE to which she could be assigned. *Id.*

On appeal, Petitioner contends that there is no evidence to establish that Mr. Robinson ever communicated to Mr. Brew his concerns about Petitioner's job performance, and therefore that concern could not have influenced the latter's decision; and second, that the evidence shows there were in fact openings in NRE to which she could have been assigned. App. Brief at 34-37. She further argues that NRE could not have been full because she had previously been permanently assigned to NRE and therefore her assignment out of NRE created a vacancy there. *Id.* at 36.

As to Petitioner's argument that she was permanently assigned to NRE at the time GAO reassigned her to ASM, this is not supported by a full reading of Petitioner's statements in the record. While Petitioner testified at deposition in 2012 that she had been permanently assigned to NRE at or about the time of the reorganization, her previous statements as well as the allegations in her Petition are inconsistent with this assertion.[21]

Petitioner's previous statements and allegations evidence that she knew that she was subject to being moved during the reorganization. Thus, in her EEO compliant, Petitioner stated that on November 1, 2000 she "[m]et with NRE Director Robinson, told him it looked like the international work would not be brought back into Denver, and asked to stay in his group." Resp. Ex. S (Pet. EEO Complaint) at 000016. And, in response to a GAO interrogatory, she stated that on November 1, 2000 she spoke to Mr. Robinson about "possibly remaining in the Defense Environmental Area after the job I was then working on was completed." Resp. Ex. N

[21] In concluding that Petitioner's assertion at deposition that she was permanently assigned to NRE created a genuine issue of material fact for trial, our dissenting colleagues ignore probative statements from Petitioner herself establishing that she knew she was not permanently assigned to NRE. Petitioner cannot properly ask the Board to ignore this evidence, which corroborates testimony from Messrs. Brew and Robinson that Petitioner was not permanently assigned to NRE.

at 52 (Pet. Sup. Interrog. Resp. #17). Petitioner also wrote in her August 10, 2001 memorandum to Mr. Brew, "I believe I fell through the cracks when [defense environmental] work was transferred from the the Defense Management group to NRE during the reorganization." Resp. Ex. J. Finally, at deposition, Petitioner acknowledged speaking during the reorganization with an employee assisting Mr. Brew on the employee preference surveys and had no explanation for why the employee's notes of the conversation reflected she said that she was then "on loan" with NRE and had been "homeless" for a year.[22] Resp. Ex. A at 313-14 (Pet. Depo.); *see also* Pet. Ex. 1 at 614-15 (Pet. Depo.).

This evidence confirms that Petitioner understood that she was at a minimum subject to being reassigned even if she was permanently assigned to NRE. Further, GAO's contention that she was not permanently reassigned is supported by Mr. Robinson, the Director of NRE in his investigative response: she "was only temporarily assigned to an NRE project while her permanent assignment in the Denver [F]ield Office was being worked out." Resp. Ex. I (Robinson Investig. Resp. #21); *Id.* Resp. #3; Resp. Ex. G (Brew Investig. Resp. #23). We note, however, that the process of Agency reorganization outlined in CG Walker's October 6, 2000 Memorandum (Resp. Ex. D) stated that the employee preference survey was voluntary and provided an opportunity to indicate interest in changing initial work group assignments. Petitioner participated in that opportunity, regardless of how one characterizes the nature of her

[22] The evidence establishing that Petitioner was not permanently assigned to NRE is consistent with the process that CG Walker outlined in a September 29, 2000 memorandum concerning the status of efforts to implement the reorganization. Pet. Ex. 12 at 3. The evidence is also consistent with a fair reading of what Petitioner alleged in her Petition. Paragraph 21 alleges that in early 2000 Petitioner transitioned back into the DMN group when Denver stopped doing international work and that later in 2000, prior to the reorganization, the DMN group's environmental work was transferred to another division, along with field staff, and renamed the NRE group (there is no evidence in the record that Petitioner was actually transferred to another division prior to the reorganization). Paragraph 23 alleges that as part of the reorganization, staff was asked for input "on which teams they wished to be permanently placed upon completion of their-then current assignments." And paragraph 24 alleges that Petitioner was notified on April 10, 2001 that she would be placed in ASM. *See* Am. Pet. ¶¶21, 23, 24.

Case: 15-6002 Document: 10 Page: 92 Filed: 08/17/2015

attachment to the new NRE team at the early stages of the reorganization. As the Memorandum explained, employees' stated preferences would "be taken into account after [management] consider[ed] organizational needs, staff skills and knowledge." *Id.* In this context, we proceed to examine the Agency's proffered LNDRs.

As to GAO's first proffered LNDR, we agree with Petitioner that the record does not support a finding that Mr. Brew was aware of Mr. Robinson's concerns about her performance in NRE prior to April 10, 2001, when she was notified that Mr. Brew was assigning her to ASM. Before us on review, GAO's only evidentiary argument on this point is that Petitioner admitted that Mr. Robinson had communicated his concerns to Mr. Brew when she said in Petitioner's Fact Statement (¶25) that "Robinson did not support Petitioner's permanent assignment to NRE." This statement does not, however, establish the necessary connection between Mr. Robinson's concerns and Mr. Brew's April 2001 decision.

There is no dispute that Mr. Robinson did not want Petitioner in NRE, but that is not the relevant point for inquiry with respect to the ASM assignment decision that was initially communicated on April 10, 2001.[23] Rather, the key issue at that point in time was whether Mr. Brew knew of Mr. Robinson's concerns and made the decision to assign Petitioner to ASM rather than NRE based on those performance concerns. We find no evidence in the record to support a conclusion that Mr. Robinson's concerns were a consideration in April 2001. Neither Mr. Brew's nor Mr. Robinson's deposition testimony or interrogatory responses indicate that

[23] As discussed *infra*, the record does establish that Messrs. Robinson and Brew spoke sometime before August 19, 2001, after Petitioner continued to press Mr. Brew to reverse the ASM assignment decision and place her in NRE. Based on Petitioner's evidence and argument, it appears that it was at this time that Mr. Robinson advised Mr. Brew that he would not support placing Petitioner in NRE because of performance concerns expressed by Mr. Zadjura while she was doing NRE work and because NRE was then fully staffed. Am. Pet. ¶27; Resp. Ex. S at 000017 (EEO Complaint). However, it is unclear when this conversation took place and the evidence only shows that Petitioner was told about this conversation some four months after she was assigned to the ASM team. GAO cannot rely upon it to defend the initial April 10, 2001 assignment decision made by Mr. Brew.

Petitioner's performance while temporarily assigned to NRE entered into the April 10, 2001 decision to assign her to ASM. Accordingly, this proffered LNDR does not support the April 10, 2001 decision and GAO cannot properly rely upon it to justify that decision.[24]

However, this does not end our inquiry because the summary judgment record does contain undisputed facts and uncontroverted evidence to establish that Mr. Robinson's acknowledged concern about Petitioner's performance in NRE was a LNDR for Mr. Brew's eventual August 2001 refusal to reconsider the ASM assignment after Petitioner persisted in protesting the assignment and asking to continue working in NRE.[25]

We conclude that the undisputed facts and additional uncontroverted evidence, much of it from Petitioner herself, establish that Mr. Robinson's concern about Petitioner's performance while she was doing NRE work was a legitimate nondiscriminatory reason in August 2001 for Mr. Brew to decline to place Petitioner in NRE and to reaffirm the April 2001 decision to assign her to ASM. Petitioner has not effectively rebutted this LNDR and we hold that a reasonable factfinder could not conclude on this record that the LNDR is a mere pretext and that more likely than not the real reason GAO ultimately refused to assign Petitioner to NRE rather than ASM was retaliation for her protected activities.

Petitioner ignores the undisputed facts and unchallenged evidence that Mr. Robinson's opposition to her permanent assignment to NRE as part of the formal reorganization, which is untainted by any evidence of retaliatory animus, was a perfectly rational, legitimate reason for

---

[24] The dissent (at 34-35) states that Mr. Robinson's objection to Petitioner's placement in NRE was not made "during the placement process." However, his statement about not supporting Petitioner was made in response to a question that referenced "the time that [Petitioner] was attempting to remain in the Defense Environmental area." *See* Resp. Ex. H at 30 (Robinson Depo.); Resp. Ex. I at 330 (Robinson Supp. Statement).

[25] The parties are responsible for the summary judgment record they create and must on appeal anticipate that the Board's *de novo* review will include the entire record, including material which undercuts a party's position on appeal.

Case: 15-6002 Document: 10 Page: 94 Filed: 06/17/2015

GAO's refusal to permanently assign her to the NRE team where she admittedly had difficulties over the course of her 2000-01 assignment. Petitioner cannot defeat summary judgment by disavowing factual allegations in her own unamended pleadings, which constitute binding judicial admissions. *Sovereign Bank v. BJ's Wholesale Club*, 533 F.3d 162, 181 (3rd Cir. 2008). And, while her discovery responses are not binding judicial admissions, they are evidence properly considered in evaluating a motion for summary judgment. *Bradley v. Allstate*, 620 F.3d 509, 526-29 (5th Cir. 2010) (party cannot manufacture an issue of fact to defeat summary judgment by contradicting a sworn discovery response).

It is clear that, throughout the proceedings below, Petitioner attributed her assignment to ASM in large part to the bad experience she had working under Mr. Zadjura in NRE. Her Petition alleges at paragraph 27 that in August 2001, Mr. Brew advised her that Mr. Robinson said NRE was fully staffed and had no room for her and that Mr. Robinson's refusal to allow her to remain in NRE was based on Mr. Zadjura providing him with "negative and false information" regarding her work performance as well as information on a grievance she had filed regarding a prior supervisor's (*i.e.*, Boris Kachura's) rating.[26]

Petitioner's EEO complaint states that Mr. Zadjura "played a key role in pushing me out of NRE." (Resp. Ex. S at 000012); recounts the "very difficult year [she] had working for Zadjura" (*id.*); and alleges that when she spoke with Mr. Brew on August 16, 2001 regarding her appeal of the ASM assignment, he said that "he had just talked to Robinson and NRE was full." *Id.* at 000017.

---

[26] Petitioner's attempt to establish that Messrs. Zadjura and Robinson acted with retaliatory animus based on a conversation Mr. Kachura had with Mr. Zadjura fails because there is no admissible evidence that could support an inference that either Mr. Zadjura's or Mr. Robinson's actions in this case were directly or indirectly affected by an isolated conversation Mr. Zadjura had with a prior supervisor before Petitioner even began to work on an NRE project.

Petitioner's sworn discovery responses say that she was not permanently assigned to NRE as part of the reorganization because of the acknowledged difficulties she had while working under Mr. Zadjura. *See* Resp. Ex. N at 11-12 (Pet. Sup. Interrog. Resp.); *see also* Pet. Ex. 1 at 561 (Pet. Depo.) (Petitioner testified that from the day she was assigned to work for Mr. Zadjura, he "was very unpleasant"), at 616 (Mr. Zadjura poisoned the well for her), and at 616-17 (Mr. Zadjura told Mr. Robinson that Petitioner was a performance problem and that is why she was not permitted to stay in NRE). Moreover, Petitioner's discovery responses state that in August 2001, Mr. Robinson "refused to allow [her] to work on NRE matters." Resp. Ex. N at 9.

Finally, Petitioner's own statement of material facts in Opposition to GAO's Motion for Summary Judgment states that Mr. Zadjura spoke to Mr. Robinson, told Mr. Robinson that Petitioner's work was "not very good" and that "she was not particularly easy to work with" and that Mr. Robinson, relying on Mr. Zadjura's representation without affording Petitioner an opportunity to rebut it, did not support Petitioner's permanent assignment to NRE. Pet. Fact Statement ¶25.

Since Petitioner's evidence is not at odds with GAO's, there is no dispute about the fact that Mr. Robinson had multiple conversations with Mr. Zadjura in which Mr. Zadjura reported that Petitioner's performance on the NRE project was not particularly good; that she was not particularly easy to work with; and that she was not receptive to feedback on her performance. Resp. Ex. H at 27-28 (Robinson Depo.); Resp. Ex. I at 000307 (Robinson Investig. Resp. #29). And, there is no dispute about the fact that Mr. Robinson opposed Petitioner's permanent assignment to NRE based on the negative feedback on her performance while performing NRE work in 2000-01, the fact that NRE in Denver was then fully staffed, and that he had no motivation to press to exceed what he described as a "soft cap" on staffing to add someone who

had failed to perform particularly well on the NRE project she was just completing. Resp. Ex. H at 30-32; Resp. Ex. I at 000303 #18.

When all of this is considered, we ultimately conclude that GAO is entitled to summary judgment with respect to its first proffered LNDR.

Turning now to GAO's additional LNDR (*i.e.*, that there was no vacancy in NRE to which Petitioner could have been assigned), the record on this point does not support Petitioner's contention that GAO's proffered reason is a pretext. It is undisputed that Petitioner was informed of her assignment to ASM on April 10, 2001 and that at that time ASM in Denver needed staff. Am. Pet. ¶24; Resp. Ex. G at 000220 (Brew Investig. Resp. #3); Resp. Ex. Q at 1 (Pet. 1/07/02 email to Walker). Nothing in the record, however, establishes the staffing level at NRE on the date she was told of her reassignment or at the time the decision was actually made. The record does include evidence showing that five employees (including Petitioner) were at some point assigned to ASM from other teams, and that four employees were at some point assigned to NRE from ASM. Resp. Ex. N at 19 (Pet. Sup. Interrog. Resp. #12). There is no record evidence, however, to show that Mr. Brew made these assignments at the same time that he made the April 10, 2001 decision to assign Petitioner to ASM.[27]

Petitioner herself shed light on Mr. Brew's reasoning in assigning her to ASM in a January 7, 2002 email to then Comptroller General Walker (Resp. Ex. Q) recounting her April 2001 conversation with Mr. Brew immediately after she learned of the assignment. Petitioner stated that she reminded Mr. Brew of her previous unsatisfactory experience in ASM four years prior. Mr. Brew said he forgot about that, but that "NRE was now too full to put me [Petitioner] back in there." Mr. Brew further said Petitioner "probably fell through the cracks" when defense

---

[27] Petitioner's response to a GAO interrogatory acknowledged that she did not know when individuals were offered assignments to NRE. Resp. Ex. N at 18 (Pet. Sup. Resp. Interrog. #12) (indicating Mr. Robinson made offers for those coming to NRE).

environmental work was transferred to NRE a few years earlier, but added that Petitioner could try to get transferred to NRE during the open season the following year. According to Petitioner, Mr. Brew also said at that time that he would support her taking leave to go on a detail in the interim, something he did in fact do. She also told Mr. Walker that Mr. Brew had offered to support her taking a leave to work on a Ph.D. *Id.* If anything, this communication undercuts Petitioner's allegation that Mr. Brew harbored retaliatory animus against her and supports GAO's unrebutted evidence that NRE was fully staffed at the relevant time.

The record does contain a document (Petitoner's Ex. 13 and its enc. 3) that shows "as best as... could . . . [be] reconstruct[ed] from available GAO personnel systems, when individuals joined or left the ASM team in Denver." Pet. Ex. 13 at 2 (Denver Office Investig. Resp. #8). The enclosure that Petitioner cites and relies upon for her argument that NRE had openings in which she could have been placed shows the time when Petitioner joined ASM from NRE as "October/November 2001," the same time frame as shown for two other employees (Arturo Holguin and Anthony Padilla) joining NRE from DA.[28] Petitioner offers these two employees' assignments as evidence that there was room for her in NRE—that is, that they took NRE positions to which she could have been appointed. However, the fact that all three employees were listed on this document as joining NRE in "October/November 2001" does not address when the assignment decisions were made and therefore does not advance Petitioner's argument. In this connection, we know that Mr. Brew decided to assign Petitioner to ASM on or before April 10, 2001, not in "October/November 2001." Accordingly, this document sheds no

[28] Petitioner testified in her deposition that Mr. Solomon had opposed the placement of both Messrs. Holguin and Padilla in ASM during the reorganization, and that she assumed they were placed in NRE because Mr. Robinson did not object. Pet. Ex. 1 at 428-29. In addition, Petitioner testified at deposition that she "assumed" that Mr. Robinson "did not object" to the placement of those who were assigned to NRE. Pet. Ex. 1 at 428-29 (Pet. Depo.).

light on when decisions were made to assign other employees, such as Messrs. Holguin and Padilla, to NRE.

Put another way, there are no conflicting facts as to NRE's staffing level on April 10, 2001, when Petitioner was informed of Mr. Brew's assignment decision; on April 16, 2001, when Mr. Brew first informed Petitioner that NRE was fully staffed; or on August 16, 2001, when Mr. Brew, after speaking with Mr. Robinson, reiterated to Petitioner that NRE was fully staffed. Thus, there is nothing to contradict the evidence that NRE was fully staffed at the relevant points in time and there is no reason to deny summary judgment because there is no conflict in the evidence. Mr. Brew states that he believed NRE was full in April 2001. He also believed that Petitioner was not permanently assigned to NRE and needed a permanent assignment. Resp. Ex. G at 000215. There is no evidence to contradict this. Mr. Brew's belief at the time suffices to defeat pretext. *Hairston v. Vance-Cooks*, 773 F.3d 266, 274 (D.C. Cir. 2014). Furthermore, we may not second-guess an employer's personnel decision absent a demonstrably discriminatory or retaliatory motive. *Id.* at 272.

In addition, we conclude Petitioner's claim that a reasonable factfinder could find that her assignment to ASM was in retaliation for her protected activities, does not rest on probative evidence that could be credited to establish that what actually motivated the assignment was retaliation. Once GAO filed a properly supported Motion asserting it was entitled to summary judgment as a matter of law, it became incumbent upon Petitioner to "come forward with 'specific facts showing that there is a genuine issue for trial'." *Matsushita*, 475 U.S. at 587. Petitioner "may not rely on conclusory allegations or unsubstantiated speculation" to satisfy this requirement. *Scotto v. Almenas*, 143 F.3d 105, 114 (2nd Cir. 1998). To survive summary judgment, Petitioner had to "substantiate her allegations with sufficient probative evidence that

would permit a finding in her favor based on more than mere speculation, conjecture, or fantasy." *Clay v. Credit Bureau Enters.*, 754 F.3d 535, 539 (8th Cir. 2014) (citations omitted). Inferences supported by only speculation or conjecture do not suffice. *Hnin*, 751 F.3d at 508. In other words, Petitioner was required to offer "concrete evidence from which a reasonable [factfinder] could return a verdict in [her] favor." *Liberty Lobby*, 477 U.S. at 256.

Petitioner asserts that the ASM assignment returned her to a work environment in which she had experienced discriminatory personnel actions, albeit never timely alleged much less proven, and other conduct which she found objectionable, but never officially complained about.[29] However, even if we look at this as background evidence in a light most favorable to Petitioner, there is no basis for concluding from this that a reasonable trier of fact could legitimately credit and rely upon this information as a basis for concluding that Petitioner's assignment to ASM in 2001 was motivated by retaliation.[30]

For one thing, from 1994 to 1997—the time Petitioner complains about when she was previously assigned to what was then the NSIAD weapons acquisition component—she alleges she had differences with certain named and unnamed NSIAD employees, including Mr. Solomon and Ted Baird (another Denver analyst in the Defense Core Group (Am. Pet. ¶9)), concerning matters such as individual office space and pay. Putting aside the timeliness of now addressing

---

[29] Petitioner uses the term "hostile work environment" to characterize her claim about the situation that existed for her in NSIAD from 1994 to 1997. But there is no record evidence to establish that the conduct she experienced was the kind of physical or verbal abuse required to form the basis for a hostile work environment claim, or that the conduct was sufficiently severe and pervasive to establish such a claim. *See Harris v. Forklift Sys.*, 510 U.S. 17 (1993). In addition, Petitioner has not appealed the AJ's dismissal of her hostile environment claim.

[30] We hold that Petitioner has satisfied the first two elements of a retaliation claim under the *McDonnell Douglas* analytical framework: that she engaged in protected activity (among other things, her involvement as a potential witness in the *Davis* and *Vargas* EEO cases, as well as her earlier complaints about pay and office space); and that the ASM assignment can in the context alleged be considered an adverse employment action. *See Burlington Northern v. White*, 548 U.S. 53 (2006).

Case: 15-6002 Document: 10 Page: 100 Filed: 08/17/2015

remote events that allegedly occurred in the mid-1990s to resolve a retaliation claim which arose in 2001, the uncontroverted evidence establishes that by April 2001, when Petitioner was informed that she was being assigned to ASM, the composition of the Denver ASM team was different from the composition of the DA group in which Petitioner had been a group leader prior to being assigned to work with the international group in 1997.[31] Thus, in 2000, Mr. Solomon ceased to be the Acting Manager of the Denver Office and became an Assistant Director in ASM. Resp. Ex. FF at 10-11 (Solomon Depo.). And although Mr. Baird also was assigned to ASM in the reorganization, the newly created ASM team included a number of other teams along with the DA remnants, a new Managing Director and other new SES leaders. Resp. Ex. G at 000214 (Brew Investig. Resp. #16). Accordingly, aside from Petitioner's mere subjective allegation of concern about being assigned to a newly created team, which she regarded as being the equivalent of a prior work group that she found inhospitable when she last worked there four years prior, there is no record evidence to support a conclusion that GAO's 2001 decision to assign her to ASM could reasonably be viewed as a retaliatory attempt to somehow punish her by returning her to a work environment that it knew would be intolerable.

Likewise, there is no evidentiary basis for viewing the 2001 ASM assignment as retaliatory based on the circumstances surrounding Petitioner's departure from NSIAD's DA group. Petitioner's deposition testimony about her 1997 departure from the co-core group leader position does not support a claim that Mr. Brew, Mr. Solomon or anyone else must have had a

---

[31] It is undisputed that ASM did not exist when Petitioner was reassigned out of the co-core group leader position in 1997, and the Motion record does not contain evidence to substantiate that the ASM group in 2001 consisted of the same "old boy" network that allegedly existed when she served as a co-core group leader. At deposition (Resp. Ex. A at 124, 130-31), Petitioner could not recall the names of more than two individuals who allegedly created a hostile environment for her in the 1990s. Evidence in the Motion record regarding ASM (*see* Pet. Ex. 13, encl. 3) shows the people assigned to ASM came from various groups and locations within GAO. In addition, the new ASM group covered more than the Defense Acquisitions area, had a new managing director, and other new leaders. Ex. G (Brew Investig. Resp. #16) at 000214.

Case: 15-6002 Document: 10 Page: 101 Filed: 06/17/2015

retaliatory motive for assigning her to ASM in 2001. *See* Resp. Ex. A at 49-50, 57-58. Thus, Petitioner testified that she was unclear as to whether she left the co-core group leader position at her own request or was "devastated" by Messrs. Brew and Solomon's decision to reassign her following an investigation of her work papers. *Id.* at 56-61, 143-44. With Petitioner's own confusion on the record about what exactly happened in 1997, she cannot plausibly maintain that a reasonable factfinder would more likely than not conclude based on the probative evidence that the decision to assign her to ASM in 2001 must have been retaliatory.

Moreover, it is significant that it was Mr. Brew who moved Petitioner out of NSIAD's DA group in 1997 at a time when Petitioner argues he was aware of her having engaged in protected activity. Petitioner has provided no evidence to support her contention that Mr. Brew would have honored her wishes in 1997 despite then knowing of her protected activity, but four years later would decide to retaliate against her based on that same protected activity.

Nor is there more than unsubstantiated speculation to support Petitioner's assertion that her assignment to ASM was based on her participation in either the *Vargas* or *Davis* case. Petitioner argues her involvement with those cases irked Messrs. Brew and Solomon, but she admits that she never told either of them what she said when she was interviewed in those cases and she was never actually called to testify in either case, although she was named as a witness for GAO in the *Vargas* case. Resp. Ex. A at 224, 235 (Pet. Depo.).

The record reflects that Mr. Brew denied having any knowledge of Petitioner being interviewed as a witness in the *Davis* and *Vargas* EEO cases at any time (and thus by implication, when he notified her in April 2001 that she was being assigned to ASM). *See* Resp. Ex. G at 000215 (Brew Investig. Resp. #21). Petitioner points to no evidence to the contrary. Rather, she points only to the protected activity she engaged in during her previous NSIAD tour

Case: 15-6002 Document: 10 Page: 102 Filed: 08/17/2015

of duty in the mid-'90s, and her displeasure with having to return there. Reply Brief at 11. Accordingly, there is no evidence in the record to establish that there is temporal proximity between Petitioner's 2001 assignment to ASM and the protected activity which she claims precipitated that assignment.

Petitioner claims that Mr. Brew assigned Sandra Davis to NRE during the implementation of the reorganization and that NRE was Ms. Davis's first choice in the employee preference survey. App. Brief at 36. Such an assignment for Ms. Davis to the team of her choice when she was actively pursuing a PAB case involving allegations of retaliation against GAO officials undermines Petitioner's argument that Mr. Brew assigned Petitioner to ASM rather than NRE in retaliation for her own protected activity.

In sum, we hold that a reasonable trier of fact could not conclude from the probative evidence of record that GAO's legitimate nondiscriminatory reasons for assigning Petitioner to ASM were pretextual and that more likely than not Petitioner was really assigned to ASM in retaliation for her protected activities. Accordingly, we sustain the AJ's grant of summary judgment to GAO on the ASM assignment claim.[32]

B. THE STATE DEPARTMENT DETAIL

We also affirm the AJ's grant of summary judgment to GAO on the claim that GAO retaliated against her when it denied her request for a year-long detail to go to work for the State Department. GAO's proffered LNDR for its Executive Committee's decision not to approve

---

[32] The dissent finds it important that the AJ did not address Petitioner's assertion that she requested to be "assigned to the civilian contracting component of ASM but [that] Solomon falsely told her there were no assignments available on the civilian side." Am. Pet. ¶30. Because Petitioner did not raise this distinction in her appeal, this claim is considered abandoned. Even assuming that she had raised this distinction in her appeal, Petitioner failed to rebut the Agency's statements to her that there were no assignments available on the civilian side. *See* Resp. Ex. A at 240 (Pet. Depo.); Resp. Ex. S at 19 (Pet. EEO Complaint).

Petitioner's request for the detail to State was that then-Comptroller General David Walker, as head of the Executive Committee and therefore primarily responsible for the detail decision, opposed the Executive Branch detail because of the potential conflict of interest such a detail posed for GAO. Response Brief at 25-26. On its face, this explanation is a reasonable ground on which the Executive Committee could have refused to grant such a detail, as GAO's primary mission on behalf of the Congress is to investigate and audit executive agency operations. *See* Resp. Ex. C at 41 (Dodaro Depo.) Thus, there is nothing inherently suspect about GAO's articulated reason for denying the detail request. But, Petitioner nevertheless argues GAO's proffered LNDR is a mere pretext and that the real reason the request was denied was retaliation for protected activities she had engaged in over the previous decade.

More specifically, Petitioner argues that CG Walker told her of the Executive Committee's decision in a January 8, 2002 email, and said at the time that the reason for denying the detail was that GAO had a "standing policy position for some time" not to grant such details. App. Brief at 39. Mr. Walker indicated that he had denied previous detail requests for GAO employees, and said that he was "concerned about consistency and fairness," as well as "about any potential miscommunication that may have occurred in [Petitioner's] case. . . ." Resp. Ex. Q at 2 (Walker 1/07/02 email to Pet.). Petitioner further argues that in his deposition taken in May 2012, Mr. Walker said that he did "not recall having any discussion about [Executive Branch details] until the policy issue was brought up to the Executive Committee" in connection with Petitioner's detail request. App. Brief at 39. Petitioner asserts this constitutes a contradiction with Mr. Walker's January 2002 statement, and that this conflict gives rise to a reasonable inference that the proffered reason for denying the detail request was a mere pretext. *Id.* at 39-40.

We find Petitioner's argument unpersuasive and hold that a reasonable factfinder could not conclude on the record before us that GAO's LNDR is a pretext and that more likely than not the denial of the detail was motivated by retaliation.

There is no dispute that at the time of the January 2002 Executive Committee meeting, when Petitioner's request for a year-long detail to State was rejected, GAO had no written policy addressing the matter. In fact, as the AJ noted (SJ Dec. at 30), Mr. Walker himself testified during discovery that it might have been better to use the term "practice," as opposed to "policy," to describe the source of governing principles the Executive Committee used in deciding this kind of detail request.[33] Resp. Ex. B at 30.

Petitioner makes much of the "policy" versus "practice" debate by suggesting that it shows contradictions in Mr. Walker's and Mr. Dodaro's statements on the subject. App. Brief at 39-40. However, this semantic question is not significant to our resolution of the pending claim.[34] For one thing, there is no evidence to rebut the statements of Messrs. Walker and Dodaro that they were consistently of the view that such details posed a conflict of interest for GAO. Ultimately, the governing Order on details was revised to specify that "[t]he Executive Committee must approve details to other agencies." Order 2300.1, General Employment Policies, Ch. 4 ¶4a (Nov. 7, 2003). Mr. Walker testified in his deposition that this allowed for a

[33] There also appears from the record to have been some confusion among lower level management officials as to who could actually approve Petitioner's detail request. Messrs. Brock and Hoskins at first thought they could do so and advised Petitioner on or about December 26, 2001, that they approved the request. Pet. Fact Response ¶26. Mr. Solomon, however, informed Petitioner the next day that her detail request would have to be approved by the Executive Committee. Resp. Ex. S at 000030. (Pet. EEO Complaint). Such confusion in management ranks about who the responsible decisionmaker is in a large organization such as GAO cannot properly be considered evidence of anything other than understandable confusion regarding the appropriate authority to consider and decide on a detail request that had GAO-wide policy implications. Petitioner has not alleged, nor is there evidence of, any request for an Executive Branch detail being approved at a management level below the Executive Committee.

[34] Providing more detailed information later, that augments and elaborates upon prior statements, does not create a genuine issue of material fact. *Hairston*, 773 F.3d at 273.

future circumstance where such a detail might be warranted despite the policy disfavoring such details.[35] Resp. Ex. B at 26-27.

Further, whether the presumption against Executive Branch details is labeled a policy or a practice, the record after full discovery fails to disclose that prior to January 2002 there were any instances of such requests being approved by the Executive Committee while Messrs. Walker and Dodaro were on the Committee. Both Mr. Dodaro and Mr. Walker testified that no such requests were granted during their tenure at the Agency. Resp. Ex. B at 27; Resp. Ex. C at 34-35. Thus, there is no evidence whatsoever that Petitioner was treated differently than anyone similarly situated.[36]

Petitioner fails to identify even one GAO employee who had been detailed to an Executive Branch agency, but nevertheless asserts that she is entitled to an inference that such details occurred (or might have occurred) based on Mr. Hoskins's cryptic response to an ambiguous question at deposition. Mr. Hoskins was asked whether he was aware of any "internal details" of GAO employees. He replied that "I don't remember, but I know there w[ere] some details made overse[a]s and with, I believe the Department of Defense."[37] Pet. Ex. 8 at 21. We cannot conclude from this statement that there is probative evidence in the record contradicting the testimonies of Mr. Walker and Mr. Dodaro, let alone evidence that a reasonable

---

[35] As noted by the dissent, the Executive Committee was not formed until the reorganization in 2000-01.

[36] Mr. Walker's January 7, 2002 email to Petitioner states: "The real policy issue is that, to my knowledge, for a variety of reasons we have never done a detail to an Executive Branch agency and we have said no to a number of related requests within the past year. I've said no to [at] least two myself." Resp. Ex. Q at 2.

[37] As to the Defense Department reference, Petitioner relied on this point before the AJ, but has not presented it to the Board on appeal as a basis for establishing that GAO's LNDR was pretextual. *See* App. Brief at 38-40.

factfinder could conclude that GAO actually approved any employee-initiated detail request analogous to Petitioner's request.

Mr. Hoskins started to work at GAO in January 2001 (about a year before the Executive Committee denied Petitioner's detail request), and left the Agency in 2007. Pet. Ex. 8 at 4 (Hoskins Depo.). The deposition testimony upon which Petitioner relied begins with Mr. Hoskins stating that he did not remember. Moreover, there are additional reasons why the testimony is not probative. It does not indicate when any "internal" details to Defense were made, if any were made at all. There is no way to determine from either the question or the response what Mr. Hoskins understood an "internal detail" to be. Nor can one determine from the response if any such internal detail might have occurred prior to, during, or after Mr. Hoskins's tenure with GAO. *See id.*

Moreover, the undisputed facts establish that the only request that Mr. Hoskins ever received at GAO for a detail to another federal agency was Petitioner's. SJ Dec. at 12 ¶26; Pet. Ex. 8 at 20-21 (Hoskins Depo.). We cannot logically deduce from Mr. Hoskins's statement that any "internal details" to the Department of Defense occurred prior to the January 4, 2002 Executive Committee meeting. Given Mr. Hoskins's vague and cursory reference to Defense details (an issue which apparently neither side saw fit to elucidate during discovery), we cannot draw a reasonable inference that conflicts with the statements of Messrs. Walker and Dodaro that they had not previously approved Executive Branch details for GAO employees. Accordingly, we hold that assessing the evidence in the light most favorable to Petitioner, she cannot establish pretext concerning GAO's LNDR for the State Department detail.

In addition to failing to effectively rebut GAO's legitimate nonretaliatory reason for declining to approve her year-long detail request, Petitioner has failed to adduce probative

Case: 15-6002 Document: 10 Page: 107 Filed: 08/17/2015

evidence from which a reasonable factfinder could conclude that CG Walker, the primary decisionmaker, was motivated to deny her detail request because of her prior protected activities. Indeed, Petitioner herself stipulated in her deposition that she could not establish that Mr. Walker was acting from a retaliatory motive. *See* Resp. Ex. A at 80, 370.

Further, there is no evidence to show that either Mr. Walker or Mr. Dodaro was even aware of Petitioner's having engaged in protected activity when they made the decision to deny her detail request. As the AJ found, both Messrs. Walker and Dodaro testified at deposition that they did not speak with Mr. Brew about Petitioner's detail request. SJ Dec. at 34. Moreover, Mr. Walker informed Petitioner in January 2002, in response to her email after the detail was denied, "I am not familiar with the past issues you allude to in your note." Resp. Ex. R at 1 (Walker 1/10/02 email to Pet.). In his deposition (taken 10 years after the fact) Mr. Dodaro did not recall having such knowledge at the time the detail decision was made. Resp. Ex. C at 38-40.

Petitioner points to Mr. Hoskins's 2012 deposition testimony to the effect that he was "almost certain" that he provided the Executive Committee with "whatever information [he] had about Ms. Hinnen's request." App. Brief at 38; *see* Resp. Ex. 2 at 25 (Hoskins Depo.). That statement was made in response to the question as to whether he recalled ever mentioning to Mr. Walker that it was a reimbursable detail. *Id.* A reasonable factfinder at best could logically deduce from this statement that Mr. Hoskins informed the Committee that Petitioner wanted the detail because she was dissatisfied with her ASM assignment. However, it is by no means a logical inference to draw from Mr. Hoskins's statement that he also informed the Committee of Petitioner's protected activity. On its face, Mr. Hoskins's statement is limited to providing the Committee with the information he had about the detail request. While that might reasonably be understood to include the reason for the request, it is a far further leap to infer from what Mr.

Case: 15-6002 Document: 10 Page: 108 Filed: 08/17/2015

Hoskins said that he briefed the Executive Committee on Petitioner's involvement as a potential witness in the *Davis* and *Vargas* EEO cases, the only protected activity that was even arguably in temporal proximity to the detail decision.[38] We find no probative evidence in the record to establish that either Mr. Dodaro or Mr. Walker knew of Petitioner's protected activities at the time of the decision denying the detail request.

Moreover, even if we were to assume that Messrs. Walker and Dodaro did know that Petitioner had engaged in protected activities at the time the Executive Committee met to consider her detail request, there is a lack of probative evidence to establish a causal connection between any such knowledge and the Executive Committee's decision on the detail.

The record reflects that CG Walker and the Executive Committee made an effort to accommodate Petitioner's detail request in a manner that was consistent with their conflict of interest concerns—namely, that she could go on leave without pay from GAO for one year and become a State Department employee for that year. Mr. Walker's first suggestion was for her to resign with reinstatement rights, which was the option given to other employees accepting assignments with the U.S./Saudi Arabian joint economic commission in prior years. Pet. Ex. 10 at 1-2. If Mr. Walker and the rest of the Executive Committee intended to retaliate, it seems far more likely that they would have not allowed her to take a one-year LWOP in order to work at the State Department. The attempt to accommodate Petitioner's request by granting a one-year leave of absence without pay while avoiding the conflict posed by an Executive Branch detail is inconsistent with any notion of retaliatory intent. Thus, the fact that GAO ultimately granted

[38] We do not read Mr. Hoskins's deposition testimony as evidence from which Petitioner can lay claim to an inference that when the Executive Committee met to consider Petitioner's detail request, Messrs. Dodaro and Walker were aware of her informal complaints about pay, office space, etc., in the Denver office in the mid-1990s. Furthermore, even if we were to read this testimony to create an evidentiary basis for Petitioner to argue that the Committee was aware of all her protected activities going back to the mid-1990s, these activities are far too remote and would not in the context presented here support a finding that any such activity was a causative factor in the 2002 decision to deny the detail request.

Case: 15-6002 Document: 10 Page: 109 Filed: 08/17/2015

Petitioner one year of LWOP to accept the assignment at State directly undercuts Petitioner's claim that there was a retaliatory motivation for declining her detail request.

In sum, we find Petitioner cannot establish on this record that GAO's proffered legitimate reason for denying her request for a one year detail to work at the Department of State was pretextual and that GAO's real reason for denying the request was to retaliate against her for having engaged in protected activities. Accordingly, we conclude that the AJ correctly granted summary judgment to GAO on this claim.

C. <u>LWOP EXTENSION DENIAL</u>

On Petitioner's claim that GAO retaliated against her by denying her request for an extension of LWOP at the conclusion of her temporary appointment to the State Department, the AJ found that the claim was timely filed, but that Petitioner did not establish any evidence to rebut GAO's proffered reason for its decision. SJ Dec. at 35-37; *id.* at 35. The AJ noted that GAO explained that Petitioner's requested one-year extension of LWOP did not meet the "benefit to GAO" test as required by Agency regulation. The AJ found that there was no dispute that approval of LWOP and extensions of LWOP are left to the discretion of GAO under Order 2630.1, Leave Policies and Procedures, Ch. 12 ¶2. SJ Dec. at 18 ¶45; *id.* at 35. Under Order 2630.1, "approval of LWOP is granted only when an employee demonstrates a real need to be absent from official duties and the overall employment record justifies favorable action." GAO Order 2630.1, Ch.12 ¶2 (Resp. Ex. W). With regard to extensions of LWOP, the Order states further:

> As a basic condition to approval of requests for extended LWOP, there should be reasonable assurance that the employee will return to duty at the end of the approved period and that GAO will benefit in some measure from the absence.
>
> * * *

Case: 15-6002 Document: 10 Page: 110 Filed: 08/17/2015

> Each request for extended leave without pay is closely examined to insure that the benefits to the government and the serious needs of the employee are sufficient to offset the costs and administrative inconveniences to the government which result from retention of an employee in a leave-without-pay status.

*Id.*, Ch. 12 ¶¶ 4.d, 4.e.

The AJ cited Petitioner's stated reasons for the extension:

> to accommodate her discomfort about returning to ASM or working for NRE;
> to allow her time to resolve her outstanding discrimination complaint filed against GAO;
> to permit her to "look into transferring to another GAO region or core group if that becomes necessary;"
> to wrap up projects ongoing at the State Department;
> to have some medical procedures done;
> to recover from the "exhausting pace [she had] been keeping over the past year;" and
> to care for her elderly mother and aunt who had medical problems.

SJ Dec. at 36; *see* Resp. Ex. U (Pet. 1/28/03 Letter to Hoskins & Harper). The AJ then considered GAO's assertion that it denied the LWOP extension request because Petitioner did not meet the criteria of the applicable Order. SJ Dec. at 36-37. There is no dispute that when Petitioner requested an extension of her LWOP, she had no intent to return to ASM, NRE, or the Denver Field Office. Moreover, there is no dispute that the work that Petitioner did for the Department of State while on LWOP was unrelated to her work at GAO. SJ Dec. at 19 ¶48. Thus, there would have been no benefit to the Denver Office or to GAO generally from Petitioner's extended absence from the Agency.

Petitioner argues that approval of her request to extend LWOP would have benefitted GAO because granting her request "would have forestalled a second EEO complaint." App. Brief at 41. There is no evidence that this is the kind of benefit to the Agency anticipated by GAO Order 2630, which allows for the possible approval of LWOP extensions only when "GAO will benefit in some measure from the [employee's] absence" and when "the serious needs of the

Case: 15-6002    Document: 10    Page: 111    Filed: 08/17/2015

employee are sufficient to offset the costs and administrative inconveniences to the government which result from retention of an employee in a leave-without-pay status." Order 2630.1, Ch. 12 ¶4. There is no reasonable basis for reading this Order to contemplate—let alone require—granting an extension of LWOP on the ground that the possibility that Petitioner might forego filing a second complaint would constitute a benefit to GAO.

The parties also agree that Jack Brock made the decision to deny Petitioner's request. In communicating that decision to her, he stated that he was aware that she did not want to return to Denver but she would have "an opportunity to seek placement in another team" during the next employee preference survey the following month, and that moving to a team outside Denver would be considered. Resp. Ex. Z (Brock 1/30/03 Letter to Pet.). In addition, the parties do not dispute that Mr. Brock offered Petitioner a shorter extension of LWOP in order to accommodate her medical needs and concerns for her family members. *See id.*

The AJ also found that Petitioner did not name Mr. Brock as an official whom she claimed was responsible for the alleged retaliation against her; nor is there any evidence that his decision was motivated by retaliatory animus.[39] SJ Dec. at 37. The AJ found that this retaliation claim was not supported by evidence that the proffered legitimate reason for the denial – that there was no benefit to GAO from the proposed extension – was pretext for retaliation. *Id.* Petitioner asserted as proof of pretext that Mr. Brock refused to meet with her to discuss her requested extension; that she was willing to unencumber her position in Denver and relocate to an unspecified GAO office; and that Mr. Brock was allegedly aware of her protected activities. On the record reviewed by the AJ, we conclude that Petitioner did not present sufficient evidence of pretext to demonstrate that she would be able to rebut the Agency's articulated legitimate

---

[39] Indeed, the AJ noted that Petitioner stated in her deposition that she had no evidence that Mr. Brock was motivated in whole or in part by Petitioner's protected activities. SJ Dec. at 37.

Case: 15-6002 Document: 10 Page: 112 Filed: 08/17/2015

reason for denying her request for an extension of LWOP. Accordingly, we conclude that the AJ properly entered summary judgment for GAO on this claim. *See St. Mary's Honor Ctr.*, 509 U.S. at 510-11; *Tex. Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804-05 (1973).

D. POSTPONEMENT OF RETIREMENT

The AJ found that there was no dispute that on November 2, 2002, GAO issued a Notice under a Voluntary Early Retirement Authority permitting employees to volunteer to retire early between February 1, 2003 and March 14, 2003. SJ Dec. at 16-17 ¶41. The AJ further found it undisputed that Petitioner submitted an application for early retirement under the VERA and, in January 2003, she was approved to take early retirement effective in March 2003. *Id.* One of the reasons why Petitioner applied for early retirement was that her temporary appointment was coming to an end and she believed that if her LWOP were extended, she would lose her health insurance. Am. Pet. ¶47. Shortly after her retirement was approved, however, Petitioner learned that State was willing to extend the appointment and contribute to her health insurance. She therefore requested of Mr. Hoskins that she be allowed to extend her retirement date to either October 2003 or January 2004. SJ Dec. ¶48; Resp. Ex. BB at 1 (Pet. 2/05/03 email to Hoskins). Her explanation was that she needed additional time to "prepare for [e]arly [r]etirement." SJ Dec. ¶48; Resp. Ex. BB at 1. Mr. Hoskins declined to grant Petitioner's request, stating that he was not authorized to delay retirement beyond the dates listed in the VERA Notice. *Id.* (Hoskins 2/05/03 email to Pet.). In support of her retaliation theory, Petitioner claims that Mr. Hoskins was not the proper authority to decide her request; that this could only be decided by the CG or the Executive Committee. Pet. Fact Statement ¶48.

Case: 15-6002 Document: 10 Page: 113 Filed: 08/17/2015

The AJ concluded that although Mr. Hoskins denied Petitioner's request to postpone her retirement date, he recalled that he likely would have spoken to Mr. Walker about Petitioner's request. SJ Dec. at 38-39. As the AJ noted, Mr. Hoskins recalled that he would have consulted with CG Walker and the Executive Committee before denying the request since it fell outside of the window for retirement allowed under the VERA announcement.[40] *Id.* at 39. The AJ further concluded that GAO articulated a legitimate reason for denying Petitioner's request to delay her retirement, namely that she sought to retire well outside of the authorized time period within which voluntary retirements could be scheduled under the terms of the VERA Notice. The AJ concluded that on the undisputed record, Petitioner did not offer sufficient evidence to demonstrate that she could prove pretext or rebut GAO's explanation for denying her request to extend her retirement date. He found that Petitioner presented no evidence that anyone else who retired under the same VERA was permitted to do so outside of its authorized window of time. SJ Dec. at 39-40. Upon review of the undisputed facts, we affirm the AJ's conclusion that Petitioner did not proffer sufficient evidence to establish that GAO's stated reason for its decision was false or was pretext for retaliation. We therefore conclude that summary judgment was properly entered for GAO.

---

[40] In his deposition, in response to the question: "Did you notify Mr. Walker of Ms. Hinnen's voluntary early retirement application extension request?" Mr. Hoskins testified:

> As I recall, the process, the VERA process, I met with the [E]xecutive [C]ommittee on all of the applications for early retirement. And I would furnish the [E]xecutive [C]ommittee with the expected dates of the retirement, as well as the managing directors.
>
> So they had to select dates. And I shared that with the [E]xecutive [C]ommittee. And I believe I did that on a weekly basis until the closing.
>
> * * *
>
> If there was a specific start date that was selected for retirement and an end date by which people had to retire, within that window, if they made changes and adjustments, I would communicate that to the [E]xecutive [C]ommittee, their request.

Pet. Ex. 8 at 51, 53.

E. CONSTRUCTIVE DISCHARGE

Lastly, the AJ considered Petitioner's claim that she was constructively discharged from GAO. The constructive discharge claim is imbedded in Count V of the Amended Petition that alleges a retaliatory hostile work environment that "caused her to involuntarily resign from the Agency, and constituted a constructive discharge in violation of Title VII of the Civil Rights Act of 1964, as amended." Am. Pet. at ¶65. In a constructive discharge case, Petitioner must first prove that she was effectively discharged from GAO and that her retirement was involuntary. *Garcia v. Dep't of Homeland Sec.*, 437 F.3d 1322, 1325, 1328-29 (Fed. Cir. 2006); *Clarke v. GAO*, PAB Docket No. 05-03 at 21 (5/17/06), *aff'd* (12/8/06).

The AJ concluded that Petitioner's decision to retire was not only presumptively voluntary, but was also voluntary on the undisputed facts presented. SJ Dec. at 46. In order to establish that a retirement is involuntary, an employee must establish that the Agency "proposed or threatened an adverse action against the employee, or caused the retirement 'by creating working conditions so intolerable for the employee that he or she is driven to involuntarily resign or retire'." *Clarke v. GAO*, (quoting *Shoaf v. USDA*, 260 F.3d 1336, 1341 (Fed. Cir. 2001)). A retirement is not involuntary simply because an employee applies for retirement in order to avoid a new assignment, a transfer, or other authorized employment action, "even if those measures make continuation in the job so unpleasant for the employee that he feels that he has no realistic option but to leave." *Staats v. USPS*, 99 F.3d 1120, 1124 (Fed. Cir. 1996). As the Court in *Staats* stated: "[T]he fact that an employee is faced with an unpleasant situation or that his choice is limited to two unattractive options does not make the employee's decision any less voluntary." *Id.*

Case: 15-6002 Document: 10 Page: 115 Filed: 08/17/2015

The AJ applied a three-part test for establishing involuntary coercion by an employer based on Federal Circuit law. This test requires an employee to prove objectively that:

> (1) [T]he agency effectively imposed the terms of the employee's resignation or retirement; (2) the employee had no realistic alternative but to resign or retire; and (3) the employee's resignation or retirement was the result of improper acts by the agency.

*Garcia v. Dep't of Homeland Sec.*, 437 F.3d at 1329; *Shoaf v. USDA*, 260 F.3d at 1341.

Petitioner argues on appeal that the AJ applied the wrong test to determine her constructive discharge claim. She contends that the GAO Personnel Act of 1980 (GAOPA), 31 U.S.C. §§731-755, was intended to provide GAO employees with the same protections as Executive Branch employees. She argues, further, that the EEOC does not follow the Federal Circuit's "very narrow … standard" that was applied in this case, and that the AJ should have disregarded Federal Circuit precedent and analyzed her claim applying an asserted EEOC policy of "considering reprisal claims with a broad view of coverage." App. Brief at 43. Petitioner then relies on a handful of EEOC cases permitting constructive discharge claims to proceed to a hearing despite a lack of evidence that a retirement was involuntary. Petitioner concludes:

> In sum, had she been before the EEOC, Ms. Foley-Hinnen's allegations that she decided to retire as a last resort only after the Agency refused to extend her LWOP or delay her retirement date and that she did so to avoid returning to a hostile work environment would compel the Commission to deny summary judgment in this case.

App. Brief at 45.

We decline to speculate what might have happened to Petitioner's constructive discharge claim if it had been filed with the EEOC. Instead, we affirm the AJ's reliance on Federal Circuit law that applies to cases before this Board and requires that Petitioner prove first that her retirement was "involuntary and tantamount to a removal" before addressing her retaliation

claims. *Tadlock v. DOT*, No. DE-0752-09-0061-1-1, 2009 MSPB LEXIS 1120 at 10 (MSPB Feb. 19, 2009) (unpublished); *see also Garcia*, 437 F.3d at 1344.[41]

On the undisputed factual record in this case, the AJ properly concluded that there was no evidence that Petitioner's retirement was involuntary or that GAO's actions were coercive. Petitioner concedes that she elected to apply for early retirement because she did not expect that her request to extend her LWOP would be extended and that she was likely to lose her health insurance. Am. Pet. at 19 ¶47. She states in her Petition,

> Consequently, rather than return to ASM, Petitioner submitted to the Agency, through Hoskins, an application for Voluntary Early Retirement ("VERA"). That application was approved, and Petitioner's retirement was set for March 14, 2003.

*Id.* It was only when she later learned that the State Department was willing to extend her appointment and contribute to her health insurance premiums that Petitioner sought to withdraw her application to retire and request an extension of her LWOP. *Id.* ¶48. Thus, it appears undisputed that what prompted Petitioner's initial application to retire were her desires to avoid working for ASM, and to avoid risking loss of health insurance benefits. This is not evidence that the Agency imposed the terms of her retirement. Unquestionably, Petitioner had alternatives other than applying to retire in the first instance. Moreover, when she learned that she could remain at State and not lose all of her health benefit contributions, she presented no evidence that her ultimate determination to retire under the VERA option was the result of improper acts by the Agency. Asking GAO to extend her LWOP for an additional year and, when that failed, to extend her retirement date for many months beyond the expiration date set in the VERA Notice furnishes no basis for converting a voluntary retirement into a constructive discharge.

---

41 In her Memorandum in Opposition to the Motion for Summary Judgment, Petitioner cites federal circuit cases in support of her contention that she was coerced by the Agency to take early retirement. *See* Opposition at 18-19. Her position that EEOC law applies was first argued on appeal.

Case: 15-6002 Document: 10 Page: 117 Filed: 06/17/2015

As discussed earlier, there is no evidence that GAO improperly disapproved the LWOP extension request, because under the applicable regulations, it was undisputed that the Agency was not likely to benefit from the additional year of Petitioner's leave. Moreover, GAO offered Petitioner LWOP for a shorter period of time specifically to allow her to address her own medical issues and those of her family members. Resp. Ex. Z. Petitioner also had the options to return to the position offered to her in Denver on the ASM team, or return to Denver and try to secure a position on a different team, or return to GAO and try to secure a position in Headquarters or in a different Field Office.[42] *Id.* These options establish conclusively that the Agency did not coerce Petitioner's ultimate retirement. Rather she made choices that she thought would best benefit her. On a constructive discharge claim, it is irrelevant that Petitioner asserts that her options were unattractive and unacceptable. We therefore conclude that the AJ correctly granted summary judgment in favor of GAO on Petitioner's constructive discharge claim.

[42] In Petitioner's Fact Statement, she admits that "because of the length of the project Petitioner was working on [at the State Department], it would have been six months to a year before she would complete that project and be eligible for reassignment to another team." Pet. Fact Statement at 13-14 ¶44. Thus, it appears that the reason she did not elect to find a new position at GAO was that her assignment at State prevented her availability for such a position.

**CONCLUSION**

Based upon the foregoing and for the reasons stated, we conclude that GAO is entitled to judgment as a matter of law. We therefore affirm the AJ's grant of summary judgment to GAO.

Members Susan R. Winfield and David P. Clark dissent from portions of this decision and state their reasons for so doing in a separate opinion attached hereto.*

**SO ORDERED.**

For the Board:

Date: 4-1-2015

William E. Persina
Chair

Robert F. Hermann
Vice-Chair

* Member John L. Braxton, who wrote the underlying Summary Judgment Decision, did not participate in the appellate review.

**Administrative Judges Susan R. Winfield and David P. Clark, dissenting in part:**

With respect, we disagree with our colleagues in part. Although, we agree with the decision of the majority members of the PAB, including the AJ, that summary judgment is appropriate on most of Petitioner's claims, we disagree with the majority's conclusion that summary judgment should have been granted in favor of GAO on two claims – the ASM assignment and the denial of Petitioner's request for a State Department detail. We conclude that there are sufficient material facts in dispute on both of these claims such that when Petitioner's proffered evidence is accepted as true and all reasonable inferences are drawn therefrom in her favor, as they must be at this stage of the proceedings, the Agency has not met its burden of proving its entitlement to judgment as a matter of law. We note that although the reasons for granting summary judgment on these claims differ between the AJ's findings and our appellate colleagues' conclusions, we disagree with both and find neither set of reasons persuasive.

SUMMARY JUDGMENT ANALYSIS

The analytical framework for summary judgment analysis is well-defined by the majority. If the movant proffers undisputed facts to establish its entitlement to judgment as a matter of law, the opponent must either prove that there are genuine material facts in dispute or that the movant is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) ("Liberty Lobby"); *Madson v. GAO*, PAB Docket No. 96-07 at 7 (4/23/97), *aff'd en banc*, (12/2/97) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

When considering a motion for summary judgment, the reviewing court must consider all of the evidence in the record without making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-151 (2000) ("Reeves"); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). Instead, the evidence of

the non-movant is to be believed and all justifiable inferences are to be drawn in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255; *Reeves*, 530 U.S. at 150; *Taydus v. GAO*, PAB Docket No. 07-03 at 6-7, *en banc* (5/04/10). As stated by the Supreme Court in *Liberty Lobby*, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

We believe that it is here that both the AJ and our appellate colleagues erred. Both the AJ and the majority opinion have made findings of fact and drawn legal conclusions that we believe may not be made in a proper analysis of a summary judgment motion. In addition, we find that where the material evidence is in dispute, our colleagues failed to accept Petitioner's evidence, including her own proffered testimony, as true and failed to draw all reasonable inferences from that evidence in her favor. Lastly, we acknowledge that the age of this case and the length of the procedural record may engender a disposition to bring this protracted litigation to a close by weighing the evidence and predicting the relative likely outcome of a hearing. We conclude, however, that this inclination should be resisted in favor of a return to the Supreme Court's guidance to determine "whether ... there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."

## PROOF OF RETALIATION CLAIMS

We concur in part with our majority colleagues' recitation of the proper analysis of Title VII retaliation claims. Title VII makes it unlawful for a federal employer to retaliate against an employee for opposing a discriminatory practice or participating in a charge of discrimination.

42 U.S.C. § 2000e-16(a). As our colleagues recognize, a plaintiff may establish a claim of retaliation either through direct or circumstantial evidence, using the same burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ("*McDonnell Douglas*").

In the instant case, in the absence of direct evidence, Petitioner may establish a *prima facie* case of retaliation, by showing:

(1) she engaged in protected activity;
(2) her assignment to the weapons section of ASM and GAO's denial of her request for a detail to the State Department were materially adverse actions; and
(3) there was a causal connection between her protected activities and these adverse actions.

*See McDonnell Douglas*, *supra*, 411 U.S. at 802; *Williams v. Dodaro*, 806 F. Supp. 2d 246, 256 (D.D.C. 2011); *Solomon v. Vilsack*, 763 F. 3d 1, 14 (D.C. Cir. 2014) ("Solomon"); *Gill v. GAO*, PAB Docket No. 08-07 (4/20/10).

<u>The Causation Standard</u>

With respect to the third element of retaliation – causation – we believe that the proper standard for review is different for claims of retaliation brought by federal sector employees as compared with private sector employees. We disagree with our colleagues who argue in favor of, but do not decide, the applicability of the more stringent "but for" standard espoused in *University of Texas Southwestern Medical Center v. Nassar*, 133 S.Ct. 2517 (2013) ("Nassar"). We are instead guided in our view, in part, by the reasoning of the EEOC in *Petitioner v. Sally Jewell, Sec. Dep't of Interior*, EEOC Doc. 0320110050 (E.E.O.C.), 2014 WL 3788011, n. 6 (July 16, 2014). There, the Commission concluded, albeit in a footnote, that the "but for" standard does not apply to Title VII retaliation claims by federal sector employees "because the relevant

federal sector statutory language does not employ the 'because of' language on which the Supreme Court based its holdings in ["*Nassar*"] ...."

In the federal sector, the applicable statutory section for retaliation claims is 42 U.S.C. § 2000e-16(a) ("[P]ersonnel actions affecting [federal] employees... shall be made '*free from any*' discrimination based on race, color, religion, sex, or national origin.") (Emphasis added). It is distinguishable from § 2000e-3(a)[1] that was the subject provision in *Nassar* and that specifically applies to private sector employees. We believe that because Petitioner's claim arises under 42 U.S.C. § 2000e-16(a), we are not bound by the *Nassar* Court's interpretation of an entirely different statutory provision containing different language defining retaliation.[2]

We note, however, that although we believe the proper standard to be applied in this case is the "motivating factor" test, we would reach the same result regardless of the standard employed – that summary judgment should not have been granted on either the ASM assignment claim or the denial of the State Department detail claim. Importantly, we find that the "but for" standard is not equivalent to a requirement that Petitioner's protected activity be the Agency's *only* consideration. Rather, we conclude that the "but for" standard requires proof that the adverse employment action would not have occurred without the protected activity. *See, e.g.,*

---

[1] This provision reads:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, *because* he has opposed any practice made an unlawful employment practice by this subchapter, or *because* he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

(Emphasis added.)

[2] No federal case has yet addressed the distinction between the federal sector employment language cited as relevant by the EEOC, and the private sector language analyzed by the Supreme Court in *Nassar*. We also note that all of the federal circuit cases cited by the majority since *Nassar* are unpublished opinions. Some of the district court cases are published.

*Jones v. Okla. City Pub. Schs.*, 617 F. 3d 1273, 1277 (10th Cir. 2010) ("[A]n employer may be held liable [for age discrimination] if other factors contributed to its taking an adverse action, as long as 'age was the factor that made a difference.'"). *See also*, *Kwan v. Andalex Grp.*, 737 F. 3d 834, 845-846 (2d Cir. 2013) ("Kwan") ("'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive'."). Finally, see, *Joseph v. Owens & Minor Distrib.*, 5 F. Supp. 3d 295, 320 (E.D.N.Y. 2014), in which the court stated:

> [T]he determination of whether retaliation was a "but-for" cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts. (Citing, *Kwan*, 737 F. 3d at 846 n.5).

<u>Temporal Proximity</u>

The majority opinion recognizes without discussing that causation may sometimes be proved by "showing that the adverse employment action occurred within a short time after the protected conduct." *Crawford v. Metro. Gov't*, 555 U.S. 271, 283 (2009) (concurring); *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001). When such is the case, the time between the adverse action and the protected activity must be "very short." *Hamilton v. Geithner*, 666 F. 3d 1344, 1357-58 (D.C. Cir. 2012) (two months); *Singletary v. District of Columbia*, 351 F. 3d 519, 525 (D.C. Cir. 2003) (one month). In *Kwan* (involving three weeks between the protected activity and the adverse action), the court stated: "[T]he but-for causation standard does not alter the plaintiff's ability to demonstrate causation at the prima facie stage on summary judgment or at trial indirectly through temporal proximity." *Kwan*, 737 F. 3d at 845.

Case: 15-6002 Document: 10 Page: 124 Filed: 08/17/2015

Legitimate Non-Retaliatory Reasons

Once a *prima facie* case is established, the burden of production shifts to the employer to produce a "legitimate, non[retaliatory] reason" for its action. *Solomon*, 763 F. 3d at 14. If the employer does so, Petitioner must respond with sufficient evidence to "create[ ] a genuine dispute on the ultimate issue of retaliation either directly by [showing] that a [retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *See id.* (quoting *Pardo-Kronemann v. Donovan*, 601 F. 3d. 599, 604 (D.C. Cir. 2010)). *See also, Cade v. Astrue*, 2014 U.S. Dist. LEXIS 128612, 20-21 (D.S.C. Sept. 15, 2014):

> Post-*Nassar* . . . a plaintiff may satisfy his burden on summary judgment [to prove pretext] "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." (quoting *Kwan, supra.*).

The *Kwan* court also stated:

> Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage. (Citations omitted). However, a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage.

737 F. 3d at 847.

In instances where, as here, the employer offers a non-retaliatory explanation for the challenged adverse employment actions, the preliminary issue whether a *prima facie* case was proved would ordinarily become moot. *See, e.g., Brady v. Office of Sgt. at Arms*, 520 F. 3d 490, 493-494 (D.C. Cir. 2008) (citing *Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711 (1983)). *See also Taylor v. Solis*, 571 F. 3d 1313, 1320 n.* (D.C. Cir. 2009); *Solomon*, 763 F. 3d at 14; *Williams*, 806 F.Supp.2d at 256. However, where, as here, the Petitioner offers evidence that the

Case: 15-6002 Document: 10 Page: 125 Filed: 06/17/2015

alleged non-retaliatory reasons for the adverse actions are pretext, the reviewing court may then consider both the evidence of the *prima facie* case as well as the evidence of pretext in determining whether summary judgment should issue. *Kwan, supra; Evans v. Sebelius,* 716 F. 3d 617, 620 (D.C. Cir. 2013).

## SUMMARY OF THE RELEVANT EVIDENCE

We believe that the AJ and our colleagues on appeal neglected to mention or consider certain contested and uncontested facts, statements and assertions that are necessary to fully evaluate and properly decide this motion for summary judgment. Therefore, we provide what we consider to be a more complete summary of the relevant evidence.[3]

### Evidence Related to Petitioner's Prior Protected Activities

Petitioner asserted that from early 1994 and continuing through 2002, she expressed to Mr. Brew and Mr. Solomon her belief that her pay was less than her male counterparts and subordinates, which amounted to gender discrimination and Equal Pay Act violations. *See* Resp. Memo, Ex. N at 13-14 (Petitioner's Supplemental Responses to GAO Interrogatories "Pet. Supplemental Discovery"). She stated that in April, 2001, she told Mr. Brew that "I believed putting me in the same hostile environment he had pulled me out of felt like reprisal for engaging in protected activity, and that this placement would be intolerable for me." *Id.* at 15. Petitioner also stated that in August 2001, "I reiterated to Brew and Solomon that I believed being reassigned to ASM was retaliation for my participating in the Davis and Vargas cases and for being vocal about violations of the Equal Pay Act." *Id.* at 16. Also Petitioner testified that she told Mr. Brew's assistant sometime in January 2001 that she could not work in the weapons

[3] We note that some background information is re-stated here for the sake of clarity.

group "based on hostile work environment," among other reasons. *See infra*, "Evidence Related to Petitioner's Assignment to the Weapons Section of the ASM Team" at 11.

In contrast to these assertions, Mr. Brew testified: "I don't ever remember her talking to me specifically about males being paid more than she was. My recollection is that she felt at one time, I believe, that she was carrying on greater responsibilities than some other people and should clearly be paid more." Resp. Memo, Ex. F at 19 (Brew deposition). Also, Mr. Brew recalled that when he arrived in Denver, Petitioner "raised an issue about the fairness with which she thought she had been treated in the European Office[.]" *Id.* at 20.

Petitioner also asserts that on or about March 6, 2000, an attorney with the Agency's Office of the General Counsel, Barry Shilito, interviewed her regarding allegations of discrimination and reprisal that a coworker, Sandra Davis, had filed against Messrs. Brew and Solomon. Amended Petition ¶ 20; Resp. Memo, Ex. N at 15 (Pet. Supplemental Discovery). On March 14, 2000, Petitioner testified on behalf of Ms. Davis at a deposition. She asserts that on or about October 5, 2000 and on or about December 13, 2000, Mr. Shilito contacted her again regarding her testimony in the Davis case. Amended Petition at ¶ 20; Resp. Memo, Ex. N at 15 (Pet. Supplemental Discovery). GAO does not deny these assertions. Response to Amended Petition ¶ 20 ("GAO is without knowledge or information sufficient to form a belief as to the truth of the allegations").

Petitioner also asserts that in May 2001, she was interviewed in connection with allegations of discrimination and reprisal raised by another coworker, Maria Vargas, against Messrs. Brew and Solomon.[4] *See* Amended Pet. ¶ 25; Resp. Memo, Ex. N at 15 (Pet. Supplemental Discovery); Response to Amended Pet. ¶ 25 (in which the Agency asserted that it did not have knowledge of this allegation). Petitioner also asserts that, on several occasions in

[4] This was approximately one month after Petitioner was "preliminarily" assigned to ASM.

July 2001, she was interviewed in preparation for a hearing on the Vargas complaint. *See* Amended Petition ¶ 26; Resp. Memo, Ex. N at 15 (Pet. Supplemental Discovery); Response to Amended Petition ¶ 26 ("GAO is without knowledge or information sufficient to form a belief as to the truth of the [ ] allegations").

Petitioner asserts that, on or about October 26, 2001, she was interviewed again about her anticipated testimony in the upcoming hearing on the Davis complaint. *See* Amended Petition ¶ 29; Resp. Memo, Ex. N at 16; Response to Amended Petition ¶ 29 ("GAO is without knowledge or information sufficient to form a belief as to the truth of the allegations"). On Friday, November 2, 2001, Petitioner flew to Washington, D.C., to testify as a witness in the Davis hearing, but once she arrived, she was not called. Amended Petition ¶ 31; Resp. Memo, Ex. N at 16 (Pet. Supplemental Discovery); Response to Amended Petition ¶ 31. Petitioner testified that when she was in Washington, D.C. that same day, she made her first contact with the Agency's EEO office [O&I], where, among other things, she expressed fear of retaliation because of her participation as a witness in protected activity. *See* Pet. Opposition, Ex. 1 at 282-283 (Petitioner deposition); Resp. Memo, Ex. N at 21 (Pet. Supplemental Discovery); *see also* Resp. Memo, Ex. S at Bates No. 18, 26 ("I stopped by to see Dennis O'Connor in the Employee Rights Office at GAO to express concern about my having to testify against Brew and Solomon") (Complainant's 4-30-02 Discrimination Complaint). Petitioner also testified that she made an appointment and met with Mr. Jesse Hoskins, GAO's Chief Human Capital Officer, that same day and made him aware of her protected activity. Pet. Opposition, Ex. 1 at 280-285 (Petitioner deposition). In particular, Petitioner testified that she told Mr. Hoskins that she was in Washington, D.C. that day to be a witness in the Davis case; that the Davis case was filed against Brew and Solomon; that she had participated in the Vargas case; and that she had visited the O&I office that same

day. She also testified that she told Mr. Hoskins she hoped her request for a detail to the State Department would be granted as a means of avoiding being reassigned to the weapons section of the ASM group (see discussion below). *See id.*

On November 5, 2001, on Monday after the weekend, Petitioner returned to work in Denver. She asserts that, upon her return, Mr. Solomon told her that he was aware that she did not testify while she was in Washington. *See* Pet. Opposition, Ex. 1 at 507 (Petitioner deposition). The next day, Mr. Solomon announced to Petitioner that, despite her appeals to himself and Mr. Brew, she would have to report to the ASM group for work. The temporal proximity between this announcement and Petitioner's last protected activity in Washington, D.C. was within 3 days, including the weekend, and, therefore, was "very close."[5]

On January 4, 2002, Petitioner contacted O&I again and began an informal counseling process about her assignment to ASM and the denial of her detail to State. *See* Amended Petition ¶ 40; Response to Amended Petition ¶ 40. On April 30, 2002, Petitioner filed a charge of discrimination against the Agency. *See* Resp. Memo, Ex. S (Complainant's charge of discrimination). The parties agree that on May 2, 2002, Petitioner filed a formal discrimination and retaliation complaint against the Agency, alleging both the assignment to ASM and the denial of the detail. *See* Amended Petition ¶ 46; Response to Amended Petition ¶ 46.

<u>Evidence Related to Petitioner's Assignment to the Weapons Section of ASM</u>

From 1993 to approximately 2000, Petitioner performed defense environmental work for the Agency's Denver Field Office. She worked in both the Defense Management and NASA

[5] The majority brushes aside the inference of retaliation that might be drawn from this temporal proximity by insisting that the adverse action of assigning Petitioner to ASM had occurred months before in April. As we noted earlier, however, even Mr. Brew called this assignment "preliminary" and on November 5, Mr. Solomon concurred that the assignment was not yet finalized when he told Petitioner, "[Y]ou're *going to be* working for me and Ted Baird." (Emphasis added.) Clearly, Mr. Solomon was not stating a past occurrence and, therefore, the April announcement does not appear to have been final.

("DMN") group and the "Defense Acquisition" ("DA") group, both of which were part of the National Security and International Affairs Division ("NSIAD").[6] Respondent's Statement of Undisputed Material Facts ("Resp. Statement") ¶¶ 1, 3; Petitioner's Response to Respondent's Statement of Undisputed Material Facts ("Pet. Fact Response") ¶¶ 1, 3. Within NSIAD, DMN and DA comprised what GAO referred to as the "Defense" core group. Amended Petition ¶ 1; Response to Amended Petition ¶ 1. Petitioner also worked on another team that was part of NSIAD – the International Relations and Trade ("IRT") group – that was then in the Denver Field Office. Resp. Statement ¶¶ 1, 3; Pet. Fact Response ¶¶ 1, 3.

Starting in 2000, GAO began a structural reorganization from five "Divisions" encompassing approximately 35 issue areas into 13 teams. Resp. Statement ¶ 4; Pet. Fact Response ¶ 4. At some point in or around 2000, the Denver office stopped doing international work. Amended Petition ¶ 21; Response to Amended Petition ¶ 21. Petitioner stated that on June 21, 2000, the Agency announced that DMN environmental work was to be moved to the Natural Resources and Energy ("NRE") team, leaving DMN only responsible for weapons/military work. Respondent's Memorandum of Law in Support of Motion for Summary Judgment ("Resp. Memo"), Ex. N at 51 (Pet. Supplemental Discovery). She testified that, as a "pre-step" "prior to the major segment of the reorganization" in 2000, she was assigned out of NSIAD to NRE and continued to do defense environmental work in NRE. *See* Petitioner's Memorandum of Law in Opposition to Respondent's Motion for Summary Judgment ("Pet. Opposition"), Ex. 1 at 306-308 (Petitioner deposition) ("they transferred everybody who worked on defense environmental issues under NSIAD over to ... natural resources and energy

[6] Petitioner and Respondent alternately refer to organizational functions within the Agency as comprised of "groups" or "teams."

[NRE]."); *see also* Resp. Memo, Ex. Q at 1 (Petitioner's email dated January 7, 2002) ("I was working in NRE during the reorganization").

Prior to the reorganization, Petitioner's management included Thomas Brew, who testified that he served (among other titles) as the Regional Manager in Denver and as Associate Director in the DA group.[7] In 1997, Mr. Brew left the Denver office to serve as the Assistant Comptroller General for Policy and eventually became the Agency's Managing Director for Field Offices. *See* Resp. Memo, Ex. F at 6-10, 56 (Brew deposition). Beginning in 1997, James Solomon testified that he served as Acting Manager of the Denver office, until 2000, when he became an Assistant Director for Acquisition and Sourcing Management ("ASM").[8] Mr. Solomon testified that during his time as Acting Manager of the Denver office, his supervisor was Mr. Brew in Washington, D.C. *See* Resp. Memo, Ex. FF at 10-11, 14 -16 (Solomon deposition). One of Petitioner's coworkers while she was in the DA group was Ted Baird. *See* Amended Petition ¶ 9.

Robert Robinson testified that he was Managing Director of NRE when that team was formed around 2000. *See* Resp. Memo, Ex. H at 10, 22 (Robinson deposition). Ed Zadjura was an Assistant Director of NRE. *See id.* at 25. Mr. Robinson recalled that Petitioner was working as a staff member for Mr. Zadjura at NRE during the reorganization. *See id.* at 26-27. In contrast to Petitioner's assertions concerning the permanency of her assignment to NRE, Mr. Robinson stated,

> [a]lthough not a permanent member of the NRE team in Denver, she was assigned to one NRE project in 2001. As I recall, her permanent team had

[7] Although Mr. Brew spent time as Regional Manager and Associate Director of DA while in Denver, we note his testimony that he never directly supervised Petitioner. *See* Resp. Memo, Ex. F at 15 (Brew testimony).

[8] According to Mr. Brew, the ASM group was the successor to the former DA group, in combination with other defense teams. Resp. Memo, Ex. G at Bates No. 214; Ex. GG at 1-2. *See also* n. 15, *infra*.

> no work for her in Denver so we found a temporary place for her on one of our projects until her permanent placement situation could be worked out.

*See* Resp. Memo, Ex. I at Bates No. 300 (Robinson statement).

On October 6, 2000, the Comptroller General issued a memorandum to all employees announcing an Employee Preference Survey. Resp. Memo, Ex. D that reads:

> By now you should have been informed of your initial team or work group assignment. The Employee Preference Survey gives you an opportunity to indicate if you are interested in changing that assignment ... [t]he effective date of any reassignment will be decided on a case-by-case basis, depending on the needs of the agency, and the employee's circumstances.

*See also* Resp. Memo, Ex. E (email dated October 5, 2000 from management to staff concerning the survey) ("The Employee Preference Survey is voluntary. *If you are satisfied with your assigned team, office or group and are not interested in changing assignments at this time, there is no need for you to complete the survey.*") (Emphasis added). Gene Dodaro, the then-Chief Operating Officer of the Agency testified that the Preference Survey was "started early after the reorganization to allow people to express their preferences for moving ... to other teams." Resp. Memo, Ex. C at 10 (Dodaro deposition). He also testified that employees "basically continued to work on the same engagements that they worked on at that time. Then they were given the opportunity through [the] employee preference survey to move to other teams." *Id.* at 9.

At the time of the Preference Survey, management planned for four teams to have a presence in the Denver Field Office: Acquisition and Sourcing Management ("ASM"), Financial Management and Assurance ("FMA"), Information Technology ("IT"), and Natural Resources and Energy ("NRE"). *See* Resp. Statement ¶ 10; Pet. Fact Response ¶ 10. According to Mr. Brew, the ASM team required experience with the military and with contracting, while the FMA and IT teams were to be comprised of accountants and computer specialist staff. *See* Resp.

Memo, Ex. G at Bates No. 220. He did not describe the experience necessary to be assigned to NRE.

Petitioner responded to the Preference Survey. She indicated that she wanted to remain in the Denver office, Resp. Statement ¶ 9; Pet. Fact Response ¶ 9; however, as her first choice, she listed the International Affairs and Trade (IAT) team that was not operating in Denver.[9] Her second choice was the NRE team where she was currently working. Mr. Brew led the analysis of the employee preference survey as it related to field office employees. Resp. Statement ¶ 7; Pet. Fact Response ¶ 7. Petitioner testified that she spoke about her responses on the Preference Survey to Mr. Brew's assistant, Jackie McDaniel, who was working with him on the reorganization.[10] Petitioner testified that she told Ms. McDaniel, among other things:

> [D]o not place me until you have had a conversation with me ... absolutely do not put me in the weapons group [of ASM]. That is the only place I cannot work based on hostile work environment and based on I'm an ex-Peace Corps volunteer and I will not work on weapons, and I've told GAO that for 20 years. I will not work on weapons systems.

Pet. Opposition, Ex. 1 at 319 (Petitioner deposition) and 615-16 (Petitioner told Mr. Solomon, among others, starting in 1993 that she was opposed to working in weapons systems, based on religious and moral grounds).[11] Petitioner testified that she told Ms. McDaniel to make sure the

---

[9] The "IAT" team was at that time located in Washington, D.C. and Los Angeles, CA. See Amended Petition ¶ 24; Response to Amended Petition ¶ 24.

[10] According to Petitioner's review of the notes taken by Ms. McDaniel during their meeting, the date of their meeting was probably sometime in January 2001. *See* Pet. Opposition, Ex. 1 at 313, 319. With respect to the Preference Survey and the role of Ms. McDaniel, Mr. Brew stated: "I do not recall her [Petitioner] asking for environmental work in that survey. Ms. McDaniel was among mission support staff making telephone contacts with staff." Resp. Memo, Ex. G at Bates No. 215 (Brew statement).

[11] Additional evidence relating to Petitioner's assertion that she requested not to be assigned to the weapons group of ASM includes: a statement by Mr. Brew that after the preference survey process was completed: "I think that I do remember her coming to me after the preference survey ... she came and said that she didn't want to be on the ASM team." Resp. Memo, Ex. F at 70 (Brew deposition). Mr. Brew also testified that Petitioner's concern was "[t]hat she didn't want to do military work." *Id.* at 47. Mr. Brew also stated that Petitioner did not want to go to ASM because "when [she] was reassigned several years before ... at her request" from DA [one of the predecessor teams that were combined to form the ASM team] "she did not get along with one of the Washington-based managers." Resp.

Agency discussed other options with her, as provided in GAO procedures, if her preferences could not be honored. *See id.* at 318-19. Despite her clear preferences, Petitioner testified, "[m]ost of my colleagues had two or three conversations as they were being placed, unless it was an obvious match," but she had no such conversations and her preference was not honored. *Id.* at 318.

Mr. Brew described his decision-making process for assigning employees to teams during the reorganization: "Staff were told, in advance, that the first consideration for placement in a new team would be the organization's needs.... I did an analysis of teams' field needs by matching their annual staffing goals against the number of staff currently on-board in each office." *See* Resp. Memo, Ex. G, at Bates No. 220 (Brew Statement). With respect to Petitioner's assignment, Mr. Brew stated:

> At the time of the survey, I think she was a member of the Defense Capabilities and Management (DCM) team and that team was no longer planning to work in the Denver Office. Therefore, Ms. Hinnen had to be moved to another team. As I recall, there were four teams planning to work in Denver at the time – [ASM, NRE, FMA, and IT] .... Therefore, the only teams that Ms. Hinnen could join were ASM or NRE. As I recall Ms. Hinnen did not request ASM or NRE, but instead only used one of her

---

Memo, Ex. G at Bates No. 214 (Brew statement). In an email to Mr. Brew, dated November 9, 2001, Petitioner wrote, in pertinent part:

> As we discussed the last time we met, I did not have a good experience working with the predecessor to the ASM group which is why I had you transfer me out of that group when you were here in Denver. This is also why I requested that the reorganization team not assign me to ASM.... Jim Solomon and Jack Brock are aware that I'm looking for a transfer; I notified them shortly after I was told I would be moved out of NRE...

Resp. Memo, Ex. GG at 1-2. In a subsequent email to Jesse Hoskins (in the same email stream), dated November 11, 2001, Petitioner wrote, in pertinent part, "As I stated in my message to Tom Brew, the only group I requested that I not be assigned was ASM." *Id.* In an email to David Walker, dated January 7, 2002, Petitioner stated:

> Somehow, I was taken out of NRE when we reorganized, against my expressed preference (and your stated policy of not removing people) and put in ASM, the only group I told them I did not want to work in because of a very bad experience I had with that group. When I appealed the decision, I reminded Tom [Brew] about that experience and about how he had to pull me out of that group when he was here in Denver.

Resp. Memo, Ex. Q at 1.

Case: 15-6002 Document: 10 Page: 135 Filed: 06/17/2015

> three choices and with that she chose the international team, which was not in Denver .... As I recall, the NRE team was fully staffed at the time in Denver and the ASM team needed staff. Since Ms. Hinnen's present team was DCM and she had worked on assessments of defense contracts as they affected environmental cleanup, she had some applicable experience with the military and with contracting. Therefore, she was *preliminarily* assigned to the ASM team.[12]

*Id.* (Emphasis added.) Both Mr. Brew's claim that Petitioner was assigned to the DCM team before he reassigned her to the ASM team and his claim that she did not indicate a preference to be assigned to NRE are significant disputed facts.[13]

In his deposition, Mr. Brew stated his reason for not assigning Petitioner to NRE: "So we had to work within the numbers, and if nat[ural] resources had 30 people working for them in Denver and an allocation of 30, then we couldn't make it 31, and we had to try to deliver the 30, not 29.... We couldn't exceed a cap." Resp. Memo, Ex. F at 71-72 (Brew deposition).

Petitioner stated that on April 10, 2001, the Agency informed her of Mr. Brew's decision to place her in ASM. Resp. Memo, Ex. N at 5, 52 (Pet. Supplemental Discovery); *see also* Respondent's Statement ¶ 16 ("In April 2001, Petitioner was notified of the decision to place her in ASM."). In the months following the April 2001 placement decision, Petitioner expressed her

[12] The majority places much emphasis on its factual finding that the ASM assignment was made in April 2001 when Mr. Brew first told Petitioner of his decision. We believe that, as Mr. Brew stated, this was a preliminary decision that was not finalized until early November 2001 when Mr. Solomon confirmed that Petitioner was required to report to the ASM team. This is also corroborated by Petitioner's proffered evidence that for months (April to September), she remained assigned to the NRE team doing environmental work, followed by several weeks of leave (September–October).

[13] We are uncertain of the source of the statement from Mr. Brew that Petitioner was assigned to the DCM group at the time of the realignment. It appears from the record that Petitioner had once been assigned to the International Relations and Trade (IRT) team that left Denver. The record then shows that in November 2000, she was assigned to a project in the NRE group when environmental work was removed from the DA group. In support of her assertion that she was in NRE (and not DCM), Petitioner offers a document, dated August 16, 2002, produced by the Agency's Field Office Manager in Denver, that "lists, as best as we could reconstruct from available GAO personnel systems, when individuals joined or left the ASM team in Denver." Pet. Opp., Ex. 13 at Bates No. 738 (text from the Field Office Manager's letter describing the purpose of the document marked as Ex. 13, Bates No. 744). As relevant here, this document states that Petitioner went "from NRE" and "joined" ASM in "October/November 2001." *See id.* at Bates No. 744. Finally, the record seems to be undisputed that Petitioner made two preference requests, not one, including an assignment to NRE.

unwillingness to work on the military side of ASM under its Managing Director, Jack Brock. *See* Resp. Statement ¶ 18; Pet. Fact Response ¶ 18. For example, Petitioner stated that on April 19, 2001, she spoke with Mr. Brew to appeal his decision, stating: "I told him that I believed putting me in the same hostile environment he had pulled me out of felt like reprisal for engaging in protected activity, and that this assignment would be intolerable for me." Resp. Memo, Ex. N at 15 (Pet. Supplemental Discovery).

Next, in a memorandum addressed to Mr. Brew and others, dated August 10, 2001, Petitioner wrote:

> I would like you to reconsider my pending transfer from the NRE Team to the ASM Team, in light of my significant expertise with defense environmental issues. I have given this a lot of thought since our last meeting. As I indicated then, I believe I fell through the cracks when our work was transferred from the Defense Management group to NRE during the reorganization.

*See* Resp. Memo, Ex. J. Petitioner stated that on August 16, 2001, "Mr. Brew reiterated that I would be reassigned to the weapons section of ASM, despite my repeated requests not to be assigned to that group." Resp. Memo, Ex. N at 5, 52 (Pet. Supplemental Discovery); *see also* Resp. Memo, Ex. G at Bates No. 215 ("I recall Ms. Hinnen's conversation with me and I checked my staffing levels and saw that NRE was full and ASM was in need of staff.") (Brew Statement).

A document, dated August 16, 2002, that Petitioner offered from the Agency's Field Office Manager in Denver, Pet. Opp., Ex. 13 at Bates No. 738, states that Petitioner went "from NRE" and "joined" ASM in "October/November 2001." *See id.* at Bates No. 744. This document also indicates that four members of "DA"[14] were transferred from DA "to NRE" from

[14] We note that this document also states that five former members of "DA" – Baird, Cherveny, Day, Durant, Gallegos – "joined ASM when ASM was formed" in "Oct-00." From this information, it would be possible to conclude, if we were tasked with fact-finding, that these five members of DA were transitioned to the ASM group

early 2001 through mid-2002: Messrs. Holguin and Padilla (from DA to NRE, October/November 2001), Mr, Kigerl (from DA to NRE, Jan. 2001) and Mr. Laetz (from DA to NRE, Feb. 2002).[15] *See id.* In addition, Petitioner submitted evidence purporting to show the preferences (or lack thereof, in the case of one employee) of these four Denver staff members prior to receiving their assignments to NRE.[16] This submission shows that Mr. Holguin's first choice was to move from ASM to NRE and his second choice was to remain in ASM; Mr. Padilla listed no preference, but was moved from ASM to NRE, Messrs Kigerl's and Laetz's choices were to move from ASM to NRE. Resp. Memo, Ex. N at 18-20 (Pet. Supplemental Discovery).[17] According to Petitioner, "[o]f the 18 staff members who were placed in NRE and ASM, no one but [herself] was placed in a group [she] did not request or approve as part of the employee preference survey." Amended Petition ¶ 28.

---

when ASM was formed in October 2000. In comparison, notably, this document does not show that the Denver Office considered Petitioner to be a member of the ASM team prior to "October/November 2001;" rather, it arguably shows that the Denver Office considered Petitioner to be a member of NRE prior to October/November 2001.

[15] Petitioner argues that this evidence shows she was already assigned to NRE when Mr. Brew decided to assign her to ASM and that the NRE group was not too full to employ her along with four others, including one who expressed no preference to move to NRE. *See* Appellant's Corrected Opening Brief at 36.

[16] It may be that the source of this information provided by Petitioner is the report of investigation, but that source material is not in the record for our review.

[17] We note that the Denver Field Office document lists these four employees' former team or group as "DA," while the evidence submitted by Petitioner lists these four employees' former team or group as "ASM." Both submissions list Petitioner as a member of NRE. The record (in particular, Petitioner's Ex. 13) suggests, although we cannot be certain, that most employees who were members of the DA group prior to the reorganization automatically joined ASM when ASM was formed, according to the Agency's record, in October 2000. If that conclusion is correct, it would explain why DA and ASM could be considered somewhat equivalent designations during the period of the Agency's reorganization. This interpretation would be consistent with Petitioner's assertion, set forth in her Amended Petition ¶ 22:

> During the agency-wide reorganization in late 2000 and 2001, the DA group was renamed the Acquisition Sourcing and Management ("ASM") team. Other than the name change and a few top-level management changes in the Washington, D.C. office, the newly renamed ASM group in the Denver Office continued to function as it had before the reorganization, with the same work areas and field staff.

We also note, however, that the Agency denied this assertion (see Response to Amended Petition ¶ 22).

Petitioner was permitted to continue doing environmental work in NRE until September 2001 when she took leave for several weeks. She was not expected to report for work in ASM until that November. *See* Resp. Statement ¶ 17; Pet. Fact Response ¶ 17. On November 6, 2001, Petitioner stated, "Solomon told me that he would be reassigning me from the Natural Resources and Environment ("NRE") group to [ ] Acquisitions and Sourcing Management ("ASM")." Resp. Memo, Ex. N at 10 (Pet. Supplemental Discovery);[18] *see also* Pet. Opposition, Ex. 1 at 514 (On November 6, 2001, [Solomon] said, "you're going to be working for me and Ted Baird.") (Petitioner deposition); *cf.* Response to Amended Pet. ¶ 34 ("Mr. Solomon advised Petitioner that if she had a concern working with Mr. Baird that Mr. Solomon would collaborate with Mr. Baird regarding her expectations.")

According to Petitioner, she asked Mr. Solomon, that if she had to work in ASM, would he at least assign her to work on the civilian side. She stated that Solomon refused because, according to him, there was no other place to put her. *See* Pet. Opposition, Ex. 1 at 239-240 (Petitioner deposition). The Amended Petition asserts: "Petitioner requested to be assigned to the civilian contracting component of ASM, but Solomon falsely told her there were no assignments available on the civilian side, and assigned her to the weapons system component of ASM." Amended Petition ¶ 30. GAO denied that allegation. Response to Amended Pet. ¶ 30. This, then, was another significant contested material fact.

<u>Evidence Related to Petitioner's Request for a Detail to Department of State</u>

On August 10, 2001, while she continued her environmental work in NRE, Petitioner sent a Memorandum to Mr. Brew (copying Elliott Smith, Rudy Payan, and Jack Brock), stating that she would like to explore the possibility of a temporary detail outside of GAO in order to avoid

---

[18] This, of course, undermines Mr. Brew's statement that Petitioner was assigned to a DCM group before she was reassigned to ASM.

working for the weapons side of ASM. *See* Resp. Memo, Ex. J. Petitioner testified that Mr. Brew referred her to Gloria Jarmon, who as Director of the Office of External Liaison was the person in charge at GAO for arranging details to NATO and other international organizations. Resp. Memo, Ex. A at 251-252, 256, 258; Resp. Memo, Ex. N at 20 (Pet. Supplemental Discovery). In this regard, Petitioner states that she "tried to follow the NATO model" when seeking her detail to State, "so there would not be a problem with precedence" while she waited one year in order to be eligible for a transfer out of ASM. *See* Resp. Memo, Ex. Q at 1 (email from Petitioner to D. Walker, dated Jan. 7, 2002 at 12:37 PM); *see also* Resp. Memo, Ex. P, at 1 (Petitioner's letter to Walker, dated January 6, 2002) (stating that Brew told her "the NATO Auditor position was the closest model to follow and that External Liaison would be in the best position to advise me.").

On September 10, 2001, Petitioner discussed with Ms. Jarmon a possible detail to the State Department. Resp. Memo, Ex. A at 255. According to Petitioner, Ms. Jarmon responded that it was GAO's policy and process "to loan people to groups that we support." *Id.* at 255-256. "So, it may make sense to send you to State even if we haven't done one to State before, if it's aligned with our goals[] and it sounds to me like it is." *Id.* Petitioner states that Ms. Jarmon briefed the Executive Committee on her detail request; the Committee's response was positive with no issues or concerns raised regarding the detail request. *See id.* at 260; Resp. Memo, Ex. N at 21. In this connection, Petitioner states that in none of her contacts with Ms. Jarmon, or anyone else, was it suggested that there was a practice or policy that precluded detailing a GAO employee to an Executive Branch Agency. *See* Resp. Memo, Ex. N at 20-21; Resp. Memo, Ex. A at 255-256; Resp. Memo, Ex. P, at 2-3 (Petitioner's letter to Walker, dated January 6, 2002).

Petitioner was told that she needed to receive a formal request from the Department of State and forward it to Comptroller General David Walker in order for the detail to be considered. *See* Resp. Statement ¶¶ 19- 20; Pet. Fact Response ¶¶ 19- 20. In a letter, dated September 19, 2001, the State Department proposed that Petitioner be allowed to participate in a "non-reimbursable detail" under which, GAO would pay Petitioner's salary and the State Department would pay official travel expenses. *See* Resp. Statement ¶ 21; Pet. Fact Response ¶ 21.

According to Petitioner, her detail request was turned over to Sallyanne Harper, the Chief Administrative Officer, and her subordinate, Jessie Hoskins, the Chief Human Capital Officer. On or about October 11, 2001, Mr. Hoskins told Petitioner that GAO would not authorize a detail to the State Department unless it was fully reimbursed. *See* Resp. Memo, Ex. N at 21; Amended Petition ¶ 30; Response to Amended Petition ¶ 30. Petitioner states that in an email conversation on November 14, 2001, Mr. Hoskins reported that he had advised the State Department that GAO had decided not to detail Petitioner unless State decided to reimburse GAO for the detail. Petitioner then requested to work part-time hours in order to spend more time attempting to secure funding from the State Department and to "avoid starting an assignment with ASM." Resp. Memo, Ex. N at 22-23 (Pet. Supplemental Discovery). Petitioner asserts that at no time during the three months that her request was pending approvals did Ms. Harper, who was a member of the Executive Committee, or Mr. Hoskins advise her that there was a practice or policy in place at the time that precluded GAO employees from accepting details to Executive Branch agencies. *Id.* at 21.

On December 11, 2001, at a ceremony where Petitioner received a community service award from the Comptroller General, she took the opportunity to discuss with him her desire to

Case: 15-6002 Document: 10 Page: 141 Filed: 08/17/2015

be detailed to the State Department. *See* Amended Petition ¶ 36; Response to Amended Petition ¶ 36; Resp. Statement ¶ 24; Pet. Fact Response ¶ 24. Mr. Walker indicated that he was not familiar with her request for a detail or the September letter from the State Department inviting her to accept a detail. At his request, Petitioner later left a copy of the letter from State with Mr. Walker's assistant. Resp. Statement ¶ 24; Pet. Fact Response ¶ 24; Resp. Memo, Ex. N at 23 (Pet. Supplemental Discovery). Mr. Walker did not tell Petitioner that there was a policy or practice in place at that time that precluded GAO employee details to the Executive Branch. *Id.*

Also at the ceremony, Petitioner discussed the detail issue with Mr. Dodaro who told Petitioner that GAO would not pay her salary for a detail to the State Department or any Executive Branch agency. *See* Resp. Statement ¶¶ 25-26; Pet. Fact Response ¶¶ 25-26; *cf.* Response to Petition ¶ 36 ("Mr. Dodaro indicated to Petitioner that GAO was limiting details even to Congress and would not approve a detail to an Executive Branch agency"). Mr. Dodaro did not tell Petitioner that there was a policy or practice in place at that time that precluded employee details to the Executive Branch. Resp. Memo, Ex. N. at 24 (Pet. Supplemental Discovery).

On December 21, 2001, Petitioner spoke again with Mr. Hoskins and advised him that the State Department had agreed to fully fund the detail. Mr. Hoskins responded that Petitioner would need approval from her Managing Director, Jack Brock (of ASM) and an official document from the State Department stating its agreement to pay for the detail. Resp. Memo, Ex. N at 25 (Pet. Supplemental Discovery). Later that same day, Petitioner called Mr. Brock's office to advise that the detail was fully funded and to request his approval as instructed by Mr. Hoskins. Petitioner spoke with Mr. Allen Li who explained that Mr. Brock was on leave for the holidays. Mr. Li told Petitioner that "[Mr.] Brew had informed ASM that [Petitioner's] detail

was 'dead' and that [she] should be permanently assigned to [the] ASM group to work for Solomon in Denver." *Id.* Petitioner advised that she had different information from Mr. Hoskins and that all she needed to begin her detail on January 7, 2002 was Mr. Brock's approval. Mr. Li then agreed to contact Mr. Brock over the holidays to attempt to secure his approval. *Id.*

On December 26, 2001, Petitioner learned that Mr. Brock had approved the one year detail to the State Department, even though she had been told that Mr. Brew said "it was dead." On the same date, she received a copy of an official letter from the State Department to GAO agreeing to pay for her detail. Resp. Statement ¶ 26; Pet. Fact Response ¶ 26; Resp. Memo, Ex. N at 25 (Pet. Supplemental Discovery). The next day, Petitioner was packing her office to move to Washington to begin her detail when Mr. Solomon came by and asked what she was doing. Petitioner explained her pending move, whereupon Mr. Solomon returned to her office in an hour and stated that according to Mr. Hoskins, "the detail is not a done deal." *Id.* at 26.

On January 2, 2002, Petitioner received an email from Mr. Hoskins stating that he had not received the official letter from the State Department agreeing to fully reimburse the detail. According to Petitioner, Mr. Hoskins did not say anything about the Executive Committee being involved in a policy decision about details or that her detail was still pending any further approvals. Resp. Memo., Ex. N at 27 (Pet. Supplemental Discovery).

Mr. Dodaro testified that GAO's policy at the time of Petitioner's request was that details outside of GAO were required to be approved by the Comptroller General in consultation with GAO's "Executive Committee." Resp. Memo, Ex. C at 24-25 (Dodaro deposition). He also testified that the Executive Committee was created during the Agency's reorganization, sometime in 2000-2001, and was comprised of the Comptroller General (Walker), the Chief

Operating Officer (Dodaro), the Chief Administrative Officer (Sallyanne Harper) and the General Counsel (Tony Gamboa). *Id.* at 8, 19.

Despite Petitioner securing approval for the detail from Jack Brock, the Executive Committee met to discuss her request on January 4, 2001. The attendees at the meeting included Mr. Dodaro, Mr. Walker, Ms. Harper, and Mr. Hoskins. *See* Resp. Memo, Ex. C at 31, 36-37 (Dodaro deposition). Mr. Dodaro explained that it was necessary for Mr. Hoskins to attend the Committee's deliberations because "I believe, as I recall, Ms. Hinnen had some conversations with Mr. Hoskins about this matter" and "we wanted to make sure we understood what had transpired up to the point for us making the decision." *Id.* at 31.

GAO contends that the Executive Committee denied Petitioner's request for a reimbursable detail to the State Department "because it determined that Executive Branch details could undermine GAO's independence and because Congress had provided GAO with appropriated funds to support Congress, not the Executive Branch." *Id.* at 33. Mr. Dodaro explained the Agency's "policy" regarding external details at the time of the Executive Committee's decision:

> The policy was to consider each situation on a case-by-case basis because there were a wide variety of detail possibilities including the Congressional detail, international organizations, *executive branch agencies,* et cetera.
>
> The policy was that it was not, we believed, to be a good idea to detail people to the executive branch agencies because of independence concerns and because we were being given our appropriation to provide support to the Congress and carry out our mission. So for those reasons we decided that details to the executive branch were not appropriate.

*Id.* at 35-36 (Emphasis added). Mr. Dodaro could not recall when that policy or practice began. *See id.* at 34.

Mr. Walker testified somewhat differently. He stated that at the time the Executive Committee met to discuss the policy concerning approvals of details for GAO employees, there was not "an expressed [sic] written policy that dealt directly with details to executive branch agencies. So there was nothing that said that you could or you couldn't do it." *See* Resp. Memo, Ex. B at 18 (Deposition of Mr. Walker). He also stated, "I do not recall having any discussions about it [details to executive branch agencies] until the policy issue was brought up to the executive committee as a result of Ms. Hinnen's request." Later in his testimony, Mr. Walker clarified, "we had a practice, not a written policy." *Id.* at 31; *cf.* Pet. Opposition, Ex. 10 at 1 (in an email to Petitioner, dated January 8, 2002, Mr. Walker wrote, "we have had a standing policy position for some time that we do not do details to the Executive branch for a variety of reasons.")

Mr. Walker further testified that after discussing the detail issue with those at the meeting, it was the unanimous view of the Executive Committee that details should not be allowed to the Executive Branch. *See* Resp. Memo, Ex. B at 20 (Walker deposition). Mr. Walker explained that the intent of the policy was not to eliminate the possibility of details to Executive Branch agencies (*see id.* at 26-27), but that such a detail "could be a rare exception under unusual circumstances." *Id.* at 32.

Mr. Hoskins testified in his deposition about the Agency's history of approving details prior to Petitioner's request. He stated in response to questions:

> Q. Had you dealt with any other types of details, say internal details, while you were at GAO and prior to Ms. Hinnen's request?
>
> A. I don't remember, but I know there was some [sic] details made overse[a]s and with, I believe, the Department of Defense."

Pet. Opposition, Ex. 8 at 21 (Hoskins deposition).

Case: 15-6002 Document: 10 Page: 143 Filed: 06/17/2015

Mr. Walker testified that after the Executive Committee denied Petitioner's requested detail, he decided to allow her to work for the State Department, but only if she was willing to take Leave Without Pay ("LWOP") during the entire detail year. That is, Petitioner would remain employed by GAO; however, she would be on LWOP from her assignment to ASM. Mr. Walker testified, "I wanted to try to be able to do something to be helpful to her, without setting an adverse precedent for the future." *Id.* at 32-33.

On January 4, 2002, the day of the Executive Committee meeting, Mr. Hoskins called Petitioner to advise her that the committee had "reversed his decision" to permit the detail to the State Department. As a result, Petitioner had to cancel her airline ticket, her rental arrangement in Washington and orientation meetings that were scheduled at the State Department. Resp. Memo., Ex. N at 27 (Pet. Supplemental Discovery). Mr. Hoskins advised Petitioner that GAO would permit her to work for the State Department if she agreed to use LWOP. *Id.*; *see* Resp. Statement ¶ 27; Pet. Fact Response ¶ 27.[19] When questioned why the Agency found no conflict of interest in allowing Petitioner to take LWOP for a year while working for an Executive Branch agency, but found that such a conflict existed if she took a fully reimbursed detail to the Executive Branch, Mr. Dodaro responded: "I believe we arrived on [sic] the decision of a leave-without-pay situation because there was miscommunication about the nature of the detail. So we thought in this particular case we would make an exception because of the situation specifically resolving [sic] Ms. Hinnen." Respondent's Memo, Ex. C at 41-42. Mr. Dodaro did not explain what the nature of the "miscommunication" was.

On Sunday, January 6, 2002, Petitioner sent Mr. Walker an email request for an emergency meeting, with an attached letter (Resp. Memo, Ex. P), in which she described the

[19] That same day, Petitioner contacted O&I. Amended Petition ¶40; Respondent's Resp. to Amended Petition ¶ 40.

Case: 15-6002 Document: 10 Page: 146 Filed: 08/17/2015

history of her request for a detail, including her suspicion that the denial was related to her "involuntary involvement in a couple of the most contentious personnel cases in Denver involving Tom Brew and Jim Solomon over the past few months.[20] She informed Mr. Walker that her detail was to have begun on the next business day, the 7th; had been in process for five months and approved "at every level of management and authorized by the highest HR official in GAO, Jessie Hoskins, as recently as January 2, 2002." Resp. Memo, Ex. N at 28 (Pet. Supplemental Discovery); *cf id.* at 25 (stating January 7 was the scheduled start date of the detail). Petitioner requested that the Agency reconsider its decision to deny the fully reimbursed detail to the State Department. Resp. Memo, Exs. O, P.

On January 7th, Mr. Walker responded that he would arrange a meeting to discuss the request that would include Gene Dodaro. *See* Resp. Memo., Ex. O. In response, Petitioner requested that Sallyanne [Harper] sit in on the meeting instead of Mr. Dodaro because "I ... know that he [Dodaro] and his wife have been close personal friends of Tom Brew for more than 30 years so it makes me a little uncomfortable given what I have to share." *See id.*

Mr. Walker replied to Petitioner by email, stating that it was not until that day – January 7th – that he first saw the letter from the State Department offering a reimbursed detail. Resp. Memo, Ex. Q at 2; see also Resp. Memo, Ex. N at 28 (Pet. Supplemental Discovery). According to Walker, before that day, he was aware only of the September letter from State offering a non-reimbursed detail. Resp. Memo, Ex. Q at 2. Mr. Walker also stated: "I'm the one who suggested the unpaid leave this past Friday. I saw it as a way to meet you[r] need without establishing a troubling precedent. It's my understanding that you would not lose benefits, but I'm having that

[20] Petitioner continued in this letter to Walker that with regard to the EEO complaints against Messrs. Brew and Solomon, she "begged GAO's lawyers and the lawyers on the other sides of these cases to keep me out of this mess because of the potential for retribution. Please, please do not let them punish me for what happened in Denver." Resp. Memo, Ex. P at 4.

checked out."[21] *Id.* Mr. Walker declined to exclude Mr. Dodaro from the meeting (*see id.*). Petitioner then explained "the significant disadvantages of using the LWOP option or Reinstatement options instead of a Detail."[22] Resp. Memo, Ex. N at 29. Later that same day, Mr. Walker convened a conference call with Petitioner and the Executive Committee in which he stated that "he had a policy against details to the Executive Branch because of the potential for conflicts of interest." *Id.* Mr. Walker told Petitioner that if an employee wished to work for an Executive Branch agency, he [Walker] preferred that the employee take LWOP because the employee would then not be on the GAO payroll while engaged in Executive branch activities.[23] Resp. Memo, Ex. N. at 29.

On January 9, 2002, Petitioner faxed two letters to Mr. Walker explaining again her concerns about the options presented to her – LWOP, resignation, or remaining in ASM under Mr. Solomon. She explained the "significant disadvantages" to all options, including the fact that "LWOP would cost [Petitioner] in terms of benefits and retirement." *Id.* at 31. In addition, she states that she "told [Walker] that the whole problem was caused by Brew removing [her] from [her] work group during the reorganization, refusing [her] 8 month-long appeal to reverse that decision, and placing [her] with Solomon who [she had] just been to Washington to testify against." *Id.*

By email, dated January 10, 2002, Mr. Walker wrote to Petitioner that he was "not familiar with the past issues you allude to in your note;" that "the buck stops on my desk and I

---

[21] Presumably, Mr. Walker learned that under LWOP status, Petitioner would lose the Agency's contribution to her retirement benefits and would have to reimburse the Agency for health care benefits.

[22] GAO offered Petitioner an alternative to LWOP – that she resign from GAO one year before she would be eligible to retire; take the detail; and seek reinstatement at the end of her detail, contingent on there being room for her in Denver and subject to budget cuts. Resp. Memo, Ex. N at 29-30 (Pet. Supplemental Discovery).

[23] Petitioner argues that if she was on a fully reimbursed detail, she similarly would not be on the GAO payroll while engaged in her detail activities. *Id.* at 29.

Case: 15-6002 Document: 10 Page: 148 Filed: 06/17/2015

felt that we needed to stick with our policy on Executive Branch details;" and that he did not speak with Mr. Brew about the detail before the Executive Committee made its decision. *See* Resp. Memo, Ex. R. On February 1, 2002, Petitioner accepted a one-year offer to work at the State Department, while on LWOP from GAO during the entire period, with no retirement contributions from GAO and an obligation to reimburse GAO for its contributions to her health care plan. Amended Pet. ¶ 45; Respondent's Response to Amended Pet. ¶ 45.

Mr. Walker testified, "[W]hat resulted from the executive committee decision, more importantly, was a written policy that addressed the issue for any and all individuals." Resp. Memo, Ex. B at 25-26. Mr. Walker also testified that the Executive Committee's decision on Petitioner's request "was based on a generic policy issue that would apply to every GAO employee who sought a detail, irrespective of who they were and what the circumstances were." *Id.* at 29. Mr. Walker stated that the written policy that arose out of the Committee's decision, "ma[de] it clear that the executive committee must approve detailed GAO employees to other agencies, which would include executive branch agencies, if there were any such requests." *Id.* at 31. Of course, this result pertained to future requests for details and underscored the absence of clarity on these issues up to that time.

<u>SUMMARY JUDGMENT ON THE ASM ASSIGNMENT CLAIM</u>

The AJ concluded that GAO was entitled to judgment as a matter of law on Petitioner's ASM assignment retaliation claim.[24] Because the AJ made findings of fact before reviewing the reasons given for the adverse actions, we address these findings.

[24] We concur with our colleagues that the timeliness issue that the AJ raised *sua sponte* was not jurisdictional and was waived by the Agency. *See*, majority opinion ("Maj. Op." at 24 n.21. We further concur that the appeal should be decided only on evidence that was submitted as part of the summary judgment proceedings and do not consider materials that were submitted for the first time on appeal. *See id.* at 3 n.2.

We agree with the finding by the AJ that Petitioner engaged in protected activities when she complained to supervisors, Brew and Solomon, that she was paid less than her male coworkers for equal work and that she was required to supervise higher paid male employees. Order: SJ at 23, 25-26. The AJ further found that Petitioner's activities as a potential witness in two coworkers' claims of discrimination against Messrs. Brew and Solomon were also protected. *Id.* at ¶¶ 19, 21. We add, for the sake of accuracy, that Petitioner's participation in those cases stretched from 2000 through November 2, 2001. Also, in January 2001, Petitioner communicated with Mr. Brew's assistant, that the weapons section of ASM had previously been "[a] hostile work environment." *See supra,* "Evidence Related to Petitioner's Assignment to the Weapons Section of ASM" at 11-12. On April 19, 2001, Petitioner told Mr. Brew that putting her in ASM "felt like reprisal for engaging in protected activity;" and in August 2001, she told both Messrs. Brew and Solomon that she believed being reassigned to ASM was retaliation for participating in her coworkers' cases and "being vocal about violations of the Equal Pay Act." Resp. Memo, Ex. N at 15-16. On November 2, 2001, the record shows that Petitioner engaged in additional protected activities when she made her first contact with the Agency's EEO office and expressed a concern about retaliation based on her participation in her coworkers' matters. *See supra,* "Evidence Related to Petitioner's Prior Protected Activities" at 9-10.

In analyzing the retaliation claims, specifically with regard to the issue of adverse employment actions, the AJ assumed, *arguendo,* that the ASM assignment was an adverse employment action. Order: SJ at 28. Then, without discussing the issue of nexus between Petitioner's protected activities and the adverse action, the AJ determined that the Agency was entitled to summary judgment because he concluded that Petitioner failed to rebut GAO's non-retaliatory reasons for the ASM assignment.

Case: 15-6002 Document: 10 Page: 130 Filed: 06/17/2015

We agree with the AJ's assumption that there was evidence to prove that Petitioner's assignment to ASM was an adverse employment action. As the AJ acknowledged, the term "adverse employment action" has a broader meaning with respect to retaliation claims and includes any harm that might dissuade a reasonable employee from making or supporting a charge of discrimination. *See, e.g., Burlington N. Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *Baird v. Gotbaum*, 662 F.3d 1246 (D.C. Cir. 2011).

On the undisputed record, the Agency's decision to assign Petitioner to ASM was unwelcome, undesirable and against her clear, expressed wishes. Under the circumstances, this was an adverse action. We note, moreover, that the record evidence supports a more nuanced adverse action finding based on Petitioner's complaint about being assigned to the weapons side, rather than the civilian side, of ASM. *See* Petitioner's Opposition, Ex. 1 at 239-240 (Petitioner claims that she asked Solomon to assign her anywhere other than the weapons/military side of ASM, or to be a "referencer," [undefined] or to work any discrete short term job in any other assignment.) It is, in our view, decisive that this specific adverse action – assignment to the weapons side of ASM, instead of the civilian side or anywhere else – was not explained by GAO when it offered non-retaliatory reasons for its decisions.

We further conclude that when the facts as reported by Petitioner are accepted as true and all reasonable inferences are drawn in her favor, a nexus can be found between Petitioner's protected activities and the adverse action. As described previously, Petitioner was engaged in ongoing protected activities from before 2000 through the effective date of her assignment to ASM in November 2001. Many of the protected activities occurred very close in time to the adverse actions taken by GAO, which when combined with the *prima facie* evidence, creates an inference of retaliation. *Crawford v. Metro. Gov't, supra*; *Clark County School Dist. v.*

*Breeden, supra.* For example, in January 2001, Petitioner expressed to Mr. Brew's assistant a strong desire not to be assigned to ASM because it was a former hostile work environment. Two months later, in early April 2001, Mr. Brew announced his preliminary decision to send Petitioner to the only team she had asked to avoid, removing her from her second choice of assignments. Also, Petitioner asserted that on or about October 26, 2001, she was interviewed concerning an EEO matter brought against Messrs. Brew and Solomon by a coworker. Resp. Memo., Ex. S at Bates No. 25. She then traveled to Washington, D.C. on November 2, 2001 to testify on behalf of another coworker against Mr. Solomon. Petitioner was not called to testify against Solomon; nonetheless, one day after she returned to Denver, Mr. Solomon told her that he was aware that she had not testified at the hearing in Washington and announced her immediate reassignment to the weapons side of ASM. These events establish a very close temporal proximity between Petitioner's protected activities and the adverse assignment action.

With respect to the Agency's proffered reasons for its actions, GAO articulates several allegedly non-retaliatory reasons for Petitioner's ASM placement:

1. "NRE's Managing Director, Mr. Robinson, opposed her placement in NRE due to performance concerns;"[25]
2. "NRE [was full and] did not require additional resources;" and
3. "ASM was the only other team in Denver for which Petitioner was qualified to work."

Resp. Memo at 38.

[25] Mr. Robinson testified that Mr. Zadjura "had multiple conversations with me about Ms. Hinnen's performance, basically saying it wasn't particularly good" and that Mr. Zadjura told him "she was not particularly easy to work with." Resp. Memo, Ex. H at 27, 28 (Robinson deposition). Mr. Robinson testified that he did not support Petitioner's request to be placed in NRE because of her performance and that the staffing level "had kind of a soft cap" and "I would not have advocated for breaking the cap for somebody I didn't think was particularly good to begin with." *Id.* at 31, 32; *see also* Petitioner's Statement ¶ 25 (citing Robinson testimony).

Notably, GAO did not offer any evidence, other than a bald denial, to rebut Petitioner's assertion:

> 4. Mr. Solomon falsely told her that there was no room for her services on the civilian side of ASM. *See* Amended Petition at ¶ 30; Response to Amended Petition ¶ 30 (GAO's denial of the assertion); Petitioner's Opposition, Ex. 1 at 239-40 ("And so I said, 'Can I please just work on the civilian side or be a referencer, or can you find something else discrete short term for me?' And he said no.... He said there was no other place to place me.") (Petitioner deposition).

We conclude that Petitioner has offered evidence that, if believed, as it must be on summary judgment, would raise triable issues as to whether the reasons offered by the Agency were pretextual. We conclude, as discussed below, that the award of summary judgment on the basis of these alleged non-retaliatory reasons was error in each instance.

<u>Reason Number One: Robinson made the decision not to assign Petitioner to NRE due to performance concerns</u>

The AJ cited GAO's assertion that the ASM assignment was purely the result of the Agency reorganization. GAO asserted that Robert Robinson, the Managing Director of NRE, was responsible for "assignment and performance rating oversight responsibilities" and that "Robinson opposed Petitioner's permanent assignment to NRE's Denver office." *See,* Resp. Memo, at 5. GAO then stated:

> Mr. Robinson believes that NRE *may have been* at or above its authorized staffing level in Denver at the time. Mr. Robinson *could have* requested permission to exceed NRE Denver's staffing levels to accommodate Petitioner's preference, but *he had no reason* to pursue such action given Petitioner' recent performance.... Mr. Robinson had no knowledge of any alleged protected activity engaged in by Petitioner ....

*Id.* (Emphasis added).

Upon review of these assertions, the AJ erroneously made the finding that Mr. Robinson was the decision maker on the ASM assignment claim. The judge specifically found:

- Robert Robinson did not support Petitioner's placement in NRE because he had been told that she had performance problems. This was his *primary* reason for not supporting her placement in NRE. Petitioner did not dispute the fact that Mr. Robinson had concerns about her performance;
- A "secondary factor" for Mr. Robinson not supporting Petitioner's assignment to NRE was that the team "was already above its authorized level in the Denver Field Office." There were no openings available in NRE for Petitioner and "[s]he therefore was assigned to ASM;"
- Mr. Robinson had no knowledge *at the time of his decision* of any of Petitioner's alleged protected activities.... There is no evidence that Mr. Robinson ... would have motivation to retaliate against her." (Emphasis added.)

Order: SJ p. 28-29.

Petitioner, however, disputed each of these factual findings. First, she disputed GAO's statement that "[d]uring the preference survey placement process, Mr. Robinson opposed [her] permanent assignment to NRE's Denver office due to her recent performance on an NRE assignment." *See* Resp. Statement ¶ 13; Pet. Fact Response ¶ 13 (denial of GAO's statement of fact). Petitioner, on appeal, explains her objection to GAO's statement of fact, arguing: "the AJ reach[ed] the erroneous conclusion that Mr. Robinson was involved in the decision" because "that is what the Agency implied when it argued that Mr. Robinson opposed Petitioner's placement in NRE *during the preference survey process*." (Emphasis in original.) Appellant's Reply in Support of Opening Brief at 8 (referencing Respondent's Memo at 5, citing Mr. Robinson's testimony as authority for GAO's statement of fact).

On review, we see that GAO cited the source of its assertion as Mr. Robinson's deposition testimony, which GAO paraphrased as: "during the preference survey placement process, Mr. Robinson opposed Petitioner's permanent assignment to NRE's Denver office." *See* Respondent's Memo at 5 (citing Mr. Robinson's testimony at page 30 of Respondent's Memo Ex. H). In actuality, however, Mr. Robinson testified as follows: "I recall – given the performance she demonstrated on her one assignment with us, I recall not supporting her

permanent placement in the NRE team." Resp. Memo, Ex. H at 30 (Robinson testimony). Significantly, the phrase, "during the placement process" was not spoken by Mr. Robinson in his testimony. Mr. Robinson does not express when it was that he did not support Petitioner's permanent placement in NRE and he does not state whether he communicated this concern to anyone during the time of the reorganization. Our colleagues in the majority decision concede that

> the record does not support a finding that Mr. Brew was aware of Mr. Robinson's concerns about her performance in NRE prior to April 10, 2001, when she was notified that Mr. Brew was assigning her to ASM .... [There is] no evidence in the record to support a conclusion that Mr. Robinson's concerns were a consideration in April 2001.
> (Majority opinion "Maj. Op." at 29, 30 accompanying n.23).

Neither does Mr. Robinson's testimony demonstrate that he professed having any influence over whether the Agency might retain Petitioner at NRE or assign her to another team during the restructuring. It is clear that GAO represented the content of Mr. Robinson's testimony in a way that may have caused the AJ to erroneously conclude that Mr. Robinson either decided or had a role in the Agency's decisions to assign employees to new teams, and in particular, that Mr. Robinson's opinion of Petitioner's performance had something to do with her assignment.[26] To the contrary, however, Mr. Robinson did not testify, at least in the portion of his testimony cited by GAO as authority for its statement of fact, to being involved in management's decision to assign Petitioner, or any other employee, during the restructuring.

There is no record support for the AJ's finding that Mr. Robinson had any role in assessing any employees' preferences or assigning them to new teams. Instead, as our majority

[26] In fact, the parties took opposing views on how she was denied an assignment to NRE. Petitioner stated, and the Agency denied, the following assertions set forth in ¶ 27 of the Amended Petition: that Mr. Zadjura spoke to Mr. Robinson about Petitioner's work performance and suggested that Mr. Robinson not allow Petitioner to remain with NRE; and that Mr. Robinson, relying on Zadjura's comments, refused to allow Petitioner to remain with NRE. However, *see* GAO's Response to Amended Petition ¶ 27 ("deny" "except to aver that Petitioner was not assigned to NRE.").

colleagues concede, the record shows that Mr. Brew led the analysis of the employee preference survey. (Maj. Op. at 26); Resp. Statement ¶ 7; Pet. Fact Response ¶ 7. Petitioner's interrogatory response states that the Agency informed her of Mr. Brew's decision and that when she sought an appeal, she addressed it to Mr. Brew who informed her that he remained firm in his decision to reassign her to the weapons section of ASM. Respondent's Memo, Ex. N at 5, 52 (Pet. Supplemental Discovery). Mr. Brew's interrogatory response states that he was responsible for making the decisions and testified that Mr. Robinson, as a managing director, had no input into the assignment process other than, potentially, to appeal after final placements were made:

> After preliminary assignments were made for individuals by Mr. Gebicke [headquarters-based staff] and me [field-based staff] with the assistance of Mr. Perez and Ms. McDaniel, we met with the Chief Operating Officer (Gene Dodaro) and the Chief Mission Support officer (Sallyanne Harper) to review each case and obtain final placement. *Once the final placement was made, we informed the gaining and losing team managing directors who had the opportunity to appeal to Mr. Dodaro and Ms. Harper.*

Resp. Memo, Ex. G at Bates No. 220 (Brew statement) (emphasis added). Relatedly, Mr. Robinson testified he did not recall whether he discussed with Brew the prospect of Petitioner's assignment to NRE:

> I don't recall a conversation with Tom [Brew] on this [Petitioner's request to be assigned to the NRE team], but *it's possible I did.* ... I'm sure I did not talk to Jim Solomon because I talked to him so rarely about anything.

(Emphasis added.) Respondent's Memo, Ex. H at 26 (Robinson deposition).

The AJ acknowledged that Brew "led the analysis of the employee preference survey for field office employees." Order: SJ p. 8 ¶ 12. In addition, he noted that Petitioner

> asked Mr. Brew and Mr. Solomon that she be allowed to remain in NRE. Mr. Brew told Petitioner that NRE was full. Mr. Solomon told her that at the end of her assignment in NRE she would be assigned to ASM.

Order: SJ p. 10 ¶22.

Case: 15-6002 Document: 10 Page: 136 Filed: 06/17/2015

It is clear that the AJ erred when he found that Mr. Robinson was the decision maker. The significance of this error is that if Mr. Robinson had been the decision maker, or if he affected Mr. Brew's decision, it might have mattered that he was allegedly unaware of Petitioner's protected activities and therefore would have no retaliatory motive to make or impact the assignment decision. If, however, Mr. Brew was the decision maker, as Petitioner contends and as the undisputed record strongly suggests, the appropriate focus for the reviewing judge would be on Mr. Brew's motives and whether he was aware of Petitioner's protected activities before he made the adverse decision.

Our colleagues in the majority, however, go on to argue that Petitioner stated that she believed that Mr. Robinson expressed his views about her performance to Mr. Brew in August 2001 and therefore this assertion supports the Agency's proffered reason for Mr. Brew's ultimate decision not to assign Petitioner to NRE. (Maj. Op. at 30-31). This evidence, however, is inconsistent with Mr. Brew's claim that he did not discuss the decisions with managing directors before making them and that if the directors had issues with the proposed assignments, they should appeal to Mr. Dodaro and Ms. Harper. Indeed, Mr. Brew testified that he thought Petitioner was a member of the DCM team when he assigned her to ASM. Moreover, Mr. Robinson did not recall discussing his concerns about Petitioner with Mr. Brew and he was certain that he had not done so with Mr. Solomon. The most Mr. Robinson said was that "it was possible" that he talked to Mr. Brew about his concerns. Therefore, neither Mr. Brew nor Mr. Robinson affirmatively stated that a conversation occurred in August or at any other time. Moreover, all that Petitioner stated was what she thought had happened.[27] Although she cannot

---

[27] Our majority colleagues insist that Petitioner cannot defeat summary judgment by attempting to disavow her factual allegations in her pleadings because they are "binding judicial admissions." We would respond that the Agency's denial of this factual allegation would also have to be a binding judicial admission, leaving us with a disputed record. (Maj. Op. at 31). *See, Parilla v. IAP Worldwide Servs. VI*, 368 F. 3d 269, 275 (3d Cir. 2004)

and does not disavow what she thought was the reason for Mr. Brew's decision not to allow her to remain in NRE, Petitioner certainly never vouched that there was a conversation between Messrs. Robinson and Brew at any point in time, or that Mr. Robinson had in fact expressed his reluctance to have her assigned to NRE.

Upon review of GAO's memorandum in support of the motion for summary judgment, we conclude that GAO did not meet its initial obligation to provide a basis for its position that Mr. Robinson in some way influenced Mr. Brew's decision on Petitioner's assignment. To quote Justice Rehnquist, writing for the majority in *Celotex Corp., supra*:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact.

477 U.S. at 323, citing FRCP 56(c). Justice White concurred, stating:

> I also agree that the movant may rely on depositions, answers to interrogatories, and the like to demonstrate that the plaintiff has no evidence to prove his case, and hence that there can be no factual dispute. But the movant must discharge the burden the Rules place upon him: it is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case.

*Id.* at 328. Here, nowhere in the motion for summary judgment does GAO assert or argue that Mr. Robinson communicated his opinion of Petitioner to Mr. Brew. Indeed, GAO points to no evidence that establishes a causal connection between Mr. Robinson's opinion and Mr. Brew's assignment decision. In the absence of such an argument and proffer, GAO has not provided support for this first claimed reason for the ASM assignment decision and for that reason alone, summary judgment should not be granted. In any event, when we review Petitioner's opposition

---

(citing *Soo Line R.R. Co. v. St. Louis Southwestern Ry. Co.*, 125 F. 3d 481, 483 (7th Cir. 1997)) ("the 'well-settled rule [is] that a party is bound by what it states in its pleadings.'")

to this assertion and the record as a whole, we are persuaded that the evidence is genuinely disputed as to whether Mr. Robinson's opinion of Petitioner's work performance was the real reason for the ASM assignment decision.

In order to avoid summary judgment, a petitioner need not disprove an employer's stated reasons for the adverse action. Instead, she may satisfy her burden to prove pretext "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered . . . reasons . . . ." *Cade v. Astrue, supra,* at 20-21 (quoting *Kwan, supra,* 737 F. 3d at 845-846). We conclude that there is ample evidence offered by Petitioner to challenge as pretext this reason given by GAO for assigning Petitioner to the ASM group – that Mr. Robinson made the decision because of his concerns about her performance. Summary judgment should be denied where, as here, GAO does not offer record support for its assertion and where Petitioner presents evidence that successfully casts doubt on the proffered justification for the adverse action. *See Solomon*, 763 F. 3d at 14. Because there is contradictory evidence in the record about why Petitioner was assigned to ASM, we conclude that she was entitled to a hearing on the issue. Accordingly, we conclude that the AJ erred in crediting this reason and awarding summary judgment on this basis.

Reason Numbers Two and Three: NRE was full and ASM was the only other team in Denver for which Petitioner was qualified to work

Our colleagues in the majority next address whether NRE was at capacity. Notwithstanding the evidence that Mr. Robinson was not involved in the Agency's decision-making concerning the preference survey, our colleagues direct much attention to Petitioner's own assertion in her Amended Petition that in August 2001, when she attempted a second appeal of the ASM assignment, "Brew told her that the Managing Director of NRE, Robert Robinson, said NRE was fully staffed and had no room for her." *See* Amended Petition ¶ 27. We note that

GAO denied this assertion: "Deny third sentence and aver that Brew had a board with field office staffing levels, which indicated that NRE was full and that he shared this information with Petitioner." *See* Response to Amended Petition at ¶ 27.[28]

There is a clear factual dispute about whether Robinson said anything to Mr. Brew about NRE's capacity before Brew made the preliminary or final decision to assign Petitioner to ASM. The record does not contain undisputed evidence that Mr. Robinson *actually* communicated to Mr. Brew his impression that NRE was full, or that Mr. Brew *actually* considered this in his decision-making; *or*, as addressed in the next section, that NRE was *actually* full. Petitioner's Amended Petition ¶ 27 says what it says, as does the Agency's response at ¶ 27; but Petitioner did not, over GAO's initial denial of her statement, aver to the truth of what Mr. Brew allegedly told her. Instead, she merely asserted what he told her.

With regard to the AJ's finding that the reason for Petitioner's assignment to ASM was that NRE was full, there is evidence in the record that disputes this finding. The AJ cited to Mr. Robinson's deposition (Resp. Memo, Ex. H at 31) in which Mr. Robinson stated:

> My recollection was that we had a kind of soft cap. ... The reason I say a soft cap is that let's say there was a person that was found – and, again, this is all hypothetical – was found to have all expertise in one particular area and was not capable of working in another area. They may assign an additional person. If there was some overriding reason why that cap would be exceeded, then that would be possible in this particular case.

Mr. Robinson did not state that NRE was full. Instead he stated there was a "soft cap" on the number of employees who could be assigned to NRE. His deposition, therefore, did not support the AJ's factual finding.

---

[28] We note that Petitioner's assertion at her Amended Petition ¶ 27 contains two levels of hearsay (assuming, first, for purposes of summary judgment, the meeting with Mr. Brew occurred as she said it did): that Mr. Brew was telling the truth that he had a conversation with Mr. Robinson where he received information from Robinson; and if that conversation actually occurred, there was any truth to Mr. Robinson's alleged assertion to Brew that NRE was full. Hearsay should not be the basis for disposing of a complaint at summary judgment. If the content of Petitioner's assertion points to a disputed issue of fact, that issue should be reserved for a hearing.

In addition, Petitioner contended that any assertion about NRE being at capacity was false because there is evidence that other individuals were transferred into NRE during the same time period that she was transferred out. *Compare*, Order: SJ at 28-29, citing Respondent's Memo, Ex. H at 31, with Amended Petition ¶¶ 24, 27; Pet. Fact Response ¶ 16; Petitioner's Statement of Material Facts As To Which There Is A Genuine Issue. (Pet. Stmt. of Facts in Dispute) ¶ 26. One document, in particular states that Petitioner went "from NRE" and "joined" ASM in "October/November 2001" (Petitioner's Opposition, Ex. 13 at Bates No. 738, 744). On its face, this document might be interpreted to represent that the Denver office considered Petitioner to be originally assigned to NRE, only to be transferred out to ASM in October/November 2001.

Petitioner's Exhibit 13 also states, among other details, that two members of DA were transferred to NRE in "October/November 2001," at the precise time that Petitioner was transferred out of NRE; one member of DA (now ASM) was transferred to NRE in January 2001 two months after Petitioner was transferred out, but before she took the detail to the State Department (see below); and another employee was transferred from DA to NRE in February 2002, the same month that Petitioner left for the detail to the State Department. If, as asserted by GAO, NRE was full during the period that reassignments were being made, then the data contained in Petitioner's Exhibit 13 appears to contradict this assertion. Again, resolution of the factual issue whether NRE was or was not full should be resolved in a hearing.

The evidence also shows that some employees were transferred from an outside group to NRE, consistent with their stated preferences. Petitioner proffered evidence that purports to show the preferences of the aforementioned Denver staff members who were assigned from DA (ASM) to NRE. Three of them expressed a preference to move from ASM to NRE, while one

expressed no preference at all. *See* Resp. Memo, Ex. N at 18-20 (Pet. Supplemental Discovery). GAO does not explain why the employee with no preference was assigned to NRE, while Petitioner's preference to remain in NRE was denied. This does not support the assertion that NRE was full.

We further note that employees were informed that they need not even participate in the preference survey because: "If you are satisfied with your assigned team, office or group and are not interested in changing assignments at this time, there is no need for you to complete the survey." Resp. Memo, Ex. E. Whether Petitioner's assignment to NRE was permanent or temporary, the evidence supports a conclusion that she was assigned to NRE and, therefore, according to the preference survey instructions, she should have been able to remain where she was if she was "not interested in changing assignments."

Mr. Brew also acknowledged that employees "basically continued to work on the same engagements that they worked on at that time. Then they were given an *opportunity* through [the] employee preference survey to potentially move to other teams." Resp. Memo, Ex. C at 9. (Emphasis added). Mr. Brew stated that he analyzed each "teams' field needs by matching their annual staffing goals against the number of staff currently on-board in each office." *See* Resp. Memo, Ex. G, at Bates No. 220. The Agency fails to address why Petitioner could not have simply remained in NRE, where she was "currently on-board," without being subject to reassignment, given the instructions that GAO gave to employees. In addition, all of the record evidence undermines Mr. Brew's claim that Petitioner was assigned to the DCM group when he assigned her to ASM.

The majority claims:

> there are no conflicting facts as to NRE's staffing level on April 10, 2001, when Petitioner was informed of Mr. Brew's assignment decision; on

> April 16, 2001, when Mr. Brew first informed Petitioner that NRE was fully staffed; or on August 16, 2001, when Mr. Brew, after speaking with Mr. Robinson, reiterated to Petitioner that NRE was fully staffed.

Maj. Op. at 35. We conclude, however, that if NRE was full in April 2001, the record evidence demonstrates that it was because Petitioner encumbered a position there. We further conclude that there is no record evidence to support a conclusion that Mr. Brew actually spoke with Mr. Robinson or that Mr. Robinson or anyone told him NRE was fully staffed. Finally, even if Mr. Robinson said this to Mr. Brew, there is no evidence that he was not including Petitioner as encumbering one of the filled positions.

On this record, a fact-finder might question the veracity of GAO's claim that NRE was full during the assignment process. Petitioner's assertions and evidence should have been accepted by the AJ as true for purposes of the motion for summary judgment and all inferences should have been decided in her favor. *See, Taydus v. GAO, supra,* at 6. The claim that NRE was "full" is not undisputed and therefore, this reason for the adverse decision might well be established as pretext at a hearing.

<u>Reason Number Four (not proffered by GAO, but asserted by Petitioner in her Amended Petition and in her testimony): Solomon told Petitioner that there was no position open for her on the civilian side of ASM</u>

On *de novo* review, we recognize that the AJ did not address Petitioner's assertion that she "requested to be assigned to the civilian contracting component of ASM[,] but [that] Solomon falsely told her there were no assignments available on the civilian side[.]" Amended Petition ¶ 30; *see also* Petitioner's Opposition, Ex. 1 at 239-240 (Petitioner deposition). We believe this error requires reversal because the relevant issue, from Petitioner's perspective, is not Mr. Robinson's opposition to her assignment to NRE, or Mr. Brew's decision to assign her to the weapons-side of ASM against her wishes, but the Agency's refusal to assign her to work on

the civilian side of the ASM team and the reasons for that refusal.[29] Petitioner asserted that although she requested to remain in NRE, the retaliation was her assignment to "the weapons section of the ASM team[,]" (instead of any other position where she could do environmental and/or international work). Order: SJ at 40. "Count 1" from the Amended Petition is also specific with respect to the retaliatory basis for the assignment: "GAO's denial of Petitioner's request not to be reassigned to *the weapons section* of the ASM team was retaliation for engaging in protected EEO activity, in violation of Title VII of the Civil Rights Act of 1964, as amended." Amended Petition ¶ 57 (emphasis added).

There are numerous examples in the record of Petitioner communicating that a significant reason for her aversion to ASM was the prospect of working with weapons and her prior experience working with that same weapons group where she believed she had experienced harassment. *See, e.g.*, Pet. Opposition, Ex. 1 at 319 (Petitioner told McDaniel, "absolutely do not put me in the weapons group [of ASM]. That is the only place I cannot work based on hostile work environment and based on I'm an ex-Peace Corps volunteer and I will not work on weapons, and I've told GAO that for 20 years. I will not work on weapons systems.") (Petitioner deposition); *see also* Mr. Brew's testimony, Resp. Memo, Ex. F at 47, 70 (Petitioner's concern was "she didn't want to do military work ... after the preference survey ... [Petitioner] came and said that she didn't want to be on the ASM team."). Mr. Brew acknowledged that the ASM team required experience with military and contracting. There is no evidence that Petitioner was even

[29] Neither the AJ nor the majority acknowledge that Count I of the Amended Petition contains Petitioner's complaint that she was the victim of retaliation when she was assigned to the "weapons section" of ASM. Both decisions – the summary judgment decision and the majority opinion on appeal – address only Petitioner's assignment to ASM generally. But this misses a critical point - that is, the complaint centers on Petitioner's assignment to the weapons section (the non-civilian side) of ASM. This specific complaint clearly presents a material issue of disputed facts in the case; thus, we conclude that the failure by both our majority colleagues and the AJ to address this claim underscores our conclusion that summary judgment should not have been granted in favor of GAO on Count I.

qualified to work on the weapons side of ASM, given her exclusive experience with international and environmental work.

The majority opinion gives short shrift to Petitioner's harassment claims, theorizing that the personnel were different and that Petitioner had failed to timely raise any formal complaints about her past experiences. (Maj. Op. at 35-36). This, however, ignores the fact that two of the team members, including Ted Baird and Mr. Solomon, remained on the team and ignores Petitioner's claim that she did not want to do military work and that she had declined to do so for 20 years. The majority erroneously argues that Petitioner cannot prove that the decision to assign her to ASM "must have been retaliatory." That is not the standard, even under *Nassar*. Likewise, the majority states that there is no "more than unsubstantiated speculation to support Petitioner's assertion that her assignment to ASM was based on her participation in either [coworkers'] case." *Id.* at 38. But the issue is not at this stage, whether Petitioner has offered preponderant proof of a causal link. Rather, it is whether she can prove that she participated in protected activity, which all parties agree she did; whether she was subjected to an adverse action, that, again, all parties agree she was; and whether she has evidence of a causal link. There is material disputed evidence about the causal connection between the two. That is the purpose of a hearing.

The record shows disputes of material facts concerning: who made the ASM assignment decision; whether NRE was full during the decision-making process; whether Petitioner was qualified to work on the weapons side of ASM; and whether, throughout the course of her attempts to appeal her assignment, there was any room for her to perform civilian duties in ASM. GAO does not offer a legitimate non-retaliatory reason for refusing to assign Petitioner to the civilian (non-weapons) side of ASM. And, if there was no civilian work in ASM, the Agency

Case: 15-6002 Document: 10 Page: 165 Filed: 06/17/2015

did not offer this argument. Neither the AJ nor the majority opinion addresses the core of this complaint. In the absence of a proffer by GAO of a legitimate non-retaliatory reason for assigning Petitioner to the weapons side of ASM, as opposed to the civilian side, we are constrained to conclude that in the face of *prima facie* evidence of retaliation (protected activity, adverse action and temporal proximity) that has not been satisfactorily explained by the Agency, the decision to grant summary judgment in favor of the Agency on this claim was error.

We also conclude that the AJ exceeded his authority in resolving the motion for summary judgment when he: (1) failed to draw all justifiable inferences in favor of the Petitioner and (2) weighed the evidence and decided material factual disputes rather than acknowledging that their existence warranted a hearing on the merits and a denial of the motion. *Liberty Lobby, supra*; *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *First National Bank v. Cities Service Co.*, 391 U.S. 253 (1968). We therefore disagree with our majority colleagues who vote to affirm this decision.

SUMMARY JUDGMENT ON THE STATE DEPARTMENT DETAIL CLAIM

GAO offers the following reason for management's denial of Petitioner's request for a reimbursable detail to the Department of State: The Executive Committee denied Petitioner's request for a reimbursable detail to the State Department "because it determined that Executive Branch details could undermine GAO's independence and because Congress had provided GAO with appropriated funds to support Congress, not the Executive Branch." Respondent's Memo at 33. Although we are not required to evaluate the preliminary issue of Petitioner's *prima facie* case of retaliation when the employer offers a legitimate, non-discriminatory explanation for its action, we address the AJ's conclusions on the subject. *See* Order: SJ at 29-31.

The AJ acknowledged Petitioner's assertion that she told Jesse Hoskins, then-Chief Human Capital Officer ("CHCO"), "in November 2001 that she was seeking a detail because of her protected activities and because she was being returned to the retaliatory hostile environment in ASM." *Id.* at 30; *see* Pet. Opposition, Ex. 1 at 280-285 (Petitioner deposition). On January 4, 2002, Mr. Hoskins contacted Petitioner and advised her that the Executive Committee had met and rejected the Department of State's offer of a reimbursable detail. However, Mr. Hoskins told Petitioner, the Executive Committee would permit her to take LWOP for one year for such a purpose. *See id.*

The AJ did not address the issue of whether the denial of the reimbursable detail was an adverse action, or whether requiring Petitioner to take LWOP was an adverse action. We conclude that there is ample evidence that the detail denial was adverse because when Petitioner was required to take LWOP, she was deprived of employer contributions to her retirement plan and for health care.

With respect to the question of a nexus between the adverse action and Petitioner's protected activity, we find that there is evidence of a close temporal connection between Petitioner's conversation with Mr. Hoskins in November 2001 along with Mr. Hoskins' discussions with the Executive Committee in January 2002, and the Executive Committee decision on January 4, 2002 denying Petitioner's request for a reimbursed detail. Evidence of this close and contemporaneous temporal connection is sufficient to permit an inference of retaliation on this claim.

The AJ reviewed GAO's non-retaliatory reason for its decision and made the following factual findings, after improperly weighing the evidence and crediting the Agency's reasons:

> [T]here is no evidence to support Petitioner's view that the detail denial was premised on retaliation. Indeed, the evidence points to a GAO policy

> against such details. Mr. Dodaro, then Chief Operating Officer and now Comptroller General, reiterated the policy as Mr. Walker described, and stated further that the policy continues in place today. (Citations to the record omitted). Thus, the Agency's top officials are uniform in explaining the policy against Executive Branch details.
>
> Comptroller General Walker testified that there was no expressed [sic] *written* policy that dealt directly with details to Executive Branch agencies. He then clarified that "it would've been better if I said a standing practice rather than policy because in reality, we didn't have a written policy." He also testified that he "personally approved all details, including to Capitol Hill." Thus, he clarified that, while there was in fact no written policy, GAO's practice was to not approve details to Executive Branch agencies. He also stated that, to his knowledge, no Executive Branch details took place while he was Comptroller General.

Order: SJ at 30-31 (emphasis in original). Based on the uniformity of statements from the Agency's top officials, the AJ made the factual finding that there was a standing practice at GAO that it did not approve details to Executive Branch agencies.

We conclude that again, the AJ exceeded his authority on summary judgment by weighing the credibility of the witnesses and making factual findings in the face of disputed facts and failed to draw reasonable inferences in favor of the non-moving party on the motion. The judge acknowledged that there was a factual dispute between the parties on whether the Agency had a policy against Executive Branch details. He stated:

> Petitioner claims that this explanation is pretextual because it is not credible; she believes that a material issue exists as to whether GAO had such a policy in fact. . . . Petitioner also maintains that Mr. Hoskins testified in his deposition that there had been details to the Department of Defense, an Executive Branch agency.

The AJ then cited the deposition transcript of Mr. Hoskins in which Mr. Hoskins stated: "... I know there was some [sic] details made oversees [sic] and with, I believe, the Department of

Case: 15-6002 Document: 10 Page: 168 Filed: 06/17/2015

Defense."[30] *Id.* at 31 (quoting Petitioner's Memorandum in Opposition to the Motion for Summary Judgment (Pet. Memo) Ex. 8 at 21).

In response to Petitioner's dispute that the Agency had a policy or practice for denying details to the Executive Branch, however, the AJ decided the disputed facts rather than recognizing that the dispute required resolution at a hearing. Without any evidence of what Mr. Hoskins meant in the above statement, the AJ theorized that Mr. Hoskins did not mean what he said, but must have been referencing "internal GAO details involving work assignments *related to* the Department of Defense." (Emphasis added). Order: SJ at 32. The AJ then attempted to justify his factual finding by stating that it was "consistent with Mr. Walker's testimony regarding details to the Executive Branch: 'none ever occurred during my tenure.'" *Id.* at 33 (citing Resp. Memo Ex. B at 20).

The AJ made further efforts to corroborate his interpretation of Hoskins' statement when he stated:

> Viewing Mr. Hoskins' statement as referencing internal GAO details involving defense-related details is also confirmed by Mr. Dodaro in his deposition testimony .... This is also consistent with what Petitioner was told regarding details to NATO – the Office of External Liaison only had experience with details to NATO, which is not an Executive Branch agency.

Order: SJ at 33. Because Petitioner did not offer personnel records or affidavits of individuals who either participated in, or approved details to the Executive Branch, the AJ concluded that Petitioner did not adequately rebut the agency's reason for denying her requested detail. He

---

[30] Although the AJ made a note that Mr. Hoskins testified that Petitioner's request for a detail was the only one involving an Executive Branch agency that he received during his tenure as CHCO, this was not critical to the decision. The issue was not how long ago there had been an Executive Branch or external detail; it was whether it had happened. If it had, this would be inconsistent with the Agency's claim that there was a policy against such details and should have been decided at an evidentiary hearing.

stated: "She provides only her opinion to counter the testimony of Comptroller General Walker and Mr. Dodaro ...." *Id.* at 33 & n.15.

What is clear, however, is that the number of witnesses on either side of a factual dispute does not give the reviewing court authority to resolve the dispute. Moreover, there was more before the AJ than merely Petitioner's opinion about whether GAO had authorized external details outside of the Legislative Branch. In deciding the motion for summary judgment, the judge was obliged to accept Petitioner's assertions as true and draw reasonable inferences therefrom particularly where they were corroborated by Mr. Hoskins' statement that he believed there had been approved details to the Department of Defense. Only Mr. Hoskins could testify about what he meant when he made this statement.[31] It was not for the AJ to interpret this statement, especially if his interpretation was contrary to the position espoused by the non-moving party. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., supra.*

Petitioner's opposition to the Agency's "policy" claim was further corroborated by information given to her by the Office of External Liaison that there had been approved details to NATO. Although NATO is clearly not an Executive Branch agency, it is even further removed from the Legislative Branch because it is an organization entirely external to the United States, comprising a partnership of countries. Thus, a detail to NATO would be inconsistent with the agency's claimed policy that only Legislative Branch details were authorized and with its position that it declined this offer of a reimbursable detail, in part, "because Congress had

[31] The majority appears to agree with this conclusion when it states: "There is no way to determine from either the question [posed to Mr. Hoskins] or the response what Mr. Hoskins understood an 'internal detail' to be. Nor can one determine from the response if any such internal detail might have occurred prior to, during, or after Mr. Hoskins' tenure at GAO." (Maj. Op. at 43).

provided GAO with appropriated funds to support Congress, not the Executive Branch." *See* Respondent's Memo at 33.[32]

Moreover, the descriptions of the policy or practice offered by GAO's witnesses are inconsistent with the description of the policy proffered by GAO in its motion for summary judgment. Mr. Walker emailed Petitioner on January 8, 2002, stating: "we have had a standing policy position for some time that we do not do details to the Executive Branch[.]" Petitioner's Opposition, Ex. 10 at 1. Mr. Walker, however, explained that the intent of the policy was not to eliminate the possibility of details to Executive Branch agencies (Respondent's Memo, Ex. B at 26-27), and that a detail to an Executive Branch agency "could be a rare exception under unusual circumstances." *See id.* at 32. Similarly, Mr. Dodaro testified that the policy did not necessarily exclude details to Executive Branch agencies: "[t]he policy was to consider each situation on a case-by-case basis because there were a wide variety of detail possibilities including the Congressional detail, international organizations, executive branch agencies, et cetera." *Id.*, Ex. C at 35. Mr. Dodaro also explained inconsistently that the reason for the denial was that "GAO was limiting details even to Congress …." (Resp. to Amended Pet. ¶ 36.) Mr. Walker and the Executive Committee could have, but did not, establish an absolute bar to details to Executive Branch agencies. Instead, based on all of the above testimony, it appears that the Executive Committee intended to leave details to the Executive Branch open as possibilities for future consideration. The inconsistent evidence about whether there was a policy and, if so, what it was, is by itself, enough reason to deny the motion for summary judgment.

The majority erroneously reaches a final conclusion that "the potential conflict of interest [the] detail posed for GAO … is a reasonable ground on which the Executive Committee *could*

[32] We also note that there is no dispute that, in response to Petitioner's requested detail, the Agency has since developed a written policy and practice concerning non-Legislative Branch details.

Case: 15-6002 Document: 24 Page: 152 Filed: 10/06/2015

have refused to grant such a detail" and "there is nothing *inherently suspect* about GAO's articulated reason for denying the detail request." (Emphasis added.) (Maj. Op. at 40). The issue, however is not for GAO to establish a "reasonable ground" for what the Executive Committee could have done. It must offer a legitimate, non-retaliatory reason for its adverse decision. Moreover, the issue on review is whether Petitioner has offered sufficient evidence to establish that the reason given is pretextual, not "inherently suspect."

It is also clear that GAO did not offer any reason at all why, in Petitioner's case, the Executive Committee did not approve her request for a detail to the State Department, given the lack of any policy against it and given that the detail was fully reimbursed by State. In this connection, GAO did not offer any reason why, at the time of the Executive Committee's meeting and decision, Walker had not seen the letter from the State Department offering a reimbursed detail, when Hoskins, at least, knew that State had offered to fully fund the detail. Nor did GAO explain why the Agency required an out-of-pocket payment from Petitioner, in the form of health care payments, and required her to lose the Agency's contributions to her retirement plan, when GAO's policy does not preclude details to Executive Branch agencies. GAO argued that it did not approve the detail because it did not want to use appropriated funds to pay for an employee who worked for the Executive Branch. But, the State Department had agreed to reimburse Petitioner's full salary during the detail. It is unclear if this would have included benefits contributions for the detailee.[33] Neither party briefed this issue.

[33] The majority cites at n.7, a GAO order, Order 2300.1 Sup., Employment (General), Ch 4 ¶4-1 (Oct. 8, 1993) that defines a detail as a "temporary assignment of an employee to a different position or set of duties for a specified period of time. There is no formal position change; *officially, the employee continues to hold the position from which detailed and keeps the same status and pay*." (Emphasis added.) The majority also cites at n.9, another GAO order, Order 2630.1, Leave Policies & Procedures (1/27/82), Chg. 5, Ch. 12 ¶1a (May 18, 1987) (Resp. Ex. W) that defines LWOP as "a temporary nonpay status and absence from duty, granted upon an employee's request. LWOP is an authorized absence ...."

Mr. Dodaro claimed: "I believe we arrived on [sic] the decision of a leave-without-pay situation because there was miscommunication about the nature of the detail. So we thought in this particular case we would make an exception because of the situation specifically resolving [sic] Ms. Hinnen." Resp. Memo, Ex. C at 41-42 (Dodaro deposition). This does not explain what the "miscommunication" was, what GAO thought was the "nature of the detail," or what the basis was for management's approval of the assignment while insisting that Petitioner pay for certain of her benefits.

The AJ also found that there was no evidence of a nexus "between Mr. Walker's denial of the detail" and Petitioner's protected activities. Order: SJ at 34. However, the record reveals that Petitioner was told by Mr. Hoskins that the decision about her detail was made by the Executive Committee. Resp. Memorandum Ex. N at 28; Resp. Memorandum Ex. Q at 2 (email from Petitioner to D. Walker dated Jan. 7, 2002 at 5:41AM) and that Mr. Walker's involvement was merely to decline Petitioner's appeal of the decision to him. We believe that the majority errs when it states that "CG Walker [was] the primary decisionmaker." (Maj. Op. at 44). Moreover, Petitioner alleges that during the entire time that she sought approvals, she was led by Mr. Brew, Ms. Harper and Mr. Hoskins to believe that the decision would be made either by Messrs. Hoskins or Brock, who approved the detail and that the External Liaison Office had previously approved external details to NATO. Nonetheless, it was Mr. Solomon who advised Petitioner the day after she secured Mr. Brock's approval that this was no longer sufficient; the matter had to be approved by the Executive Committee (not Mr. Walker). Petitioner contends: "[T]he Executive Committee did not customarily review detail requests to domestic agencies or international organizations." The parties, therefore, disputed who or what was the appropriate authority to decide the detail question.

It is also not altogether clear on the record presented what information was presented to the Executive Committee and by whom. Mr. Hoskins stated that he likely told the Executive Committee, including Messrs. Walker and Dodaro, about Petitioner's reasons for wanting the detail. Petitioner had told Mr. Hoskins that she wanted the detail because she did not want to work on the weapons systems team of ASM and because she had experienced a hostile work environment with that same group of coworkers.[34] According to Mr. Dodaro, Mr. Hoskins not only gave the factual background for the detail request, but he also "was there to provide his perspectives on this issue." Resp. Memo, Ex. C at 32. Mr. Dodaro also stated: "I believe, as I recall, Ms. Hinnen had some conversations with Mr. Hoskins about this matter" and "we wanted to make sure we understood what had transpired up to the point for us making the decision." (Dodaro deposition at 31). This evidence supports Petitioner's claim that the Executive Committee was advised by Mr. Hoskins about her true reasons for wanting the detail in order to avoid the adverse decision to assign her to the weapons side of ASM.

We find that the AJ erred when he decided a clear factual dispute concerning whether GAO had ever approved details to Executive Branch agencies, or had a policy against doing so. The evidence was genuinely disputed and the issue was material. No more was required to deny the motion for summary judgment. *Celotex Corp., supra*; *Bryant v. GAO,* PAB Docket No. 10-03 (7/11/11). We also conclude that the AJ erroneously focused on what Mr. Walker knew and whether there was reason to believe that he had any retaliatory motive. Because the detail decision appears to have been made by the Executive Committee, the issue for the AJ should

[34] The majority attempts to limit the import of this evidence by asserting: "A reasonable fact finder *at best* could logically deduce from this statement that Mr. Hoskins informed the Committee the Petitioner wanted the detail because she was dissatisfied with her ASM assignment." (Maj. Op. at 44) (emphasis added). We believe that a reasonable factfinder could conclude that Mr. Hoskins told the Committee all that he knew from Petitioner, including her claim that she did not want to work on weapons systems and that she had suffered a hostile work environment the last time she worked with that team.

have been whether a reasonable fact-finder could conclude that the Executive Committee was aware of Petitioner's protected activity within a very close temporal proximity to its decision to deny the detail. If the Executive Committee was made aware of Petitioner's protected activities by Mr. Hoskins when he "gave his own perspective" on her request for the detail, the immediate decision to deny the detail would have been contemporaneous and, therefore, "very close." *Crawford, supra,* 555 U.S. at 280 (concurring); *Williams,* 806 F. Supp. 2d at 259; *Jones v. Bernanke*, 557 F. 3d 670, 677 (D.C. Cir. 2009); *Woodruff v. Peters*, 482 F. 3d 521, 529 (D.C. Cir. 2007).

The significant inconsistencies related to GAO's proffered reasons for the Executive Committee's decision, combined with the close temporal proximity between possible knowledge of Petitioner's protected activity and the decision, are sufficient to create a triable issue of fact with regard to whether Petitioner's protected conduct was a motivating factor for management's decisions. Or, if applying "but for" causation, we believe a reasonable trier of fact could reasonably conclude that the Executive Committee's decision would not have occurred absent Petitioner's protected activity, especially if the evidence shows that details to Executive Branch agencies had occurred prior to Petitioner's request for the same.

We conclude, therefore, that in the face of disputed facts on the detail claim, the AJ improperly made factual findings, some of which were unsupported by the record. Moreover, Petitioner presented evidence that, if believed, rebutted the agency's articulated "policy" reasons for the decision to deny her requested detail. Accordingly, we conclude that on the record presented, it was error for the AJ to grant summary judgment in favor of GAO on Petitioner's detail denial claim.

Case: 15-6002 Document: 10 Page: 179 Filed: 06/17/2015

**NOTICE**

**RIGHT TO JUDICIAL REVIEW**

This is a final decision of the Personnel Appeals Board and, pursuant to 31 U.S.C. §755, any final decision of the Board under subsections (1), (2), (3), (6) or (7) of 31 U.S.C. §753(a), may be appealed to the United States Court of Appeals for the Federal Circuit. The petition for review must be filed with the Federal Circuit by the 30th day after the party seeking review receives notice of the Board's final decision.

**CERTIFICATE OF SERVICE**

This is to certify that on April 1, 2015, the foregoing Decision in the case of *Foley-Hinnen v. GAO*, Docket No. 11-03, was sent to the parties as listed below:

Attorney for Petitioner:
Marisa Williams, Esq.
Williams & Rhodes, LLP
7887 E. Belleview Avenue
Suite 1100
Englewood, CO 80111
TEL: (303) 220-0303

E-mail: mlw@williamsandrhodes.com

(E-mail and U.S. Mail)

Attorneys for Respondent:
Joan M. Hollenbach
Managing Associate General Counsel
Lincoln Schroth
Senior Attorney
U.S. Government Accountability Office
Suite 7838

441 G Street, N.W.

Washington, D.C. 20548
E-mail: HollenbachJ@gao.gov
SchrothL@gao.gov

(E-mail and Hand Delivery)

Attorneys for PAB/OGC (Amicus):
Stuart Melnick
General Counsel
Frank J. Mack
Senior Trial Attorney
Personnel Appeals Board, GAO
441 G Street, N.W.
Room 1562
Washington, D.C. 20548
E-mail: MelnickS@gao.gov
MackF@gao.gov

(E-mail and Hand Delivery)

Date: 4/1/2015

Patricia V. Reardon-King
Clerk of the Board