15-6002

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

PATRICIA FOLEY-HINNEN,

Petitioner,

v.

U.S. GOVERNMENT ACCOUNTABILITY OFFICE,

Respondent.

ON PETITION FOR REVIEW OF A DECISION OF THE
PERSONNEL APPEALS BOARD IN 11-03

# BRIEF OF THE RESPONDENT U.S. GOVERNMENT ACCOUNTABILITY OFFICE

Joan M. Hollenbach
John A. Bielec
Lincoln Schroth
U.S. Government Accountability Office
441 G Street, N.W., Room 7838
Washington, D.C. 20548
(202) 512-6074
Attorneys for Respondent

Domenique Kirchner
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Of Counsel for Respondent

November 19, 2015

# TABLE OF CONTENTS


Page(s)

TABLE OF AUTHORITIES ....................4

Statement of Related Cases ....................7

Statement of the Issues ....................7

Statement of the Case ....................8

Statement of the Facts ....................10

A. Ms. Foley-Hinnen's Work In The Denver Field Office. ....................10

B. The Assignment to ASM. ....................12

C. Ms. Foley-Hinnen's Pursuit of a Detail. ....................16

Summary of the Argument ....................21

Argument ....................22

I. The PAB Properly Granted Summary Judgment On The Assignment Claim Because Ms. Foley-Hinnen Failed To Establish A Prima Facie Case, And Failed To Create A Triable Factual Issue Showing That GAO's Legitimate Reasons Were Pretext. ....................22

A. Ms. Foley-Hinnen Failed To Establish Nexus. ....................23

B. GAO Articulated Legitimate Reasons for Ms. Foley-Hinnen's ASM Placement, And Insufficient Evidence of Pretext Exists to Deny Summary Judgment. ....................31

1. Ms. Foley-Hinnen Never Demonstrated That NRE Required Additional Staff In April 2001. ....................35

2. Mr. Robinson Opposed Ms. Foley-Hinnen's NRE Placement. ....................39

3. No Record Evidence Rebuts GAO's Assertion That No "Civilian" ASM Work Was Available. ....................46

II. The PAB Properly Granted Summary Judgment On The Detail Claim Because Ms. Foley-Hinnen Failed To Establish A Prima Facie Case, And Failed To Create A Triable Factual Issue Showing That GAO's Legitimate Reasons Were Pretext. ....................47

A. The Executive Committee Lacked Knowledge of Protected Activity. ...50

B. GAO's Legitimate Reasons Have Remained Unchanged. ....................55

C. Mr. Walker Approved No Other Executive Branch Details. ..................57

D. Permitting Ms. Foley-Hinnen To Work At The State Department Evidences A Lack Of Retaliatory Animus. ....................60

III. Ms. Foley-Hinnen Was Not Denied Due Process. ....................62

Conclusion ....................65

Certificate of Compliance ....................66

Certificate of Service ....................67

## TABLE OF AUTHORITIES

Cases Page(s)

Abbott Laboratories v. United States, 573 F.3d 1327 (Fed. Cir. 2009) ..................63

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)..........................................32

Baroudi v. Secretary, U.S. Dep't of Veterans Affairs, 616 Fed. Appx. 899 (11th Cir. 2015) ..........................................................................................25

Bell v. Shinseki, 584 Fed. Appx. 42 (4th Cir. 2014) ..............................................25

Brady v. Ofc. of Sgt. at Arms, 520 F.3d 490 (D.C. Cir. 2008) ...............................30

Cathedral Candle Co. v. U.S. Int'l Trade Comm'n, 400 F.3d 1352 (Fed.Cir.2005) ..........................................................................................63

Clark County School Dist. v. Breeden, 532 U.S. 268 (2001)................ 23, 25, 28-30

Crabtree v. Secretary, U.S. Dep't of Homeland Security, 611 Fed. Appx. 256 (6th Cir. 2015) ..........................................................................................25

Crockett v. Abraham, 284 F.3d 131 (D.C. Cir. 2002) ............................................57

Dale v. Chicago Tribune Co., 797 F.2d 458 (7th Cir. 1986) ...................................61

Davis v. GAO, PAB Docket Nos. 00-05 and 00-08 (July 26, 2002) aff'd by full Board (July 11, 2003).................................................................................34

Davis v. James, 597 Fed. Appx. 983 (10th Cir. 2015) ............................................25

Esquibel v. Lahood, 604 F. Supp. 2d 133 (D.D.C. 2009).......................................54

General Accounting Office v. General Accounting Office Personnel Appeals Bd., 698 F.2d 516 (D.C. Cir. 1983)........................................................8

Gonzales v. Oregon, 546 U.S. 243 (2006).............................................................63

Gose v. U.S. Postal Serv., 451 F.3d 831 (Fed. Cir. 2006)......................................63

Greene v. U.S. Dep't of Veterans Affairs, 605 Fed. Appx. 501 (6th Cir. 2015) ..........................................................................................25

Haddon v. Exec. Residence at White House, 313 F.3d 1352
(Fed. Cir. 2002) .......................................................................... 23, 32, 49

Hairston v. Vance-Cooks, 773 F.3d 266 (D.C. Cir. 2014) ......................... 24, 57, 61

Hinds v. Sprint/United Mgmt., 523 F.3d 1187 (10th Cir. 2008). .............................30

Littleton v. Pilot Travel Centers, LLC, 568 F.3d 641 (8th Cir. 2009).......................24

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) ............................. 22, 47

Morrison v. City of Bainbridge, 432 Fed. Appx. 877 (11th Cir. 2011)....................30

Palmer v. McDonald, No. 14-15546, 2015 WL 4978778
(11th Cir. Aug. 21, 2015) ..........................................................................25

Pepper v. Precision Valve Corp., 526 Fed. Appx. 335 (4th Cir. 2013) ....................30

Philbrick v. Holder, 583 Fed. Appx. 478 (6th Cir. 2014).......................................25

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000)............... 32, 43

Rexnord Indus., LLC v. Kappos, 705 F.3d 1347 (Fed. Cir. 2013)..........................30

Roberts v. Separators, Inc., 172 F.3d 448 (7th Cir. 1999).......................................33

Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98 (2nd Cir. 2011) ........42

Schnabel v. Abramson, 232 F.3d 83 (2nd Cir. 2000) .............................................33

Scosche Industries, Inc., v. Visor Gear, Inc., 121 F.3d 675 (Fed. Cir. 1997) .........38

Smithkline Beecham Corp. v. Apotex Corp., 439 F.3d 1312 (Fed. Cir. 2006).......46

Stallworth v. Singing River Health Sys., 469 Fed. Appx. 369 (5th Cir. 2012) ........30

Stewart v. Ashcroft, 352 F.3d 422 (D.C. Cir. 2003)...............................................61

Talavera v. Shah, 638 F.3d 303 (D.C. Cir. 2011) ...................................................54

Taylor v. Solis, 571 F.3d 1313 (D.C. Cir. 2009) .....................................................26

Test v. Holder, 614 F. Supp. 2d 73 (D.D.C. 2009).................................................54

Twist v. Meese, 854 F.2d 1421 (D.C. Cir. 1988) ...................................................42

U.S. v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars, 403 F.3d 448 (7th Cir. 2005) .......... 27

University of Texas Southwestern Medical Center v. Nassar, 133 S. Ct. 2517 (2013) .......... 25, 29

Vargas v. McHugh, No. 15-50544, 2015 WL 6774016 (5th Cir. Nov. 3, 2015) .... 25

Ward v. Jewell, 772 F.3d 1199 (10th Cir. 2014) .......... 25

Statues Page(s)

5 U.S.C. § 2302(b)(9) .......... 9

42 U.S.C. § 2000e-3(a) .......... 25

Regulations Pages(s)

4 C.F.R. § 27.1 .......... 62-64

4 C.F.R. § 28.11 .......... 8

4 C.F.R. § 28.12 .......... 8, 9

4 C.F.R. § 28.18 .......... 8

4 C.F.R. § 28.101 .......... 8

5 C.F.R. § 1200.3(b) .......... 64

## STATEMENT OF RELATED CASES

The U.S. Government Accountability Office ("GAO") is aware of no other related cases.

## STATEMENT OF THE ISSUES

I. Whether the Personnel Appeals Board, U.S. Government Accountability Office (PAB or Board) properly affirmed summary judgment in favor of GAO on Ms. Foley-Hinnen's claim that her assignment to a new team was retaliatory where Ms. Foley-Hinnen failed to satisfy the nexus element of her prima facie case and GAO offered legitimate, non-retaliatory reasons for her reassignment which no reasonable factfinder could determine were a pretext for retaliation.

II. Whether the PAB properly affirmed summary judgment in favor of GAO on Ms. Foley-Hinnen's claim that GAO retaliated against her by permitting her to work directly for the State Department for a year, rather than detail her there, where Ms. Foley-Hinnen does not contend that the decision-maker retaliated against her, there is no evidence that the decision-maker knew of her protected conduct, and there is no evidence that supports a nexus between Ms. Foley-Hinnen's protected activities and the decision.

III. Whether the PAB properly interpreted its own regulation by affirming summary judgment in GAO's favor where three of five members of the PAB determined that GAO was entitled to summary judgment.

## STATEMENT OF THE CASE

Ms. Foley-Hinnen retired from GAO in February 2003. (A141 ¶ 55) She had filed an EEO complaint (the "EEO Complaint") with GAO's Office of Opportunity and Inclusiveness (O&I)[1] in April 2002. (A900) She amended the EEO Complaint in February 2003. (A121) After compiling a two volume record of investigation, GAO issued a final agency decision in May 2006 denying her claims. (A463)

Once GAO has been afforded an opportunity to administratively consider a claim, GAO employees may further pursue claims of discrimination at the PAB, which performs the combined functions of the Merit Systems Protection Board and Equal Employment Opportunity Commission.[2] See General Accounting Office v. General Accounting Office Personnel Appeals Bd., 698 F.2d 516, 518 (D.C. Cir. 1983). Employees must first file a charge with the PAB General Counsel's Office (PAB/OGC) and obtain a right to petition letter before filing a legal action with the PAB via a petition. See 4 C.F.R. §§ 28.11, 28.12, and 28.18.

[1] O&I is GAO's civil rights office charged with investigating complaints of prohibited discrimination against GAO.

[2] Alternatively, GAO employees may pursue an action directly in federal district court rather than at the PAB. 4 C.F.R. § 28.101.

Ms. Foley-Hinnen filed a charge with the PAB/OGC in June 2006. (A463) The PAB/OGC issued a right to petition letter in March 2011.[3] (A114) Ms. Foley-Hinnen filed a petition with the Board on April 27, 2011. (A114) After a lengthy discovery period, GAO moved for summary judgment as to all of Ms. Foley-Hinnen's claims. (A114; A200) On July 8, 2013, the PAB member assigned to hear the case issued an initial decision (the "Initial Decision") granting GAO summary judgment on all counts. (A400-50) Ms. Foley-Hinnen appealed the Initial Decision to the full Board. (A116) On April 2, 2015, the Board issued a written decision (the "Board Decision") affirming summary judgment in GAO's favor.[4] (A1-55)

At issue in the current appeal are two GAO actions that Ms. Foley-Hinnen considers retaliatory under Title VII of the Civil Rights Act of 1964.[5] The first is GAO's assignment of Ms. Foley-Hinnen to its Acquisition and Sourcing

---

[3] Ms. Foley-Hinnen inaccurately claims that it was GAO that did not issue her a right to petition letter until March 2011. The PAB/OGC, however, issues such letters. 4 C.F.R. § 28.12. GAO has no control over the issuance of such letters or the conduct of PAB/OGC investigations of charges. Id.

[4] Two members of the PAB jointly filed a partially dissenting opinion. (A56-111) References to the Board Decision herein refer to the portions of the opinion (A1-55) affirming summary judgment in GAO's favor.

[5] Ms. Foley-Hinnen initially filed an eight-count Amended Petition also alleging a retaliatory hostile work environment, a retaliatory denial of a request for extended leave without pay, involuntary retirement, and additional claims under 5 U.S.C. § 2302(b)(9). (A121-144) GAO obtained summary judgment on these claims, which Ms. Foley-Hinnen does not challenge on appeal.

Management (ASM) team in 2001 (the "Assignment Claim"). The second is GAO's subsequent decision to grant Ms. Foley-Hinnen's request to work temporarily at the State Department for a year, but by requiring her to accept a temporary, paid appointment directly from the State Department rather than as a detailee from GAO (the "Detail Claim").

## STATEMENT OF THE FACTS

### A. Ms. Foley-Hinnen's Work In The Denver Field Office.

Ms. Foley Hinnen was a Band II Analyst working in GAO's Denver field office. (A300) Until approximately 2000, she was assigned to the National Security and International Affairs Division (NSIAD) where she performed work for NSIAD's Defense Management and NASA group, Defense Acquisitions group, and International Relations and Trade group. (A300) Ms. Foley-Hinnen alleges in her Amended Petition – though she never filed a legal action or EEO complaint over any of these issues – that, beginning at least as early as 1993, she was the subject of a host of discriminatory, retaliatory, and hostile actions, as well as Equal Pay Act (EPA) violations, perpetrated by numerous individuals in the Denver field office. (A123-126 ¶¶ 2-11) Ms. Foley-Hinnen alleges that she complained from time to time to two other Denver employees, James Solomon and Thomas Brew, about these purportedly illegal actions, some of which Ms. Foley-Hinnen claims that Messrs. Solomon and Brew committed themselves. (Id.)

Messrs. Solomon and Brew worked in the Denver office at varying times and in varying roles during the time Ms. Foley-Hinnen worked there. Mr. Brew served concurrently as an associate director in the DA group and Regional Manager in Denver until September 1997, and then left Denver for GAO headquarters in Washington, D.C. (A601-03) At Headquarters, Mr. Brew first served as an Assistant Controller General and then, in approximately 2000, he became Managing Director for Field Offices. (A602) Mr. Solomon was Assistant Regional Manager, and then Acting Regional Manager for the Denver office through 1999, working under Mr. Brew. (A615-16) Beginning in 2000, Mr. Solomon ceased working in an oversight role for the Denver office, and became an Assistant Director for the ASM audit team, where he reported to Managing Director Jack Brock. (A615; A1402)

Up until 1997, Ms. Foley-Hinnen did significant work in the Defense Acquisitions (DA) group, and alleges that members of the DA group subjected her to such a "hostile environment" that she appealed to Mr. Brew, who was still Regional Manager in Denver at the time, to remove her from the group. (A126 at ¶ 11) Mr. Brew agreed to this request, removed her from the group, and allowed her to work in the international group. (Id.)

**B. The Assignment to ASM.**

In approximately 2000, GAO began a structural reorganization from five "Divisions" (such as NSIAD) encompassing approximately 35 issue areas (such as the DA group) into 13 teams. (A1203; A802) The reorganization eliminated divisions like NSIAD and disbursed their component parts among the newly formed teams. (A1203) Staff had to be assigned to one of the new teams, which occurred in early October 2000. (A785) Ms. Foley-Hinnen claims that she was assigned to the Natural Resources and Environment (NRE) team at that time. (A325 ¶ 19)

Once employees were assigned to teams, GAO initiated an employee preference survey that would move employees to different teams or office locations. (A785) Employees could remain in their assigned teams by foregoing the survey, which was voluntary. (A786) GAO's organizational needs were paramount in the placement decision for survey participants. (A1203 p. 11, Lines 7-9) Thus, GAO warned employees that if they participated in the preference survey, their preferences would be taken into account, but only "after [GAO] consider[ed] organizational needs, staff skills and knowledge." (A785; A834) Ms. Foley-Hinnen elected to participate in the survey. (A327 ¶ 21)

Mr. Brew, as Managing Director for Field Offices, led the analysis of the employee preference survey as it related to field office employees. (A834)

Mark Gebicke led the effort for headquarters employees. (Id.) James Perez and Jackie McDaniel assisted them in the process. (Id.) Mr. Solomon, who by then was a member of ASM, was not part of the survey team. (Id.; A615)

Mr. Brew made a preliminary team assignment for each field office survey participant. (A834) Assignments were then presented to then Chief Operating Officer Gene Dodaro and then Chief Financial Officer/Chief Administrative Officer Sallyanne Harper for a final decision. (Id.) Once final placements were made, the relevant Managing Directors (i.e., the heads of the newly created teams) gaining and/or losing staff were informed and provided an opportunity to appeal the placements. (Id.; A1300-01) Affected employees were subsequently informed of their new team assignments. (A834; A1300-01)

Ms. Foley-Hinnen indicated in the survey that she wanted to remain in the Denver office and listed the International Affairs and Trade (IAT) team and the NRE team as her first and second preferences, respectively. (A1400 p. 310-311) IAT, however, did not operate in Denver and Mr. Brew could not accommodate this choice. (A834) Only four teams operated in Denver: ASM, NRE, Financial Management and Assurance (FMA), and Information Technology (IT). (A834) Ms. Foley-Hinnen lacked the accounting specialty required to work in FMA and did not fit with IT since she was not a computer specialist. (A834; A1400 p. 311-312) Thus, Mr. Brew had to place her in either ASM or NRE. (A834)

Ms. Foley-Hinnen had previously worked on assessments of defense contracts relating to environmental issues, and thus had applicable experience with both the military and contracting work to be conducted in ASM, which needed staff. (A834) NRE, on the other hand, did not require additional staff and thus Mr. Brew assigned Ms. Foley-Hinnen to ASM. (Id.)

In April 2001, Ms. Foley-Hinnen was notified of the decision to place her in ASM. (A1402 p. 320) On April 19, 2001, Ms. Foley-Hinnen met with Mr. Brew to ask that he reconsider her placement. (A326 ¶ 22; A916) Ms. Foley-Hinnen believed that ASM consisted of the same individuals from the DA group who purportedly subjected her to a hostile environment. (A326 ¶¶ 21-22) Yet ASM did not exist when Ms. Hinnen asked Mr. Brew in 1997 to reassign her from the DA group, ASM encompassed new areas beyond the DA group, had a new Managing Director, and new senior executive leaders. (A828) Mr. Brew advised her that the decision was "firm" (A916) and that she would be placed with the military weapons component of ASM. (A326 ¶ 22)

Ms. Foley-Hinnen did not immediately begin working in ASM in April because she was in the midst of a work assignment for NRE. (A1402 p. 320) On or about August 10, 2001, as her NRE work neared completion, Ms. Foley-Hinnen again asked Mr. Brew to reconsider her placement in ASM. (A829; A850) Mr. Brew checked office staffing levels, but saw that NRE was full and that ASM

still required staff. (A829) Mr. Brew indicated to Ms. Foley-Hinnen that he had checked with Robert Robinson, the Managing Director of NRE, and that NRE was full. (A132 ¶ 27; A916)

Ms. Foley-Hinnen worked on an assignment in Mr. Robinson's NRE team from November 2000 through July 2001 under Edward Zadjura, an Assistant Director in NRE. (A327 ¶ 25) Mr. Zadjura had expressed concerns to Mr. Robinson about the quality of Ms. Foley-Hinnen's work on multiple occasions. (Id.) "Relying on [Mr.] Zadjura's representation, [Mr.] Robinson did not support [Ms. Foley-Hinnen's] permanent assignment to NRE." (Id.) Though Mr. Robinson could have requested permission to exceed NRE Denver's staffing levels to accommodate Ms. Foley-Hinnen's preference, he had no reason to pursue such action given her performance. (A1006) Mr. Robinson had no knowledge of any alleged protected activity engaged in by Ms. Foley-Hinnen, including her participation in PAB cases. (A1010)

Ms. Foley Hinnen was determined not to work for ASM, and decided to take a lengthy vacation in September through October 31, 2001, to travel to Asia. (A850) Immediately upon her return, on November 2, 2001, Ms. Foley-Hinnen arrived in Washington, D.C. to testify in an administrative hearing at the PAB filed by Sandra Davis. (A635) Ms. Foley-Hinnen did not testify at the hearing. (A917)

She returned to the Denver office the following Monday, November 5, and on November 6 was informed by Mr. Solomon – by then a member of ASM – that she needed to receive a work assignment in ASM. (A1394-95 pp. 237-38) Mr. Solomon advised Ms. Foley-Hinnen that the "civilian" jobs were fully staffed and that she would perform "military" work. (A918)

**C. Ms. Foley-Hinnen's Pursuit of a Detail.**

Because Ms. Foley-Hinnen did not want to work in ASM, she explored the possibility of doing a temporary detail outside of GAO with the State Department. (A850; A1396 p. 247) She raised the possibility with Mr. Brew "who agreed to support [her]" and referred her to the GAO office which handled GAO's processing of details to NATO. (A916; A1397 pp. 250-51)

GAO had never detailed an employee to the State Department (A1398 p. 256) and had no written policy dictating how such requests should be processed. (A1206-07) As of September 24, 2001, and continuing until a final decision was made, Jesse Hoskins, GAO's Chief Human Capital Officer, took charge of handling Ms. Foley-Hinnen's detail request. (A1302; A1404 p. 370)
Ms. Foley-Hinnen's request was the first, and only, time that Mr. Hoskins was involved in a detail request to another federal agency during his employment with GAO. (A1411 pp. 20-21)

Ms. Foley-Hinnen procured a formal request dated September 19, 2001, from the State Department to then Comptroller General David Walker proposing a "non-reimbursable detail" by which GAO would pay Ms. Foley-Hinnen's salary and the State Department would pay official travel expenses. (A1303) Mr. Walker, however, did not receive a copy of the letter until several months later. (A1203-04)

On October 11, 2001, Mr. Hoskins notified Ms. Foley-Hinnen that he had advised officials at the State Department that a detail could not be approved unless the detail were on a reimbursable basis, meaning that GAO would receive 100% reimbursement for her salary. (A1306) By December 11, 2001, the State Department still had not proposed a reimbursable detail. On that date, Ms. Foley-Hinnen was in GAO headquarters to attend an awards ceremony and mentioned her excitement about the detail opportunity to Comptroller General Walker. (A641) Mr. Walker indicated that he was not familiar with the matter and, after Ms. Foley-Hinnen asked if he had seen the September 19, 2001, letter from the State Department, indicated that he was not familiar with it. (Id.) Ms. Foley-Hinnen later supplied him with a copy. (Id.)

Ms. Foley-Hinnen also approached Gene Dodaro (GAO's Chief Operating Officer at the time and now the Comptroller General of the United States and head of GAO) at the awards ceremony and mentioned that the State Department hoped

GAO would pay for the detail. (A641) Mr. Dodaro indicated that GAO would not pay her salary for a detail to the State Department. (A641-42)

On December 21, 2001, Ms. Foley-Hinnen advised Mr. Hoskins that the State Department had agreed to fund the detail. (A643) Mr. Hoskins indicated that she needed to obtain the approval of her Managing Director, Jack Brock, and an official document from the State Department agreeing to pay for the detail. (Id.) The State Department provided the document, and Mr. Brock gave his approval on December 26, 2001. (Id.)

On January 4, 2002, Mr. Hoskins contacted Ms. Foley-Hinnen and advised her that GAO's Executive Committee – i.e., GAO's top policy-making body consisting of Comptroller General Walker, Chief Operating Officer Dodaro, then Chief Administrative Officer/Chief Financial Officer Sallyanne Harper, and then General Counsel Tony Gamboa – had met and decided that she could not use the vehicle of a detail to work at the State Department. (A645) The Executive Committee would, however, permit Ms. Foley-Hinnen to work at the State Department through other means, such as using Leave Without Pay (LWOP) from GAO for one year so she could accept a temporary appointment from the State Department. (Id.)

The Executive Committee had met to consider Ms. Foley-Hinnen's detail request and how GAO should generally handle similar types of requests. (A1205

p. 19) It decided that GAO employees should not serve on details to executive branch agencies such as the State Department regardless of whether the proposed details were on a reimbursable or non-reimbursable basis. (A1205) The reasons for this general policy were two-fold. First, the Executive Committee was concerned over a potential conflict of interest. (A1205, p. 20) GAO is part of the legislative branch whose main purpose is to audit executive branch agencies. Detailing GAO Analysts to the executive branch could potentially compromise GAO's independence, particularly to the extent a GAO employee might become involved in executive branch or policymaking activities in connection with matters that GAO might be asked to do work on at some time in the future. (A1205, p. 20; A810, p. 41) Moreover, GAO had recently been downsized and had cut back significantly even on details to the legislative branch. (A1205, p. 20) GAO needed to use its appropriated funds to support its own mission. (A809 pp. 35-36)

On January 7, 2002, Ms. Foley-Hinnen emailed Comptroller General Walker and asked him to reconsider the decision regarding the detail. (A1026) She attached a letter to the email stating her views about the detail and stating that the denial seemed "suspiciously coincidental to my involvement in a couple of the most contentious personnel cases in Denver involving Tom Brew and Jim Solomon." (A1023) Ms. Foley-Hinnen's letter also stated that she had "stayed quiet about some fairly significant matters for years rather than stir up

trouble" and that she would "hate to have to go into all of these matters with you." (A1023)

Mr. Walker reiterated in an email the policy position and again notified Ms. Foley-Hinnen that she could take a year of LWOP from GAO so that she could be employed directly by the State Department and accept the position. (A1026) In a separate email, Mr. Walker told Ms. Hinnen that he was "not familiar with the past issues you allude to in your note," that "the buck stops on [his] desk and [he] felt that [he] needed to stick with our policy on Executive Branch details," and that he did not even speak with Mr. Brew about the detail before the Executive Committee made its decision. (A1307) Mr. Walker separately expressed remorse for the "expectation gap" that had been created because there was no clear policy in place laying out the process for obtaining approval for details. (A1027) He indicated that he intended to rectify this issue, which he ultimately did by instituting a written policy that the Executive Committee had to approve all detail requests. (A1027; A1206-07)

Ms. Foley-Hinnen accepted a paid temporary appointment at the State Department for the year while in an LWOP status with GAO. (A1308)
Ms. Foley-Hinnen has never identified any other employee that GAO permitted to serve in a detail at an executive branch agency. Indeed, during Mr. Walker's tenure as Comptroller General (beginning in 1998) GAO did not permit any of its

employees to serve on details to the executive branch. (A1205 p. 20, A1207 p. 27; A809)

## SUMMARY OF THE ARGUMENT

Ms. Foley-Hinnen has failed to establish that the PAB acted arbitrarily, capriciously, abused its discretion, or otherwise acted inconsistent with law by affirming the Initial Decision and granting GAO summary judgment. This Court should affirm summary judgment on the Assignment Claim because Ms. Foley-Hinnen failed to establish a nexus (a necessary element of her prima facie case) between her protected activity and Mr. Brew's decision to place her in ASM as Mr. Brew had no knowledge of her participation in administrative hearings filed by other employees and her only other protected activity happened nearly four years before Mr. Brew placed her in ASM. Moreover, GAO articulated legitimate reasons for placing her in ASM (i.e., Ms. Foley-Hinnen was qualified to work in ASM, ASM required additional staff while NRE did not, and Mr. Robinson opposed her placement in NRE due to performance issues). When the record is viewed as a whole, no reasonable factfinder could render a verdict in Ms. Foley-Hinnen's favor because the evidence of retaliatory motive is insufficient as a matter of law.

This Court should similarly affirm summary judgment in GAO's favor on the Detail Claim. Ms. Foley-Hinnen has admitted repeatedly that she does not

contend that Comptroller General Walker – the ultimate decision-maker on her detail request – was motivated to retaliate against her. Therefore, Ms. Foley-Hinnen cannot establish the nexus element of her claim. Moreover, GAO articulated legitimate reasons for requiring her to accept a temporary appointment rather than detailing her to the State Department (i.e., it was concerned with maintaining its independence and generally felt it was inappropriate to utilize its appropriated funds to support an executive branch agency). Ms. Foley-Hinnen has not produced probative evidence showing that these legitimate concerns were a pretext or motivated by retaliatory animus, particularly given that: (1) GAO did not permit any of its employees to accept such details during Mr. Walker's tenure; (2) GAO's decision-makers were unaware of her protected activities; and (3) GAO went out of its way to permit Ms. Foley-Hinnen to work at the State Department by volunteering alternative means for her to take the position.

## ARGUMENT

### I. The PAB Properly Granted Summary Judgment On The Assignment Claim Because Ms. Foley-Hinnen Failed To Establish A Prima Facie Case, And Failed To Create A Triable Factual Issue Showing That GAO's Legitimate Reasons Were Pretext.

Retaliation claims are subject to the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Haddon v. Exec.

Residence at White House, 313 F.3d 1352, 1359 (Fed. Cir. 2002). A plaintiff must establish a prima facie case of retaliation by showing that (1) she participated in protected activity; (2) defendant had knowledge of the protected activity; (3) an adverse action occurred; and (4) a causal connection (i.e., a nexus) exists between the protected activity and the adverse action. Id. at 1359. If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the action. Id. The plaintiff then must demonstrate that the articulated reason is pretext and show by a preponderance of the evidence that the real reason was prohibited retaliation. Id. When an adverse action closely follows an employee's protected activities, the temporal proximity may create an inference of a nexus, though the timing must be "very close" to create a triable issue of retaliation. Clark County School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (three-month gap not close enough in time to show nexus).

**A. Ms. Foley-Hinnen Failed To Establish Nexus.**

Ms. Foley-Hinnen failed to establish a prima facie case because she did not establish a nexus between any of her protected activities and her placement in ASM. Ms. Foley-Hinnen engaged in several types of protected activity. First, she was interviewed in May and July 2001 as a witness in connection with a PAB case filed by Maria Vargas. (A634) Second, she was listed as a witness, but did not

testify, at a November 2, 2001, hearing in a PAB case filed by Sandra Davis. (A635) Third, Ms. Foley-Hinnen made repeated informal complaints dating back to at least 1993 to numerous supervisors, including Mr. Brew, regarding alleged discriminatory treatment of her, a hostile environment, and violations of the EPA. (A123-26 ¶¶ 2-11)

No nexus exists between any of these protected activities and her placement in ASM. First, Ms. Foley-Hinnen was notified of the decision to place her in ASM in April 2001, but was not involved in the Vargas case until a month later, in May 2001. (A634) Her participation in Vargas could not have influenced Mr. Brew, who had no knowledge of this participation in any event. (A611 pp. 90-91; A829) Nor could Ms. Foley-Hinnen's participation in Davis have influenced Mr. Brew as he had no knowledge of her involvement in that case either. (A611 pp. 90-91; A829) See, e.g., Hairston v. Vance-Cooks, 773 F.3d 266, 273 (D.C. Cir. 2014) (affirming summary judgment to employer because decision-maker disclaimed knowledge of protected activity); Littleton v. Pilot Travel Centers, LLC, 568 F.3d 641, 645 (8th Cir. 2009) (same).

The only protected activities of which Mr. Brew was aware were Ms. Foley-Hinnen's informal complaints to him of alleged discrimination, EPA, and other violations from the 1990s. Though Mr. Brew and Ms. Foley-Hinnen once worked in the same Denver office, it is undisputed that Mr. Brew left that

office in September 1997 to move to GAO headquarters in Washington, D.C. (A601-03) He made the decision to place Ms. Foley-Hinnen in ASM in April 2001 – more than three years later. See Breeden, 532 U.S. at 273-74 (even a three or four month gap is not close enough to establish nexus).[6] Ms. Foley-Hinnen admitted that she "didn't need to have conversations with [Brew] very often," (A1391 p. 119), and has never identified any record evidence of any discrimination-related or EPA-related conversation she had with Mr. Brew closely before his decision to place her in ASM in April 2001. As there was no temporal proximity between any protected activities that Mr. Brew had knowledge of and his April 2001 decision to place Ms. Foley-Hinnen in ASM, GAO was properly

[6] Both the administrative judge and the Board declined to address the applicability of University of Texas Southwestern Medical Center v. Nassar, 133 S. Ct. 2517 (2013) to Ms. Foley-Hinnen's retaliation claim. Nassar, which involved a private sector employee's claim of retaliation under 42 U.S.C. § 2000e-3(a), held that the employee bears the burden of "establish[ing] that…her protected activity was a but-for cause of the alleged adverse action by the employer." Id. at 2534. The Fourth, Fifth, Sixth, Tenth and Eleventh Circuit Courts of Appeals have applied the but-for causation standard of Nassar to retaliation claims of Federal government employees, albeit largely in unpublished opinions. Ward v. Jewell, 772 F.3d 1199, 1203 (10th Cir. 2014); Davis v. James, 597 Fed. Appx. 983, 987 (10th Cir. 2015); Crabtree v. Secretary, U.S. Dep't of Homeland Security, 611 Fed. Appx. 256 (6th Cir. 2015); Greene v. U.S. Dep't of Veterans Affairs, 605 Fed. Appx. 501 (6th Cir. 2015); Palmer v. McDonald, No. 14-15546, 2015 WL 4978778 at *3 (11th Cir. Aug. 21, 2015); Vargas v. McHugh, No. 15-50544, 2015 WL 6774016 at *4 (5th Cir. Nov. 3, 2015); Baroudi v. Secretary, U.S. Dep't of Veterans Affairs, 616 Fed. Appx. 899 (11th Cir. 2015); Philbrick v. Holder, 583 Fed. Appx. 478 at *5 (6th Cir. 2014); Bell v. Shinseki, 584 Fed. Appx. 42, 43 (4th Cir. 2014). This Court need not determine whether the but-for causation standard of Nassar applies to Federal employees as the administrative judge and Board both determined that the lesser, motivating-factor standard of causation was not met.

awarded summary judgment. See, e.g., Taylor v. Solis, 571 F.3d 1313 (D.C. Cir. 2009) (affirming summary judgment to employer because two and a half month gap between protected activity and adverse action insufficient to establish nexus).

On appeal, however, Ms. Foley-Hinnen has attempted to forge a temporal link between her protected activity and her assignment to ASM by attempting to re-write the timeline and change the decision-maker from Mr. Brew to Mr. Solomon. She first claims that Mr. Brew's April 2001 placement of her in ASM was only a "preliminary" decision. See Petitioner's Opening Brief, p. 8. She then argues that Mr. Solomon finalized her ASM placement in November of 2001, just days after she returned from the Davis hearing. Id. p. 15 Ms. Foley-Hinnen claims that the PAB erred by failing to infer a causal link due to the proximity between her participation in Davis, and Mr. Solomon's "final" November placement of her in ASM. Id.

Ms. Foley-Hinnen's theory is both factually inaccurate and legally deficient. First, Ms. Foley-Hinnen mischaracterizes the record and presents a narrative that directly conflicts her own prior statements. By April, the decision to place her in ASM was final, not preliminary. As Ms. Foley-Hinnen has repeatedly admitted, she met with Mr. Brew on April 19, 2001 in an attempt to appeal her ASM placement with Mr. Brew, and "Brew told [her] that the decision was **firm**…" (A916; A130 ¶ 24) (emphasis added). Indeed, prior to filing the present appeal,

Ms. Foley-Hinnen has never claimed – not in her discovery responses, or in her opposition to summary judgment, or in her appeal to the PAB below – that the April decision was "preliminary." (See generally, A620-71; A335-53; A451-96) Ms. Foley-Hinnen cannot repudiate her own statements to avoid summary judgment. See, e.g., U.S. v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars, 403 F.3d 448, 466 (7th Cir. 2005)) ("Summary judgment would be meaningless if litigants could manufacture genuine issues of material fact through self-serving and unsupported 'admissions' materially different from positions taken in the past.").

To be sure, Ms. Foley-Hinnen did not like Mr. Brew's decision and attempted to persuade him to change her ASM assignment by bringing the issue up again in August 2001. (A850) Her refusal to accept the decision, however, does not render it preliminary. GAO never wavered from its April 2001 decision to place her in ASM. Neither Mr. Brew nor any other knowledgeable witness has ever testified that employees had formal "appeal" rights from the placement decisions, and contemporaneous documentation describing the placement process affords no appeal route. (A1300-01)

The only reason Ms. Foley-Hinnen did not immediately begin working in ASM in April is that she first needed to complete her work on the NRE job before she could begin work in ASM. (A850) Once she completed the NRE work,

Ms. Foley-Hinnen (as she admits) did everything she could to avoid actually beginning her ASM assignment by taking extended leave in September through October. (Id) She was absent from the Denver office until November 5, and only then – when Ms. Foley-Hinnen could take no more leave and had no choice but to return to the office – did Mr. Solomon advise her that she would need to begin doing ASM work. (A1394-95 pp. 237-38) This was not Mr. Solomon's "finalization" of a decision, but the end consequence of a decision made by Mr. Brew months earlier.[7]

Moreover, even assuming, arguendo, that Mr. Brew's April decision were only preliminary, this fact would still not permit Ms. Foley-Hinnen to avoid summary judgment. The Supreme Court has expressly rejected the theory upon which Ms. Foley-Hinnen relies, i.e., that the relevant date in a retaliation claim is the date the decision was "finalized." Breeden, 532 U.S. 268, 272.

In Breeden, the employee alleged that her supervisor transferred her to a new position in retaliation for filing a lawsuit. 532 U.S. at 271-72. The employee's supervisor had indicated on April 10, 1997, that she was considering transferring the employee to a new position. Id at 272. The next day, April 11, 1997, the

[7] Ms. Foley-Hinnen's attempt to link her protected activity to Mr. Solomon's conversation with her in November suffers from an additional factual deficiency. Namely, Mr. Brew, Mr. Gebicke, Mr. Perez, and Ms. McDaniel comprised the preference survey team. (A834) Mr. Solomon was not a part of the placement process.

employer was served with the employee's complaint. Id. The supervisor carried through with the transfer the next month, in May 1997. Id. The district court granted summary judgment to the employer, finding no nexus between the transfer and the lawsuit since the supervisor had indicated that she was contemplating the transfer prior to knowing about the lawsuit. Id. The Ninth Circuit reversed, noting that the transfer did not actually occur until a month after the supervisor learned of the lawsuit. Id.

The Supreme Court agreed with the district court and found that, as a matter of law, the employee had failed to create a triable issue of nexus to survive summary judgment. 532 U.S. at 272. It held that:

> [e]mployers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.

Id. (emphasis added).

The present case falls squarely within the holding of Breeden.[8] Even accepting Ms. Foley-Hinnen's argument that Mr. Brew's April 2001 decision to place her in ASM were only preliminary, the fact that GAO proceeded along lines it previously contemplated and ultimately placed her in ASM "is no evidence

[8] Notably, Breeden was decided prior to Nassar and found that such evidence was insufficient to create a triable issue of nexus applying the lesser motivating-factor standard that the Board evaluated in the present case.

whatever of causality." Breeden, 532 U.S. at 272. It does not support a finding of nexus.

Ms. Foley-Hinnen thus failed to establish the necessary nexus element of her prima facie case. The Board Decision did not evaluate the prima facie case as a threshold issue and instead, citing Brady v. Ofc. of Sgt. at Arms, 520 F.3d 490, 493-94 (D.C. Cir. 2008)[9], proceeded directly to the ultimate question of discrimination because GAO also articulated legitimate, non-retaliatory reasons for Ms. Foley-Hinnen's ASM placement. (A20-21, n. 14) This Court, however, may affirm a decision for any reason that finds support in the record. See, e.g., Rexnord Indus., LLC v. Kappos, 705 F.3d 1347, 1356 (Fed. Cir. 2013). The Federal Circuit has never addressed whether, at the summary judgment stage, it should forego its analysis of the prima facie case and proceed directly to the ultimate question of discrimination when a defendant articulates legitimate reasons for its actions. GAO submits that the Federal Circuit should join the 4th, 5th, and 10th Circuits in requiring a plaintiff to meet this requirement. See, e.g., Pepper v. Precision Valve Corp., 526 Fed. Appx. 335, 336 n.*(4th Cir. 2013) (unpublished); Stallworth v. Singing River Health Sys., 469 Fed. Appx. 369, 372 (5th Cir. 2012) (unpublished); Hinds v. Sprint/United Mgmt., 523 F.3d 1187, 1202 n. 12 (10th Cir. 2008). As

[9] It also cited to the Eleventh Circuit's decision in Morrison v. City of Bainbridge, 432 Fed. Appx. 877, 881 n.2 (11th Cir. 2011) (unpublished).

Ms. Foley-Hinnen did not establish nexus, GAO was properly entitled to summary judgment on her Assignment Claim.

### B. GAO Articulated Legitimate Reasons for Ms. Foley-Hinnen's ASM Placement, And Insufficient Evidence of Pretext Exists to Deny Summary Judgment.

GAO had legitimate, non-retaliatory reasons for placing Ms. Hinnen in ASM. As discussed above, Ms. Foley-Hinnen only had two potentially viable placement options at the time: ASM and NRE. Ms. Foley-Hinnen had previously worked on assessments of defense contracts relating to environmental issues, and thus had applicable experience with both the military and contracting work to be conducted in ASM. (A834) Though Ms. Foley-Hinnen clearly did not want to do this work, she does not on appeal – and has never – challenged the fact she was qualified to work in ASM. ASM needed additional staff (id.); Ms. Foley-Hinnen does not on appeal – and has never – challenged the fact that ASM needed additional staff. Moreover, Mr. Robinson opposed Ms. Foley-Hinnen's permanent placement in NRE due to performance problems while working on an NRE engagement. (A327 ¶ 25; A1006; A1014) Organizational needs were paramount to the placement decision (A785), and since NRE did not need additional staff, Ms. Foley-Hinnen was assigned to ASM. (A834)

Since GAO articulated legitimate, non-retaliatory reasons for her placement, Ms. Foley-Hinnen was required to produce "concrete evidence from which a

reasonable [factfinder] could return a verdict in [her] favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). Courts should grant summary judgment when the nonmoving party's "evidence is merely colorable, or is not significantly probative." Liberty Lobby, 477 U.S. at 249-50 (citations omitted). As the Initial Decision and Board Decision both recognized, when the record is considered as a whole, Ms. Foley-Hinnen did not produce sufficient evidence for a reasonable factfinder to return a verdict in her favor, even affording her all reasonable inferences.

In evaluating whether the nonmoving party has produced sufficient evidence for a reasonable factfinder to conclude that the moving party's stated reasons are a pretext for retaliation, courts must consider the underlying strengths and weaknesses of the nonmoving party's prima facie case. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148-49 (2000). As the Federal Circuit has recognized, the elements of a prima facie case are necessary to prove discrimination within the meaning of Title VII. Haddon, 313 F.3d at 1362-64 (EEOC erred by permitting employee to circumvent showing of an adverse action even where employer articulated a legitimate nondiscriminatory reason for its actions). Ms. Foley-Hinnen's failure to establish the nexus element of her prima facie case by itself strongly supports an affirmance in GAO's favor.

Moreover, the record clearly demonstrates that no reasonable factfinder could conclude that GAO's proffered legitimate non-retaliatory reasons for its actions are untrue and that more likely than not Ms. Foley-Hinnen's assignment to ASM was actually motivated by retaliation for her protected activities. As the Board Decision recognized, it is significant that Mr. Brew removed Ms. Foley-Hinnen from the purportedly "hostile" DA group in 1997 at a time when Ms. Foley-Hinnen had recently engaged in protected activity by protesting various allegedly illegal actions in the Denver office. (A126 ¶ 11) Ms. Foley-Hinnen has identified no credible reason why Mr. Brew would have agreed to take her out of this allegedly hostile group in 1997, only to wait nearly four years before reassigning her to what Ms. Foley-Hinnen perceived to be the same group in 2001 based off of distant protected activity.[10] As the same actor made both decisions, GAO is entitled to a strong presumption against retaliation, even at summary judgment. See, e.g., Schnabel v. Abramson, 232 F.3d 83, 91 (2nd Cir. 2000) (same actor factor "highly relevant" at summary judgment and "strongly suggest[s] that invidious discrimination was unlikely"); Roberts v. Separators, Inc., 172 F.3d 448, 452 (7th Cir. 1999) (even at summary judgment, a strong presumption against

[10] As discussed above, Mr. Brew did not view this as assigning Ms. Foley-Hinnen to the same group as ASM did not exist in 1997, it encompassed issues beyond the DA group, was led by a new Managing Director, and had new senior executives. (A828)

discrimination exists when the same person both hires and fires an employee in a protected class).

Mr. Brew had no knowledge of Ms. Foley-Hinnen's participation in either the Davis or Vargas cases, and Ms. Foley Hinnen has never identified any record evidence to the contrary. Moreover, her participation in these cases was so minimal that it could not plausibly have motivated Mr. Brew to retaliate against her even had he known of it. Ms. Foley-Hinnen was only interviewed by attorneys associated with these cases. She never testified at either a deposition or at a hearing. (A1392-93 pp. 227-30) Indeed, Ms. Foley-Hinnen was listed as a witness for GAO in Vargas, and thus if she had ultimately testified it would have been on behalf of GAO, not the plaintiff. (A1310) Further, while Ms. Foley-Hinnen has consistently characterized the Davis case as being "against Brew," the record completely refutes this bare assertion. Mr. Brew was not listed by Ms. Davis as allegedly being responsible for the actions she was challenging, (A1312, 1318, and 1322), and his name is entirely absent from the 44-page decision in that case. See Davis v. GAO, PAB Docket Nos. 00-05 and 00-08 (July 26, 2002) aff'd by full Board (July 11, 2003).[11] Mr. Brew never understood the Davis case as involving him in any way. (A611 pp. 90-91) Ms. Foley-Hinnen cannot rely upon a case that

[11] The Davis decision is a published PAB decision and is available at the PAB's website: www.pab.gao.gov. It is not available either on Westlaw or Lexis and is being included in the appendix at A1327-70.

was totally unrelated to Mr. Brew to show a causal connection between Mr. Brew's placement of her in ASM and her very limited participation in that case.

1. Ms. Foley-Hinnen Never Demonstrated That NRE Required Additional Staff In April 2001.

Ms. Foley-Hinnen claims that she created a triable issue as to pretext because four other individuals joined NRE at various points in time. See Petitioner's Opening Brief, p. 20. Specifically, Ms. Foley-Hinnen identifies Robert Kigerl, who joined NRE in January 2001; Arturo Holguin and Anthony Padilla, who both joined in "October/November 2001"; and Thomas Laetz, who joined in February 2002. Id. pp. 8-9 (citing A840, 847) She argues that this fact shows that GAO's articulated reason for not placing her in NRE is a pretext.

The documentation that Ms. Foley-Hinnen relies upon shows "as best as…could…[be] reconstruct[ed] from available GAO personnel systems, when individuals joined or left the ASM team in Denver." (A840) Importantly, it does not purport to address when these assignment decisions were made (see id.), a fact Ms. Foley-Hinnen acknowledges she does not know. See (A637-38) (Ms. Foley-Hinnen's interrogatory answer identifying the four individuals and acknowledging "[she] do[es] not know the dates Mr. Robinson made the offers."). Staffing levels, of course, change over time. Moreover, it is undisputed that

staffing levels could be exceeded with support from the Managing Director, Mr. Robinson (A1006), and that employees could change teams not just through the preference survey process, but also by gaining agreement from the gaining and losing teams' Managing Directors. (A835)

Thus, the fact that Mr. Kigerl began working in NRE in January 2001 – three months before Mr. Brew decided in April to place Ms. Foley-Hinnen in ASM – in no way undercuts Mr. Brew's statement that NRE did not need additional staff in April while ASM did. Though Mr. Holguin and Mr. Padilla appear to have begun working in NRE in October/November 2001, Ms. Foley-Hinnen only accomplished delaying working in ASM until November because she first had to finish an NRE engagement and then took an extended vacation from September through the end of October. There is no record evidence that the decision to place Mr. Holguin and Mr. Padilla occurred in April 2001 and not at a different point in time, or what the staffing levels were when the decisions for these two were made. That Mr. Laetz began working in NRE nearly a year after Ms. Foley-Hinnen's placement again sheds no light on NRE's staffing levels in April 2001, and in no way undercuts Mr. Brew's assertion that NRE did not require additional staff at that time.

Notably, Ms. Foley-Hinnen omits from her discussion a fifth individual who was transferred to NRE in December 2001: Sandra Davis. (A487) This is the

same Ms. Davis who Ms. Foley-Hinnen has consistently stated was pursuing an action against Messrs. Brew and Solomon and at whose hearing Ms. Foley-Hinnen traveled to Washington, D.C., to testify in November 2001. As Ms. Foley-Hinnen herself noted in her appeal to the full Board below, NRE was Ms. Davis' first choice for team assignment. (A487, A1371-72) This is additional evidence of a lack of retaliatory animus; if Mr. Brew would grant the person purportedly suing him her top choice of NRE, no reasonable factfinder could conclude that he would retaliate against a non-testifying witness like Ms. Foley-Hinnen (about which he had no knowledge).

As the Board Decision correctly recognized, there are no conflicting facts as to NRE's staffing level in April 2001 when Mr. Brew made the final decision to place Ms. Foley-Hinnen in ASM, and there are no conflicting facts as to NRE's staffing levels on August 16, 2001, when Mr. Brew reiterated to Ms. Foley-Hinnen that NRE did not require additional staff. Thus, even if staffing levels were the only criteria Mr. Brew had to consider, there is nothing to contradict the evidence that NRE did not require staff at the only relevant points in time.

Further, Ms. Foley-Hinnen's argument appears to presume that space was the only consideration in making placement decisions. She essentially argues that if she wanted NRE and NRE had room (or could make room), then GAO was obligated to place her there; ipso facto if others were placed in NRE, then GAO's

reasons for placing her in ASM were a pretext. It is undisputed, however, that organizational needs were "paramount" in the process and trumped individual preferences. Mr. Brew had to evaluate which teams needed staff, and where individuals should be placed given their skills and experience and the needs of the teams. It is undisputed that Ms. Foley-Hinnen had the skills and experience to work in ASM, which needed staff. Thus, even if the evidence on which Ms. Foley-Hinnen relies showed that NRE had additional staff assigned to it at the relevant points in time – and as discussed above, it does not – then this would still not be sufficiently probative of pretext because Ms. Foley-Hinnen has made no showing that these individuals had the skills and experience, or that the organization had the need, to place them anywhere but NRE. Summary judgment should be affirmed.[12]

[12] Ms. Foley-Hinnen also claims that she was the "only employee who was involuntarily reassigned," see Petitioner's Opening Brief, p. 12, and that of the "18 staff members who were placed in NRE and ASM" no one but her was placed in a group she did not request. Id. at 9. There is no competent record evidence to support these assertions. For instance, there is no document in the record purporting to show the total results for placements for all teams in the Denver office, for GAO as a whole, or for NRE and ASM as a whole across the agency. Indeed, Mr. Robinson's testimony established that NRE alone involved approximately 200 individuals. (A1004) Ms. Foley-Hinnen's basis for these assertions is her own interrogatory answer (A638-39) in which she makes assertions about where certain individuals were placed that are not based on personal knowledge. Ms. Foley-Hinnen lacks any foundation for testifying on this issue. See Scosche Industries, Inc., v. Visor Gear, Inc., 121 F.3d 675, 682 (Fed. Cir. 1997) (party opposing summary judgment must rely on competent evidence that would be admissible at trial).

2. Mr. Robinson Opposed Ms. Foley-Hinnen's NRE Placement.

As both the Initial Decision and the Board Decision correctly recognized, one additional fact also distinguishes Ms. Foley-Hinnen from other individuals placed in NRE; NRE's Managing Director, Mr. Robinson, opposed Ms. Foley-Hinnen's permanent placement in NRE due to performance problems she had exhibited while working on an NRE assignment. (A327 ¶ 25; A1006; A1014) Mr. Robinson had no knowledge of any of Ms. Foley-Hinnen's protected activities. (A1010)

During her appeal to the PAB as well as on this appeal, Ms. Foley-Hinnen has taken the position that Mr. Robinson had no role in preventing her from being placed in NRE. She argues that this part of GAO's legitimate reasons for not placing her in NRE is false, and thus she was entitled to a trial on the Assignment Claim. See Petitioner's Opening Brief, pp. 16-18. Ms. Foley-Hinnen labels both the Initial Decision's and the Board Decision's crediting of Mr. Robinson's opposition as "a construct of the Board, nothing more." Id. at p. 18.

Yet a review of the record establishes that the notion that Mr. Robinson had no role in this process is, in fact, a new construct of Ms. Foley-Hinnen's, which she created only after she lost summary judgment. From the beginning, Ms. Foley-Hinnen has consistently stated that Mr. Robinson thwarted her placement in ASM. She alleged it in her EEO Complaint. (A916) ("[Mr. Brew]

told me he had just talked to Robinson and NRE was full.") She alleged it in her Amended Petition:

> Unbeknownst to Petitioner, her immediate supervisor on her NRE assignment, Edward Zadjura, had spoken to Robinson and given him negative and false information on Petitioner's work performance, and her grievance of her prior supervisor's rating, and suggested that Robinson not allow Petitioner to remain with NRE. <u>Robinson, relying on Zadjura's comments, refused to allow Petitioner to remain with NRE</u>, even though she had 7 years of leadership experience with exception [sic] ratings in that issue area.

(A132 ¶ 27) (emphasis added). She then swore to this fact during discovery. (A628) ("In approximately August 2001, <u>Robinson refused to allow [Ms. Foley-Hinnen] to continue performing NRE assignments" and told Brew there was "no room" in NRE for her.</u>) (emphasis added).

When GAO moved for summary judgment, it could not simply ignore this allegation. Ms. Foley-Hinnen was clearly alleging that Mr. Robinson retaliated against her and played a role in preventing her assignment to NRE. GAO needed to counter this theory and submitted as undisputed the following facts: "[d]uring the preference survey placement process, Mr. Robinson opposed Petitioner's permanent assignment to NRE's Denver office due to her recent performance on an NRE assignment." (A204)

In her summary judgment opposition, while Ms. Foley-Hinnen labeled this fact as "disputed," she provided no citations to the record showing a legitimate

dispute. (A302 ¶ 13) Then, in her sur-reply opposing summary judgment, Ms. Foley-Hinnen explained the reason for her denial:

> Petitioner denied GAO's assertion because it incorrectly stated that Mr. Robinson opposed Petitioner's assignment to NRE 'due to her recent performance on an NRE assignment.' As Petitioner explained, Robinson had been told that Petitioner's work was not very good; she was not given an opportunity to rebut the comments made to Robinson, and Robinson relied upon the representation made about her performance.

(A1379 ¶ 13) Indeed, Ms. Foley-Hinnen even reaffirmed the allegation that Mr. Robinson thwarted her placement in NRE when she submitted a counter-statement of facts for purposes of opposing summary judgment describing the placement process and stating that "[r]elying on Zadjura's representation, Robinson did not support Petitioner's permanent placement in NRE." (A326-27 ¶¶ 22-25) GAO effectively countered Ms. Foley-Hinnen's claim in part by pointing to undisputed record evidence showing that Mr. Robinson had no knowledge of her protected activities (A1010), and thus could not have retaliated against her.

After she lost summary judgment and appealed to the PAB, however, Ms. Foley-Hinnen injected a new theory into this case that Mr. Robinson had no role in the process at all, arguing for the first time that there was no direct, precise statement showing the exact timing and method by which Mr. Robinson communicated his opposition regarding her potentially joining NRE. (A485-86)

She improperly criticized the PAB member who wrote the Initial Decision for not recognizing these "facts" and instead relying on facts that Ms. Foley-Hinnen herself alleged and repeatedly affirmed. See Twist v. Meese, 854 F.2d 1421, 1425 (D.C. Cir. 1988) ('…the district court is not obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis and determination of what may, or may not, be a genuine issue of material disputed fact.'").

In the present appeal, Ms. Foley-Hinnen reiterates this argument. To support her new theory, she notes that Mr. Robinson testified at his deposition that he did not recall discussing his opinion about her with Mr. Brew and admitted only a possibility of having spoken with Mr. Brew. See Petitioner's Opening Brief, p. 17. She further claims that "GAO's proffer of a false reason for Mr. Brew's decision was a pretext for discrimination" and that the PAB therefore failed to afford her a proper inference. Id.

Ms. Foley-Hinnen cannot fault GAO for addressing an issue that she repeatedly raised and for proving that Mr. Robinson could not have retaliated against her. She cannot run from the record she created in her pleadings and at summary judgment, and then fault the PAB for holding her to her own facts. See, e.g., Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 105-06 (2nd Cir. 2011) (district court properly rejected plaintiff's new allegations directly

contradicted by prior sworn statements and judicial admissions); Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars, 403 F.3d at 466 (courts should not permit parties to avoid summary judgment by asserting facts "materially different from positions taken in the past").

Indeed, even if one were to accept Ms. Foley-Hinnen's new theory and conclude that Mr. Robinson did not communicate his opposition to Ms. Foley-Hinnen's placement in NRE – and, as discussed below, the record does not support this theory – at most this issue becomes an irrelevancy. See Reeves, 530 U.S. at 148 (acknowledging that there are instances where, even when a plaintiff has set forth sufficient evidence to reject the defendant's explanation, an employer may still be entitled to judgment as a matter of law if the plaintiff has created only a "weak" issue of fact and there is independent evidence that no discrimination occurred). Ms. Foley-Hinnen has not shown that Mr. Robinson's statement that he did not want Ms. Foley-Hinnen in NRE was false and therefore indicative of pretext. Nor would this indicate that Mr. Brew's real reason for assigning Ms. Foley-Hinnen to ASM was retaliation. It does nothing to call into question Mr. Brew's explanation that ASM needed staff, while NRE did not.

In any event, the record clearly demonstrates that Mr. Robinson opposed Ms. Foley-Hinnen's NRE placement during the placement process. GAO acknowledges that Ms. Foley-Hinnen is correct that there is no clear, precise

testimony as to the exact method by which Mr. Robinson communicated his opposition to Ms. Foley-Hinnen's placement in NRE. However, it is beyond dispute that he did, in fact, communicate this fact.

When this case was at the EEO complaint stage, Mr. Robinson provided a sworn statement to the investigator and was directly asked about his role in the placement process. Namely, question 21 in Mr. Robinson's affidavit specifically referenced the preference survey and asked what information he had about Mr. Brew's reorganization team "fail[ing] to honor [Ms. Foley-Hinnen's] staffing preference in the reorganization." (A1014) He stated:

> [b]ased on the performance she demonstrated and the surplus of staff already on NRE's Denver team I recall not supporting her permanent assignment to NRE.

(A1014 at Question and Answer 21) <u>See</u> <u>also</u> (A1013 at Question and Answer 18) ("I recall not supporting her permanent placement in NRE's Denver team especially since I believe the team was already above its authorized level of Denver staff at the time."). If Mr. Robinson had no role in the placement process, his answer to a question specifically asking him about Mr. Brew and the placement process would have been to state that he had no role. Instead, as the Board

Decision accurately noted, he submitted a sworn statement that he opposed her placement given NRE Denver's staffing levels and her poor work performance.[13]

Mr. Robinson's deposition – given nearly ten years later – does not conflict with his sworn statement. While Ms. Foley-Hinnen stresses Mr. Robinson's deposition testimony that he does not recall having a conversation with Mr. Brew about her placement, she omits significant context. Specifically, she omits Mr. Robinson's testimony that Mr. Brew had numerous different roles at GAO over the years, and given the passage of time, Mr. Robinson could no longer recall at the deposition whether Mr. Brew was in charge of the placement process during the relevant time period. (A1005 p. 26, Lines 1-7) Moreover, Mr. Robinson further indicated that, while he could no longer recall a specific conversation with Mr. Brew, it was possible that they did have one.[14] (A1006 p. 26, Lines 10-14)

Ms. Foley-Hinnen did not create a record in any way conflicting Mr. Robinson's clear sworn statements that he communicated his objections during the placement process. Nor can Ms. Foley-Hinnen disavow her own sworn

[13] As previously noted, contemporaneous documentation confirms that Managing Directors, like Mr. Robinson, had a role in the placement process and received the opportunity to provide input into placement decisions. (A1301)

[14] Notably, Ms. Foley-Hinnen only asked Mr. Robinson at deposition about "discussions" with Mr. Brew. (A1005). Mr. Brew, however, did not work alone and had a staff that included Jackie McDaniel, among others. Counsel did not ask about conversations with Ms. McDaniel or other staff members involved in the placement process.

interrogatory answer asserting that "[i]n approximately August 2001, Robinson refused to allow [her] to continue performing NRE assignments." (A628) The Board Decision properly found that Mr. Robinson's opposition constitutes an additional legitimate, non-retaliatory reason for Ms. Foley-Hinnen's placement in ASM. (A31-33)

3. No Record Evidence Rebuts GAO's Assertion That No "Civilian" ASM Work Was Available.

Ms. Foley-Hinnen's last argument concerns her assignment to do "military" rather than "civilian" work in ASM. Specifically, Ms. Foley-Hinnen contends that "neither Mr. Brew nor anyone else at GAO offered any evidence to support Mr. Solomon's assertion" that no civilian work was available. Petitioner's Opening Brief, p. 21. She claims that the Board Decision thus failed to draw all reasonable inferences in her favor. Id. at pp. 21-22.

Ms. Foley-Hinnen is wrong for several reasons. As an initial matter – and as the Board Decision accurately noted – Ms. Foley-Hinnen did not raise this argument in her brief on appeal to the Board. (A39 at n. 32) See also, (A451-96) (failing to assert argument). The Board Decision properly found this issue to be waived and abandoned. See Smithkline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1320 (Fed. Cir. 2006) (issues not raised in an opening brief on appeal are waived).

Second, Ms. Foley-Hinnen attempts to stand the burden shifting framework of McDonnell Douglas on its head by claiming that she was entitled to a trial because GAO never "offered any evidence to support Mr. Solomon's assertion" that only "military" work was available. Under McDonnell Douglas, however, GAO only had to articulate a legitimate reason for assigning her military work, which it did (i.e., no civilian work was available). Ms. Foley-Hinnen, not GAO, had the burden to identify record evidence showing that GAO's reasons were not true. She has failed to do so. Summary judgment on the Assignment Claim should thus be affirmed.

## II. The PAB Properly Granted Summary Judgment On The Detail Claim Because Ms. Foley-Hinnen Failed To Establish A Prima Facie Case, And Failed To Create A Triable Factual Issue Showing That GAO's Legitimate Reasons Were Pretext.

Ms. Foley-Hinnen wanted to work for a year at the State Department and asked GAO to detail her to work there. Comptroller General Walker, as the head of GAO, leader of the Executive Committee, and ultimate decision-maker for the request, opposed executive branch details due to the potential conflict of interest such details posed to GAO given that a detailed GAO employee might become involved in executive branch or policymaking activities in connection with matters that GAO might be asked to do work on in the future. (A1205 p. 20; A810 p. 41) Moreover, GAO had recently been downsized and had cut back significantly even

on details to the legislative branch, and Mr. Walker determined that GAO's appropriated funds should be used to support its own mission. (A1205 p. 20; A809 pp. 35-36) Mr. Walker had never before authorized an executive branch detail, and would not authorize a detail for Ms. Foley-Hinnen, just as he had recently denied several similar requests. (A1026) Ms. Foley-Hinnen has never identified any other employee that GAO permitted to serve on a detail at an executive branch agency.

Nonetheless, Mr. Walker wanted to be sure that Ms. Foley-Hinnen could do the State Department work she wanted and, unsolicited, came up with an alternative solution to permit her to work there. Rather than working at State as a GAO detailee, Ms. Foley-Hinnen could take LWOP for a year and accept a direct (paid) federal appointment with the State Department, which would help minimize independence concerns and avoid "a troubling precedent" for GAO. (A1026) Ms. Foley-Hinnen agreed to this alternative and accepted a temporary paid appointment with the State Department.

Ms. Foley-Hinnen has never disputed that Comptroller General Walker was the ultimate decision-maker for her detail request, and she has testified under oath that she does <u>not</u> contend that Mr. Walker retaliated against her:

> Q. So am I correct then that you are not contending that Dave Walker said or did anything to you that you believe was motivated in whole or in part by your protected activity?

> A I have no evidence that Dave Walker retaliated against me for protected activity. Whether it happened, I don't have the evidence.

(A1390 p. 80, Lines 15-21) (emphasis added). Additionally, Ms. Foley-Hinnen has provided sworn interrogatory answers that do not identify Mr. Walker as an individual who retaliated against her. (A621 at Interrogatory 2 and Response 2; A631 at Interrogatory 4 and Response 4) (both failing to name Mr. Walker as an individual who retaliated against her for protected activity or contributed to the allegedly hostile environment). She did not name Mr. Walker as a retaliator in her Amended Petition. (A122) (not listing Mr. Walker among the responsible parties "believed to be responsible for the actions at issue here"). She did not name Mr. Walker in her EEO Complaint. See (A909-11) (naming the GAO managers responsible for retaliation but omitting Mr. Walker).

In short, there is no issue fit for trial. Ms. Foley-Hinnen has admitted at every conceivable opportunity that she cannot demonstrate a nexus because she does not contend that the decision-maker was motivated by retaliatory animus. (A1390; A122; A621, 31; A909-11) To have a trial over a Title VII retaliation claim, "[t]here still must be action that is [retaliatory] within the meaning of Title VII," see Haddon, at 1363, since Title VII only protects against actions motivated

by retaliatory animus. GAO was plainly entitled to summary judgment on the Detail Claim.[15]

**A. The Executive Committee Lacked Knowledge of Protected Activity.**

Even putting aside the fact that Ms. Foley-Hinnen does not contend that Mr. Walker retaliated against her, summary judgment should be affirmed for the additional reason that Ms. Foley-Hinnen failed to establish that Mr. Walker or any other member of the Executive Committee knew about her protected activities prior to denying the detail. GAO's Executive Committee consisted of Mr. Walker, Mr. Dodaro, Ms. Harper, and Mr. Gamboa. Mr. Walker had no knowledge of Ms. Foley-Hinnen's alleged protected activities, (A1307), nor did he consult with Mr. Brew or Mr. Solomon (the two primary "retaliators" in Ms. Foley-Hinnen's view) regarding the detail request. (A1207 p. 27, Lines 13-17) Similarly, Mr. Dodaro had no knowledge of Ms. Foley-Hinnen's alleged protected activities, (A810 pp. 38-39), nor did he consult with Mr. Brew or Mr. Solomon about the detail. (A807 pp. 27-28) Similarly, Ms. Foley-Hinnen has never identified any

[15] Nor can Ms. Foley-Hinnen cite to any record evidence showing that Mr. Walker was improperly influenced to deny the detail by an individual with a retaliatory motive. In fact, Ms. Foley-Hinnen has testified that her Detail Claim rests on her own unsupported speculation that Mr. Brew intervened at the last minute and sabotaged her detail. (A1405 pp. 608-09). No record evidence supports Ms. Foley-Hinnen's supposition as Mr. Walker and Mr. Dodaro both deny that they consulted with Mr. Brew regarding the detail. (A1207 p. 27; A807 p. 27)

communications to Ms. Harper or Mr. Gamboa showing that they had knowledge of her protected activities.

Nonetheless, Ms. Foley-Hinnen argues that sufficient record evidence exists to show that the Executive Committee knew about her protected activity. Specifically, Ms. Foley-Hinnen argues that she told Mr. Hoskins in November 2001 that she wanted the detail because she did not want to work in ASM due to her prior experience with that group (even though ASM did not exist before the reorganization in 2000). See Petitioner's Opening Brief, p. 33. She then claims that "Mr. Hoskins admitted that he most likely told the Executive Committee…about [her] reasons for wanting the detail: because she did not want to work on the weapons systems team of ASM and because she had experienced a hostile work environment with that same group of coworkers." Id. She further claims that Mr. Dodaro corroborated this statement by testifying in his deposition that Mr. Hoskins gave the factual background and his perspective on the detail request. Id. at pp. 33-34.

As the Board correctly determined, see (A42-44), Ms. Foley-Hinnen's argument on this point relies solely on speculative assumptions extrapolated from out-of-context statements that are squarely contradicted by direct testimony. Though Ms. Foley-Hinnen neglects to provide in her brief any citation to record evidence supporting her characterization of Mr. Hoskins' communication with the

Executive Committee, she made the same argument below (see A488-89), and thus GAO is able to identify for the Court the alleged "evidence" on which Ms. Foley-Hinnen relies. Ms. Foley-Hinnen's basis for her assertion is a single question and answer during Mr. Hoskins' deposition:

> Q. Do you recall if you ever mentioned to Mr. Walker that it was a reimbursable detail?
>
> A. I'm almost certain that whatever information I had about Ms. Hinnen's request, I would have shared with the executive committee.

(A1412 at p. 25, Lines 10-14) Thus, Mr. Hoskins was merely asked whether he mentioned if the detail was reimbursable, and his response simply affirms that he likely did. The question had nothing to do with Ms. Foley-Hinnen's protected activity. Importantly, at no time in the deposition was Mr. Hoskins asked about whether Ms. Foley-Hinnen had conversations about her protected activities with him such that it might be reasonable to assume that his answer above might include such information. (See generally, A1406-1421) Mr. Hoskins' testimony in no way conveys that he disclosed Ms. Foley-Hinnen's protected activity to Mr. Walker.

Ms. Foley-Hinnen's assertions about the meaning of Mr. Dodaro's testimony are similarly unsupportable. While Mr. Dodaro did state generally that Mr. Hoskins shared background information about her detail request, (A808 p. 31, Line 17-p. 32, Line 6), Mr. Dodaro repeatedly denied that he had any knowledge of Ms. Foley-Hinnen's protected activities when asked directly about this topic:

Q. …Did there come a time when you were aware that Mr. Brew had discrimination and/or retaliation claims pending against him?

A. I don't recall that.

Q. How about Mr. Solomon? Were you aware of that with Mr. Solomon?

A. I don't recall that either.

Q. Were you aware that Ms. Hinnen had participated in some of those cases?

A. No. I mean, I don't recall that or being aware of that.

Q. Do you recall Ms. Hinnen ever expressing to you the reasons why she sought the detail?

A. I don't recall that.

Q. Let me, again, try to refresh your recollection. Do you recall her alleging that Mr. Brew and Solomon involuntarily removed her from NRE and assigned her to ASM against her will?

A. I don't recall that.

Q. Did you ever hear – again, outside of communications with GAO's attorneys – that Ms. Hinnen believed her reassignment to ASM was retaliation for engaging in protected activity?

A. I don't recall that.

(A810 p. 38, Line 12 – p. 39, Line 14) Like Mr. Dodaro, Mr. Walker has specifically disclaimed knowledge of Ms. Foley-Hinnen's alleged protected activities. (A1307)

Ms. Foley-Hinnen's assertion that Mr. Hoskins' and Mr. Dodaro's general statements in response to questions unrelated to the disclosure of protected activity create a triable issue of fact is thus based on pure extrapolation. She is not asking for a reasonable inference, but instead an inference based purely on speculation and flatly contradicted by direct statements from both Messrs. Walker and Dodaro that they had no knowledge of Ms. Foley-Hinnen's protected activity. It in no way supports a reversal. See, e.g., Talavera v. Shah, 638 F.3d 303, 313 (D.C. Cir. 2011) (affirming summary judgment to employer; plaintiff did not create triable issue of fact when she "offered only evidence from which a reasonable jury would have had to speculate" that deciding official knew of protected activity); Test v. Holder, 614 F. Supp. 2d 73, 82 (D.D.C. 2009) (plaintiff failed to establish nexus on retaliation claim because when confronted with unequivocal statements denying knowledge "'mere speculation'…fails to create a genuine issue of material fact to avoid summary judgment.") (quoting Esquibel v. Lahood, 604 F. Supp. 2d 133, 137 (D.D.C. 2009).

**B. GAO's Legitimate Reasons Have Remained Unchanged.**

Ms. Foley-Hinnen next argues that the PAB did not grant all reasonable inferences in her favor by asserting that GAO's explanation for denying her detail request has changed over time. See Petitioner's Opening Brief, p. 30. Ms. Foley-Hinnen cites to communications with Comptroller General Walker in January 2002, during which Mr. Walker stated that GAO has had a "standing policy position for some time" of not approving executive branch details. Id. at p. 27. Ms. Foley-Hinnen then claims that Mr. Walker later testified inconsistently during discovery by stating that GAO did not have a policy for details to the executive branch prior to Ms. Foley-Hinnen's request, and only created that policy when it came time to decide her request. Id. at pp. 27-30.

Both the Initial Decision and the Board Decision correctly recognized that this argument relies on semantics and not any actual inconsistency. Indeed, Ms. Foley-Hinnen attempts to create the appearance of inconsistency by selectively citing to only certain portions of the record. During Mr. Walker's deposition, Ms. Foley-Hinnen's counsel directly asked Mr. Walker about the perceived inconsistency in his statements on the issue, and he provided clarification:

> Q. I'm particularly curious about the first sentence of the second full paragraph that begins, "As we discussed by phone yesterday, we have a standing policy position for some time that we do not do details to the executive branch for a variety of reasons."

A. Yes.

Q. I thought I heard you say earlier in our conversation that the executive committee was deliberating whether or not to have such a policy as a result of Ms. Hinnen's bringing forth her detail request. Did I misunderstand your testimony?

A. You didn't misunderstand. We did not have a written policy. I guess, looking at this language, it would've been better if I said a standing practice rather than policy because in reality, we didn't have a written policy. You know, our practice was that we didn't do it, but we didn't have a written policy. Ms. Hinnen's issue – or her request, if you will – ultimately brought it to the executive committee, which then had to set a policy. So we had a practice, not a written policy.

Q. Before you left GAO, you also didn't have a written policy regarding details to executive branch agencies; is that true?

A. We modified our written policy to make it clear that the executive committee must approve detailed GAO employees to other agencies, which would include executive branch agencies, if there were any such requests.

(A1208 p. 30, Line 7-p. 31, Line 14) (emphasis added).

As this testimony reveals, the "inconsistency" claimed by Ms. Foley-Hinnen is nothing of the sort. It is merely an example of Mr. Walker providing at his deposition a more precise and nuanced explanation for how GAO handled executive branch details during his tenure than he provided in his original email to Ms. Foley-Hinnen. Ms. Foley-Hinnen cannot wordsmith a contradiction that does

not exist. Hairston v. Vance-Cooks, 773 F.3d 266, 273 (D.C. Cir. 2014) (providing more detailed information once litigation begins does not create a genuine issue of material fact); Crockett v. Abraham, 284 F.3d 131, 134 (D.C. Cir. 2002) (providing more detailed information later, that augments and elaborates upon prior statements, does not create a genuine issue of material fact).

Whether labeled as a policy or a standing practice, Mr. Walker has consistently stated that he was concerned with independence issues. His reasons for denying Ms. Foley-Hinnen's request have never changed. He never wavered from this position, and Ms. Foley-Hinnen's semantic arguments provide no basis for reversing summary judgment for GAO.

**C. Mr. Walker Approved No Other Executive Branch Details.**

Both Mr. Walker and Mr. Dodaro testified that GAO approved no details to the executive branch during Mr. Walker's tenure at GAO, which began in 1998. (A1205 p. 20, A1207 p. 27; A809) Moreover, Ms. Foley-Hinnen has failed to provide any probative evidence – such as personnel records, testimony from employees who served in executive branch details or testimony from officials who approved such details – showing that Mr. Walker and the Executive Committee permitted other employees to accept executive branch details.

Nonetheless, Ms. Foley-Hinnen argues on appeal that Mr. Hoskins "testified about the Agency's history of approving details prior to [her] request" and

characterizes his testimony as establishing that GAO approved details to the Department of Defense, an executive branch agency. See Petitioner's Opening Brief, p. 31. Ms. Foley-Hinnen argues that the Board erred in "refusing to credit Mr. Hoskins' professed historical knowledge." Id.

To support her position, Ms. Foley-Hinnen relies upon the following question and Mr. Hoskins' answer thereto:

> Q. Had you dealt with any other types of details, say internal details, while you were at GAO and prior to Ms. Hinnen's request?
>
> A. I don't remember, but I know there was some details made overseas and with, I believe, the Department of Defense.

(A1411 p. 21, Lines 9-14).

Yet a close reading of this testimony, and, importantly, the context immediately preceding this single question and answer, reveals that Mr. Hoskins' response does not support Ms. Foley-Hinnen's proffered conclusions. First, immediately prior to being asked this question, counsel asked Mr. Hoskins about how he knew what procedures to follow in handling Ms. Foley-Hinnen's external detail request. (A1411 p. 19, Line 12- p. 20, Line 4). Mr. Hoskins responded that he had "never gotten one of these before," that Ms. Foley-Hinnen's "was the only time…while [he] was there" that GAO received such a request, and that he therefore had to figure out the procedures through discussions with the Executive

Committee because there "hadn't [been] a request for a detail to a federal agency before." (A1411 p. 20, Line 5-p. 21, Line 8) Thus, Mr. Hoskins clearly testified that Ms. Foley-Hinnen's external detail request was a singular and unique experience for him while he was at GAO.

In the very next question, Ms. Foley-Hinnen's counsel immediately sought to contrast this experience by asking "[had] you dealt with any <u>other types of details</u>, say <u>internal details</u>, while you were at GAO and prior to Ms. Hinnen's request?" (A1411 p. 21, Lines 9-11) (emphasis added). Only then, in response to a question that on its face distinguished itself from external details to other agencies, did Mr. Hoskins somewhat cryptically respond that he "believe[d]" there were Department of Defense details. (A1411 p. 21, Lines 12-14)

Both the question and Mr. Hoskins' answer patently and clearly involve types of detail requests different in kind from the one Ms. Foley-Hinnen submitted. Notably, Ms. Foley-Hinnen's counsel asked no follow-up question seeking further detail as to what Mr. Hoskins meant when he referred to the Department of Defense. (A1411-12) Nor did Ms. Foley-Hinnen's counsel ask, or establish in any way, that the question about "other types of…internal details" was unclear to Mr. Hoskins, that he misunderstood it, or that he was actually referring to external details such as Ms. Foley-Hinnen's even though he had clearly and emphatically

testified only moments before that he knew of no other detail requests to executive branch agencies. (A1411)

As such, Ms. Foley-Hinnen is not asking for a "reasonable inference" based on Mr. Hoskins' testimony. Instead, she is asking the Court to assume either that the question her counsel asked was different from the one actually posed, or that Mr. Hoskins' understood the question to mean something entirely different from the one posed. There is nothing in the record to support either of these conclusions. The Board correctly concluded that Mr. Hoskins' testimony on this point was insufficient to create a triable factual issue, and summary judgment should be affirmed.

**D. Permitting Ms. Foley-Hinnen To Work At The State Department Evidences A Lack Of Retaliatory Animus.**

Ms. Foley-Hinnen also argues that, contrary to GAO's purported concerns over a conflict of interest, it nonetheless permitted her to work for the State Department while on LWOP. Ms. Foley-Hinnen claims that she was entitled to an inference of retaliation because this shows that GAO was not truly concerned about a conflict of interest. See Petitioner's Opening Brief, p. 32.

This argument represents mere disagreement with GAO's business judgment. In Comptroller General Walker's view, there was a fundamental difference between, on the one hand, a GAO employee serving under a GAO appointment being detailed to the State Department (an agency GAO audits), and

on the other hand, an individual who takes leave from her job with GAO, obtains a separate federal appointment from the State Department, and then works directly for the State Department for pay pursuant to that appointment. Ms. Foley-Hinnen may not believe that this is a particularly important distinction, but it cannot be disputed that this distinction was important to GAO. Hairston, 773 F.3d at 273 (the key question is not the correctness of the reasons offered by the employer, but whether the employer honestly believes them). Courts do not make inferences of discrimination or retaliation by second-guessing the business judgment of an employer, even if they disagree with its decisions. See, e.g., Stewart v. Ashcroft, 352 F.3d 422, 429 (D.C. Cir. 2003); Dale v. Chicago Tribune Co., 797 F.2d 458, 464-65 (7th Cir. 1986).

Second, it is simply nonsensical that Ms. Foley-Hinnen views the fact that GAO actually permitted her to work at the State Department as evidence of a retaliatory motive. Mr. Walker and the Executive Committee went out of their way to help Ms. Foley-Hinnen obtain the job she wanted by volunteering the idea of LWOP so she could take a paid direct appointment with the State Department. GAO employees do not have a free-standing right to perform work at other agencies while being employed by GAO, and GAO had no obligation to assist Ms. Foley-Hinnen obtain this position. If GAO were truly motivated to retaliate, it could have simply told her that she could not work for the State Department in any

capacity. As both the Initial Decision and Board Decision correctly recognized, this was an act of assistance that, far from supporting an inference of retaliation, thoroughly refutes such an inference and further demonstrates the lack of a triable issue over nexus. The Court should affirm summary judgment in favor of GAO on the Detail Claim.

III. Ms. Foley-Hinnen Was Not Denied Due Process.

In the Initial Decision, the PAB member assigned to hear the case granted summary judgment to GAO on the Detail and Assignment Claims. On appeal, the four remaining PAB members considered Ms. Foley-Hinnen's arguments, and two of them agreed that summary judgment should be granted in favor of GAO, with two members filing a dissenting opinion. Thus, three of five PAB members have ruled in favor of GAO.

The PAB regulations state, in pertinent part, that "a simple majority of the Board shall constitute a quorum and a majority of a quorum may act for the Board." 4 C.F.R. § 27.1 As explained in the Board Decision, "[a]s the Board is composed of five members, one of whom wrote the underlying Summary Judgment Decision, the affirmance of that Decision by two additional members constitutes a majority for purposes of [Ms. Foley-Hinnen's appeal to the Board]." (App. 24, n. 18).

In her appeal, Ms. Foley-Hinnen argues that the PAB denied her due process because the PAB member who wrote the Initial Decision should have played a formal role in the review of his own summary judgment opinion. Though she acknowledges that she has no precedent to support her position, she claims that section 27.1 does not clearly address this issue and the Board was not empowered to act without all five members joining the Board Decision.

Though labeled as a due process issue, in substance Ms. Foley-Hinnen argues that the PAB misapplied its own ambiguous regulation. It is well-established, however, that an agency's interpretation of its own regulation is entitled to a high level of deference. See, e.g., Abbott Laboratories v. United States, 573 F.3d 1327, 1330 (Fed. Cir. 2009). Indeed, an agency's interpretation of its own regulation is entitled to even broader deference than to its construction of a statute, "because in the latter case the agency is addressing Congress's intentions, while in the former it is addressing its own." Id. (quoting Cathedral Candle Co. v. U.S. Int'l Trade Comm'n, 400 F.3d 1352, 1363–64 (Fed.Cir.2005)). Thus, courts must defer to an agency's interpretation of an ambiguous regulation so long as its "interpretation is neither plainly erroneous nor inconsistent with the regulation." Gose v. U.S. Postal Serv., 451 F.3d 831 (Fed. Cir. 2006) (citing Gonzales v. Oregon, 546 U.S. 243 (2006)).

The Board's interpretation of section 27.1 is neither plainly erroneous nor inconsistent with the regulation. Section 27.1 essentially states that a majority of the Board is required for the Board to act. That plainly was the case for Ms. Foley-Hinnen because three of five members have evaluated her case and found that no reasonable factfinder could rule in her favor.

The Board's treatment of this issue is consistent with Merit Systems Protection Board (MSPB) treatment of split decisions on appeal. At the MSPB, an administrative judge's decision becomes the final decision of the MSPB when there is a split on appeal. See 5 C.F.R. § 1200.3(b) ("When…the Board members are unable to decide any case by majority vote, the decision, recommendation or order under review shall be deemed the final decision or order of the Board."). The Court should thus affirm the PAB's award of summary judgment to GAO.

CONCLUSION

For the reasons stated above, GAO respectfully requests that the Court affirm summary judgment in its favor in its entirety.

Respectfully submitted,

/s/

Lincoln Schroth
Senior Attorney
U.S. Government Accountability Office
Office of the General Counsel
441 G Street, N.W. – Room 7838
Washington, D.C. 20548
(202) 512-6074

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, I certify that this brief contains 13,670 words as calculated by the word processing system used to prepare this brief.

/s/
Lincoln Schroth
Attorney for Respondent U.S.
Government Accountability Office
November 19, 2015

# CERTIFICATE OF SERVICE

I, Lincoln Schroth, hereby certify under penalty of perjury that on this 19th day of November 2015, I filed and served a copy of the foregoing Brief of Respondent U.S. Government Accountability Office in the matter of Foley-Hinnen v. GAO, No. 15-6002, on all parties by operation of the Court's electronic filing system.

/s/
Lincoln Schroth